IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

THE ESTATE OF ROSE SKY TOLBERT,
by and through Personal Representatives,
PHILLIP TOLBERT AND CHARLENE SUINA,
and PHILLIP TOLBERT AND CHARLENE
SUINA, Individually,

          Plaintiffs,

vs.                                         Cause No.

GALLUP INDIAN MEDICAL CENTER,
DEPARTMENT OF HEALTH AND HUMAN
SERVICES, THE UNITED STATES OF
AMERICA, GIENIA LYNCH, M.D., JANET M.
GREENHOLZ, M.D., SAFIA RUBAII, M.D.,
GILBERTO ALVAREZ-COLON, M.D., ROBERT
LEACH, D.O., TERENCE H. HAMEL, M.D. and
REGINA WILLIAMS, R.N.,

          Defendant.

**COMPLAINT TO RECOVER DAMAGES
FOR WRONGFUL DEATH AND LOSS OF CONSORTIUM
ARISING FROM MEDICAL NEGLIGENCE**

    Plaintiffs the Estate of Rose Sky Tolbert, by and through Court-Appointed Personal Representatives, Phillip Tolbert and Charlene Suina, and Phillip Tolbert and Charlene Suina who are baby Rose's parents, Individually, by and through their attorneys, Curtis & Co. Law Firm, hereby state as their claims against Defendants:

    1.    Baby Rose Sky Tolbert wrongfully died only a few hours after her birth as a result of multiple acts of negligence of the U.S.A. by and through the Indian Health Service Hospital, Gallup Indian Medical Center, and their health care providers on September 10, 2017.

    2.    Baby Rose's mother, Charlene Suina comes to Gallup Indian Medical Center ("GIMC") at approximately 5:30 p.m. on September 9, 2017, at 35 weeks pregnant because, after

giving birth to six children, she recognized the pain she was feeling with the baby's movement was abnormal. Her heart rate was 215 beats per minute and the baby's heart rate was 180 beats per minute. Both were abnormal. Ms. Suina knew she had gestational diabetes and a positive anti-kell antibody, as was also known by GIMC. Ms. Suina's heart rate is not recorded in the medical records provided to the Plaintiffs, although Baby Rose's tachycardia is recorded.

3. GIMC Obstetrician Dr. Gienia Lynch chose a drug screen to diagnose the reason for Ms. Suina and her baby's high heart rates. All drug tests came back negative. Ms. Suina had a prior history of c-section and placental abruption, which was known by Dr. Lynch. Dr. Lynch made a choice not to transfer Ms. Suina for the obvious required c-section of her premature 35-week old baby regardless of the lack of any neonatal intensive care unit at GIMC, or any qualified specialized neonatal staff to care for a premature baby.

4. At 7:20 p.m., Ms. Suina was on the telephone updating her significant other and baby's father, Phillip Tolbert, who as a truck driver was driving a route out of state. During the call the parents discussed Charlene and the baby's current high heart rates. Dr. Lynch came into the room at the time of the call and told the parents that an emergent cesarean section would need to be consented to and Ms. Suina consented.

5. Ms. Suina expecting the c-section to occur became very distressed at the lack of attention to her or the baby. Dr. Lynch did not see Ms. Suina again until after 10:00 p.m. The records show Dr. Lynch did not activate the c-section team until after 10:09 p.m. Ms. Suina was not taken into the operating room for over another hour at 11:14 p.m., and baby Rose was not delivered until 11:43 p.m., over six hours after arrival.

6. GIMC was so unprepared for an emergency c-section that they knew would happen for four hours that there was no assistant surgeon available for the surgery and a nurse

midwife was forced to attend as an assistant surgeon. Assistants to surgery have a point to surgery, to keep the patients safe, something unavailable at Charlene Suina's surgery.

7. Ms. Suina should have been transferred to a higher level of care for immediate c-section given her history, signs and symptoms, and the obvious need for a neonatal intensive care unit for the impending delivery of a pre-mature baby of a mother with gestational diabetes which carries an additional risk to the baby of lung immaturity, on top of the expected lung immaturity of simply being prematurely born.

8. It was a breach of the standard of care for Dr. Lynch and all other health care providers involved in the pre-birth care of Ms. Suina and baby Rose to fail to transfer them to a higher level of care, where a safe and appropriate immediate delivery care and a neonatal intensive care unit were available.

9. Dr. Lynch was incapable of making any diagnosis of the cause of the abnormal condition of her patient Ms. Suina.

10. The physicians, nurses and other GIMC staff assessed, cared for, diagnosed and treated baby Rose as if she was a full-term baby, rather than the pre-term (premature) baby of a mother who had gestational diabetes and other complications in her pregnancy.

11. The pediatrician present at baby Rose's birth, Dr. Janet M. Greenholz, M.D., should have recognized the obvious need for neonatal care of baby Rose following her birth, given her immaturity and her mother's conditions present at delivery.

12. Dr. Greenholz completely failed to provide the level of care necessary to keep pre-maturely born baby Rose safe. Dr. Greenholz did basic post-delivery checks that while partially appropriate for a full-term baby, were wholly inappropriate for a pre-mature baby of a mother with gestational diabetes and other pregnancy complications necessitating emergency c-section.

Even the baby's cord blood sent to the lab following birth for analysis was never analyzed. Proper orders for lab and other studies and orders to the nurses for intensive monitoring and care for her patient were not made by Dr. Greenholz.  Dr. Greenholz should know the level of care available at GIMC and should have transferred the baby to a higher level of care for neonatal intensive unit care and treatment if she was unable to provide the needed specialization to baby Rose, given her limitation as a general pediatrician.  Dr. Greenholz's failures were a breach of the standard of care which contributed to cause baby Rose's wrongful death.

      13. The nursing staff at GIMC were either not properly trained to manage the medical care of a premature baby, such as baby Rose that requires neonatal intensive care unit level care and/or were negligent in the care of pre-mature baby Rose. Additionally, given their failure in training and/or in the provision of medical care to baby Rose, they contributed to cause her wrongful death.

      14. Baby Rose was treated in every way as a normal term baby although she was not by the nursing and other health care staff at GIMC.  Regina Williams, RN took charge of baby Rose.  Nurse Williams and the other health care staff at GIMC failed to provide the required level of neonatal nursing care to baby Rose.  Nurse Williams failed to advocate for the appropriate testing, studies, medication, intensive monitoring or doctor's orders necessary for baby Rose's safety.  Nurse Williams instead treated baby Rose in all ways as if she was a normal full-term baby, rather than the premature baby of a mother with gestational diabetes and other pregnancy complications.  No suctioning of amniotic fluid was done from baby Rose's belly, regardless of the failure of the delivery to compress and expel the amniotic fluid from her system. Failure by nurse Williams and the other attendant nurses and health care staff to the

needs of baby Rose was a breach of the standard of care and contributed to cause her wrongful death.

15. Instead, baby Rose was handed to her grandmother in a room to hold.

16. There are no oxygen saturations listed for baby Rose in her medical record.

17. There are no arterial blood gas readings for baby Rose in her medical record.

18. There were no medications given to baby Rose prior to the code that was to ensue.

19. There were no medical interventions of any kind taken for baby Rose until her grandmother became terrified that suddenly she was not breathing.

20. As her baby was not being attended to by the GIMC staff, Ms. Suina was undergoing surgery with Dr. Lynch who proceeded to do more than the tubal ligation consented to by Ms. Suina. Dr. Lynch destroyed the fallopian tubes during the surgery, rather than "tying her tubes" as was the understood surgery. This extension of the surgery meant that the surgery would never be reversible. There was no consent for the extended and irreversible surgery. The lack of consent and the extension of the surgery by Dr. Lynch was a breach in the standard of care that has caused Phillip Tolbert and Charlene Suina incapable of ever having a child together, now that baby Rose has died.

21. Baby Rose's lungs were expectedly not fully matured given her pre-term birth to a mother with gestational diabetes and other complications of pregnancy. Failure to decompress her stomach of its unexpelled amniotic fluid contents predictably resulted in baby Rose aspirating amniotic fluid and going into respiratory distress at approximately 1:40 a.m., just short of two hours after her birth.

22. Predictably because of the lacsidasical attitude of the GIMC staff, when the baby's respirations decreased were noticed initially they were ignored. And without the required

intensive monitoring care needed as a pre-mature baby of her mother, baby Rose did not receive the immediate care needed for her respiratory distress.

23. This situation only worsened after the code was eventually called.

24. There is no code sheet for the code conducted by GIMC physicians, nurses and staff. This is a violation of federal regulation, policy, and the standard of care. This is in fact such a violation as to amount to spoliation of evidence entitling Plaintiffs to a finding of liability, causation and damage against Defendants involved in the code.

25. It is referenced that Defendant Safia Rubaii, M.D., an Emergency Physician, initiated an umbilical venous catheterization during the code event, but never checked the catheter's placement despite having an x-ray to review. The x-ray shows the catheter was wrongly placed into the artery oft he umbilical cord, such that all medication delivered into the catheter traveled to the wrong part of her body, and she did not receive the benefit of the medication given during the code, contributing to cause the wrongful death of baby Rose.

26. During the code event, Defendant Robert Leach, D.O., attempted to place an endotracheal tube (hereafter, "ETT") into baby Rose, which "came out."

27. A second attempt was made to place an ETT, but this time Defendant Dr. Leach placed the ETT in baby Rose's esophagus and not in the trachea as the chest x-ray taken demonstrates.

28. Instead of extubating the ETT, which is required to remove it from the esophagus so it may be properly placed into the trachea, the ETT was simply pulled back by Gilberto Alvarez-Colon, M.D., a pediatrician also participating in the code. Simply pulling the ETT back will result in placing it higher in the esophagus, continuing to insufflate the stomach and not the lungs.

29. The records state that Defendant Dr. Leach then left the unit to view the chest x-rays, leaving baby Rose Tolbert with the ETT misplaced. The baby's x-rays should be viewable in any emergency room, and a physician leading the code and leaving the baby to view an x-ray would be evidence of an improperly equipped emergency room which would be a breach of the standard of care in properly operating GIMC.

30. Baby Rose was never properly ventilated following her respiratory distress.

31. The nurses involved in the code failed to properly or accurately monitor or otherwise care for baby Rose during the code event.

32. Defendant Terence Hamel, M.D., was the radiologist who was responsible for timely informing the code team of the critical finding of misplacement of the umbilical catheter and the ETT. His failure to timely inform the team of the critical findings of the x-rays immediately during the code event contributed to baby Rose Tolbert's wrongful death.

33. Baby Rose was declared dead at 2:31 a.m., on September 10, 2018.

34. Baby Rose Tolbert became hypoxic which progressed to anoxic brain injury, organ failure, and death because of the breaches in the standard of care by the physicians, nurses and other healthcare staff at GIMC on September 10, 2017.

35. Defendant GIMC and its agents and/or employees failed to properly assess, care for, treat, prevent, and in fact created, the circumstances that caused baby Rose Tolbert's injuries, death, and damages.

36. Phillip Tolbert and Charlene Suina, who reside in Gallup, New Mexico, bring this suit as Court-Appointed Personal Representatives for their deceased baby girl, Rose Sky Tolbert, for the purpose of pursuing the Estate's legal rights against Defendant USA, as well as all other defendants in their individual capacities.

37. Defendant United States of America, through the Indian Health Services, does business and operates a healthcare facility called "Gallup Indian Medical Center" in Gallup, New Mexico.

38. At all material times, Defendant Gienia Lynch, M.D., was a licensed obstetrician/gynecologist practicing in her specialty at GIMC with apparent authority to act on behalf of Defendant USA as an agent and/or employee.

39. At all material times, Defendant Janet M. Greenholz, M.D., was a licensed pediatrician practicing in her specialty at GIMC with apparent authority to act on behalf of Defendant USA as an agent and/or employee.

40. At all material times, Defendant Regina Williams, R.N., was a licensed labor and delivery nurse practicing in her specialty at GIMC with apparent authority to act on behalf of Defendant USA as an agent and/or employee.

41. At all material times, Defendant Safia Rubaii, M.D., was a licensed emergency medicine physician practicing in her specialty at GIMC with apparent authority to act on behalf of Defendant USA as an agent and/or employee.

42. At all material times, Defendant Robert Leach, D.O., was a licensed emergency medical physician practicing in his specialty at GIMC with apparent authority to act on behalf of Defendant USA as an agent and/or employee.

43. At all material times, Defendant Gilberto Alvarez-Colon, M.D., was a pediatrician practicing in his specialty at GIMC with apparent authority to act on behalf of Defendant USA as an agent. However, Plaintiffs have been unable to verify his license to practice medicine.

44. At all material times, Defendant Terence Hamel, M.D., was a licensed radiologist practicing in his specialty at GIMC with apparent authority to act on behalf of Defendant USA as an agent and/or employee.

45. The events giving rise to this complaint occurred at Gallup Indian Medical Center, which is part of the United States Health and Human Services Deparment and the Indian Health Service located in Gallup, New Mexico on September 9-10, 2017.

46. This action arises under the current state of the Federal Tort Claims Act, Title 28, United States Code, Section 1346(b), as hereinafter more fully appears.

47. On or about February 6, 2019, which was more than six months before this action was instituted, the claims set forth herein, which are subject to the Federal Tort Claims Act, were received by Indian Health Services, a division of the United States of America Department of Health and Human Services pursuant to 28 U.S.C § 2675(a).  Said agency failed to respond with a denial of this claim on or before August 6, 2019 which is expiration of the six-month stay for suit, and therefore, the claims are deemed denied, and this suit is appropriate in U.S. District Court pursuant to 45 C.F.R. 35.2(b) and 28 U.S.C. 2675(a) and deemed timely.

48. The tort claim for which Plaintiffs sue herein arose from the acts and omissions hereinafter alleged which occurred in the city of Gallup, State of New Mexico.

49. Personal jurisdiction and venue are proper in Federal District Court of New Mexico pursuant to 28 U.S.C. § 1346(b)(1).

50. If the physicians, nurses or other health care providers are found through the discovery process to be contractors of GIMC, they are not deemed employees of GIMC and the Federal Tort Claims Act does not apply to them, mandating a jury trial of the case with regard to these actors.

51.     Defendants Lynch, Greenholz, Leach, Rubaii, Alvarez-Colon, and Hamel were credentialed to be members of the Medical Staff of GIMC and granted privileges to perform specific medical conduct at GIMC on September 9 and 10, 2017, which caused their involvement in the care and treatment of baby Rose and her mother Charlene Suina.

52.     Plaintiffs are prohibited from publicly accessing information on GIMC's credentialing and privileging of the above physicians until after the filing of the lawsuit, and as such the only good faith basis Plaintiffs have to assert negligent credentialing and privileging of Defendant physicians is the gross negligence and/or reckless disregard for the safety of their patients shown by their conduct in treating baby Rose and her mother Charlene Suina.

53.      The Federal Government should be subject to punitive damages for its utter indifference in properly staffing and managing the Indian Health Service Hospitals, including Gallup Indian Medical Center which contributed to cause the wrongful death of baby Rose Sky Tolbert.

54.     All special protections accorded the United States of America, it's Department of Health and Human Services, its division the Indian Health Service and its hospital the Gallup Indian Medical Center under the Federal Tort Claims Act, Title 28, United States Code, Section 1346(b) are unconstitutional, against public policy and in fact create a disparity between the routinely substandard medical treatment available to members of the Navajo Nation and the guarantee of life accorded all Americans, which encompasses access to safe and effective medical care, through the 14th Amendment to the Constitution of the United States. Specifically, the Federal Tort Claim Act violates the Equal Protection Clause of the 14th Amendment to the United States Constitution, as the making and/or enforcement of the FTCA abridges the privileges of citizens of the United States; and deprives native Americans, including

baby Rose Sky Tolbert of **life** without due process of **law**; and denies to her within its jurisdiction the equal protection of the common law of the State of New Mexico to hold those who committed medical malpractice causing her wrongful death fully accountable for their negligence and their reckless disregard for the safety of her life.

55. The concept of "Sovereign Immunity" and the government's need to "waive immunity" is an antiquated and unfit rubric for determining the accountability of the Federal Government of the United States of America. The special protection afforded the Federal Government of the United States of America as it applies to this case violates the constitutional right of the members of the Navajo Nation, including Charlene Suina and baby Rose Sky Tolbert to equal protection under the law which guarantees life and thereby safe and effective medical care.

56. The application of the New Mexico Medical Malpractice Act ("MMA"), Section 41-5-1 et seq., to cap damages against the United States of America and it's Department and Division for the negligence of its employees at the Indian Health Service Hospital known as the Gallup Medical Center is unconstitutional, as the MMA itself has been found to be an unconstitutional infringement on the inviolate right to jury trial enshrined in the New Mexico Constitution.

57. The application of the New Mexico Medical Malpractice Act ("MMA"), Section 41-5-1 et seq., to cap damages against the United States of America for the negligence of its employees at the Indian Health Service Hospital known as the Gallup Medical Center is unconstitutional, as the MMA violates the Equal Protection Clause, Art. II. Sec. 18 of the New Mexico Constitution.

58. The application of the New Mexico Medical Malpractice Act ("MMA"), Section 41-5-1 et seq., to cap damages against the United States of America for the negligence of its employees at the Indian Health Service Hospital known as the Gallup Medical Center is unconstitutional, as the MMA violates Separation of Powers, Art. 3, Sec. 1 of the New Mexico Constitution.

WHEREFORE, Plaintiffs pray for Judgment against Defendants for reasonable compensatory damages, in an amount to be ascertained at trial, pre- and post-judgment interest, and for such other and further relief as this court deems appropriate.

Respectfully submitted,

*Attorneys for Plaintiff*

CURTIS & CO.
215 CENTRAL AVENUE NORTHWEST
THIRD FLOOR
ALBUQUERQUE, NM 87102
T  505-243-2808    F  505-242-0812
lisa@curtislawfirm.org
laura@curtislawfirm.org

*Electronically signed*
*/s/ Lisa K. Curtis*
Lisa K. Curtis, Esq.