# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

PHILLIP TOLBERT and THEDORE W.
BARUDIN, *Personal Representative for the
Estate of Rose Sky Tolbert*,

       Plaintiffs,

vs.                                                   No. CIV 19-0830 JB/LF

GALLUP INDIAN MEDICAL CENTER;
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; THE UNITED STATES OF
AMERICA; GIENIA LYNCH; JANET M.
GREENHOLZ; SAFIA RUBAII; GILBERTO
ALVAREZ-COLON; ROBERT LEACH;
TERENCE H. HAMEL and REGINA
WILLIAMS,

       Defendants.

## MEMORANDUM OPINION[1]

**THIS MATTER** comes before the Court on Defendant United States' Partial Motion to

Dismiss for Lack of Subject Matter Jurisdiction, filed August 18, 2020 (Doc. 50)("Motion").  The

Court held a hearing on September 16, 2020.  See Clerk's Minutes at 1, filed February 22, 2021

(Doc. 58).  The primary issues are: (i) whether the Court should dismiss the negligent failure-to-

transfer claim, for failure to transfer decedent Rose Sky Tolbert and her mother, Charlene Suina,

to a hospital with a neonatal intensive care unit ("NICU"), because Plaintiffs Phillip Tolbert and

Theodore W. Barudin, the personal representative for R. Tolbert's estate (collectively, "the

Plaintiffs"), have not exhausted their administrative remedies under the Federal Tort Claims Act,

---

[1]On March 23, 2021, the Court entered an Order granting in part and denying in part the
Defendant United States' Partial Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed
August 18, 2020 (Doc. 50).  See Order at 1-2, filed March 18, 2021 (Doc. 64).  In the Order, the
Court stated that it would "issue a Memorandum Opinion at a later date more fully detailing its
rationale for the decision."  Order at 1 n.1.  This Memorandum Opinion is the promised opinion.

28 U.S.C. § 2675(a) ("FTCA"), where the Plaintiffs' Standard Form 95s ("SF-95s") spend two paragraphs discussing events before R. Tolbert's delivery; (ii) whether the Court should dismiss the claims of negligent hiring, credentialing, privileging, training, and supervision of medical personnel, because the discretionary-function exception to the FTCA's waiver of sovereign immunity bars these claims; (iii) whether the Court should dismiss the improperly-equipped-emergency-room claim, because the discretionary-function exception bars this claims; and (iv) whether the Court should deny the Plaintiffs' punitive damages and prejudgment interest request, because 28 U.S.C. § 2674 prohibits the Court from awarding punitive damages or prejudgment interest.  The Court concludes that: (i) it will not dismiss the Plaintiffs' allegations regarding the Defendant United States of America's failure to transfer the mother, Charlene Suina, and R. Tolbert to a different hospital, because the SF-95s provide the United States with adequate notice of the Plaintiffs' claims and discuss in detail events that occurred before R. Tolbert's delivery; (ii) the Court will dismiss the negligent training claim, and dismiss in part the negligent credentialing and privileging claims under the FTCA's discretionary-function exception; (iii) the Court will dismiss the emergency-room-equipment claim, because selecting emergency room equipment involves discretionary policy decisions; and (iv) the Court will dismiss the Plaintiffs' request for punitive damages and prejudgment interest, because 28 U.S.C. § 2674 prohibits the Court from awarding such damages against the United States in FTCA cases, and 28 U.S.C. § 2674 is constitutional.  Accordingly, the Motion is granted in part and denied in part.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint, filed September 9, 2019 (Doc. 1).  The Court accepts the factual allegations as true for the purposes of the Motion.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Sanders v. Mountain

Am. Fed. Credit Union, 689 F.3d 1138, 1141 (10th Cir. 2012)(concluding that a court accepts "all facts pleaded by the non-moving party as true and grants all reasonable inferences from the pleadings in that party's favor").  The Court does not, however, accept as true the legal conclusions within the Complaint.  See Ashcroft v. Iqbal, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

1.     **The Parties.**

P. Tolbert and Suina are R. Tolbert's parents, and reside in Gallup, New Mexico.  See Complaint ¶ 36, at 7.  The United States "through the Indian Health Services, does business and operates a healthcare facility called "Gallup Indian Medical Center" ("Gallup Medical") in Gallup, New Mexico."  Complaint ¶ 37, at 7.  "The events giving rise to this complaint occurred at Gallup Indian Medical Center, which is part of the United States Health and Human Services Department and the Indian Health Service located in Gallup, New Mexico on September 9-10, 2017."  Complaint ¶ 45, at 9.  R. Tolbert's mother, Suina, had given birth to six children before giving birth to R. Tolbert.  See Complaint ¶ 2, at 1.  During her previous births, Suina experienced c-sections and placental abruption.  See Complaint ¶ 3, at 2.

Suina and Gallup Medical were aware that Suina had gestational diabetes[2] and a positive

_____

[2]Gestational diabetes is:

[a] diabetic condition that appears during pregnancy and usually goes away after the birth of the baby. Gestational diabetes is best controlled by dietary adjustment. Gestational diabetes can cause birth complications. One complication is macrosomia, in which the baby is considerably larger than normal due to large deposits of fat; such a baby can grow too large to be delivered through the vagina. Gestational diabetes also increases the risk of low blood sugar, low serum calcium and low serum magnesium in the baby immediately after delivery. The key to prevention is careful control of the mother's blood sugar levels. If the mother maintains normal blood sugar levels, it is less likely that the fetus will

anti-kell antibody.[3]  Complaint ¶ 2, at 1.  Gallup Medical does not have a neonatal[4] intensive care unit ("NICU"), nor does it have "any qualified specialized neonatal staff to care for a premature baby."  Complaint ¶ 3, at 2.

2.     **The Delivery.**

Suina arrived at Gallup Medical "at approximately 5:30 p.m. on September 9, 2017." Complaint ¶ 2, at 1.  Suina was thirty-five weeks pregnant, about five weeks short of a full-term pregnancy[5]  See Complaint ¶ 2, at 1.  Because Suina and R. Tolbert had high heart rates, Gallup Medical Obstetrician Dr. Gienia Lynch conducted a drug screen, which came back negative.  See Complaint ¶ 3, at 2.  Dr. Lynch was unable to diagnose "the cause of the abnormal condition of her patient," Suina.  Complaint ¶ 9, at 3.  At 7:20 p.m., Suina called P. Tolbert; P. Tolbert was a truck driver and "was driving a route out of state."  Complaint ¶ 4, at 2.  Suina informed P. Tolbert

---

develop . . . abnormalities.

Jay W. Marks, Medical Definition of Gestational diabetes, MedicineNet (June 3, 2021), https://www.medicinenet.com/what_not_to_eat_when_pregnant_pictures_slideshow/article.htm

These antibodies can cause disorders in newborns.

[4]Neonatal means "of, relating to, or affecting the newborn and especially the human infant during the first month after birth."  Neonatal, Merriam Webster, https://www.merriam-webster.com/dictionary/neonatal (last visited July 26, 2021).

[5]A typical pregnancy

lasts for about 280 days or 40 weeks.  A preterm or premature baby is delivered before 37 weeks of your pregnancy. . . .  Late preterm infants are born between 34 and 37 weeks.  Babies born before 39 weeks have a greater chance of breathing problems, low blood sugar and other problems that may result in being admitted to a neonatal intensive care unit (NICU).

Why is 40 Weeks so Important, New York Department of Health, https://www.health.ny.gov/community/pregnancy/why_is_40_weeks_so_important.htm (last visited July 20, 2021).

during the call that she and R. Tolbert had elevated heart rates.  <u>See</u> Complaint ¶ 4, at 2.  "Dr. Lynch came into the room at the time of the call and told the parents that an emergen[cy] cesarean section would need to be consented to . . . ."  Complaint ¶ 4, at 2.  Suina consented to the emergency cesarean section.  <u>See</u>  Complaint ¶ 4, at 2.

From 7:20 p.m. to 10:00 p.m., Suina did not see Dr. Lynch and "became very distressed at the lack of attention to her or the baby."  Complaint ¶ 5, at 2.  Dr. Lynch then "activate[d] the c-section team" some time after 10:09 p.m.  Complaint ¶ 5, at 2.  Suina went into the operating room at 11:14 p.m.  <u>See</u> Complaint ¶ 5, at 2.  Dr. Janet Greenholz, a pediatrician, was present for R. Tolbert's birth.  <u>See</u> Complaint ¶ 11, at 3.  A nurse-midwife substituted for an assistant surgeon during the delivery, because there was no assistant surgeon available.  <u>See</u> Complaint ¶ 6, at 2-3.  R. Tolbert was delivered at 11:43 p.m. "over six hours after arrival."  Complaint ¶ 5, at 2.

### 3.   Gallup Medical's Post-Delivery Treatment of R. Tolbert and Suina and R. Tolbert's Death.

"The physicians, nurses and other Gallup Medical staff assessed, cared for, diagnosed and treated baby Rose as if she was a full-term baby, rather than the pre-term (premature) baby of a mother who had gestational diabetes and other complications in her pregnancy."  Complaint ¶ 10, at 3.  "Dr. Greenholz did basic post-delivery checks that, while partially appropriate for a full-term baby, were wholly inappropriate for a pre-mature baby of a mother with gestational diabetes and other pregnancy complications necessitating emergency c-section."  Complaint ¶ 12, at 3.  "Proper orders for lab and other studies and orders to the nurses for intensive monitoring and care for her patient were not made by Dr. Greenholz."  Complaint ¶ 12, at 4.  Following the birth, R. Tolbert's "cord blood" was "sent to the lab . . . for analysis," but "was never analyzed.  Complaint ¶ 12, at 3.

After the birth, Dr. Lynch performed surgery on Suina.  See Complaint ¶ 20, at 5.  Suina had consented to a tubal ligation surgery.  See Complaint ¶ 20, at 5.  "Dr. Lynch destroyed the fallopian tubes during the surgery, rather than 'tying her tubes' as was the understood surgery." Complaint ¶ 20, at 5 (no citation for quotation).  "This extension of the surgery meant that the surgery would never be reversible."  Complaint ¶ 20, at 5.  "There was no consent for the extended and irreversible surgery."  Complaint ¶ 20, at 5.  "The lack of consent and the extension of the surgery by Dr. Lynch . . . caused Phillip Tolbert and Charlene Suina" to be "incapable of ever having a child together, now that baby Rose has died."  Complaint ¶ 20, at 5.

R. Tolbert "was treated in every way as a normal term baby although she was not by the nursing and other health care staff at Gallup Medical."  Complaint ¶ 14, at 4.  Regina Williams, a Register Nurse ("R.N."), was caring for R. Tolbert, and did not "compress and expel the amniotic fluid from her system."  Complaint ¶ 14, at 4.  "There are no oxygen saturations listed for baby Rose in her medical record."  Complaint ¶ 16, at 5.  "There are no arterial blood gas readings for baby Rose in her medical record."  Complaint ¶ 17, at 5.  "There were no medications given to baby Rose . . . ."  Complaint ¶ 18, at 5.  R. Tolbert's lungs were not fully matured after the birth. See Complaint ¶ 21, at 5.

R. Tolbert then "was handed to her grandmother in a room to hold."  Complaint ¶ 15, at 5. R. Tolbert's grandmother "became terrified that suddenly" R. Tolbert "was not breathing." Complaint ¶ 19, at 5.  R. Tolbert began "aspirating amniotic fluid" and went "into respiratory distress at approximately 1:40 a.m.," about two hours after the birth.  Complaint ¶ 21, at 5.  When R. Tolbert's "respirations decreased . . . initially they were ignored."  Complaint ¶ 22, at 5.  A code "was eventually called," but "there is no code sheet for the code conducted by Gallup Medical physicians, nurses and staff."  Complaint ¶ 24, at 6.  Dr. Safia Rubaii, an Emergency Physician,

"initiated an umbilical venous catheterization during the code event, but never checked the catheter's placement despite having an x-ray to review."  Complaint ¶ 25, at 6.  "[T]he catheter was wrongly placed into the artery of the umbilical cord, such that all medication delivered into the catheter traveled to the wrong part of" R. Tolbert's "body, and she did not receive the benefit of the medication given during the code . . . ."  Complaint ¶ 25, at 6.  Dr. Robert Leach, a Doctor of Osteopathic Medicine, then "attempted to place an endotracheal tube [("ETT")[6] . . . into baby Rose, which 'came out.'"  Complaint ¶ 26, at 6 (no citation for quotation).  Dr. Leach again attempted to place the endotracheal tube, but placed ETT into R. Tolbert's esophagus, rather than in her trachea.  See Complaint ¶ 27, at 6.  "Instead of extubating[7] the ETT, which is required to remove it from the esophagus so it may be properly placed into the trachea, the ETT was simply pulled back by Gilberto Alvarez-Colon, M.D., a pediatrician also participating in the code."  Complaint ¶ 28, at 6.  "Simply pulling the ETT back will result in placing it higher in the

---

[6]An endotracheal tube is used during endotracheal intubation, which

is often an emergency procedure that's performed on people who are unconscious or who can't breathe on their own.  EI maintains an open airway and helps prevent suffocation.

In a typical EI, you're given anesthesia.  Then, a flexible plastic tube is placed into your trachea through your mouth to help you breathe.

The trachea, also known as the windpipe, is a tube that carries oxygen to your lungs.  The size of the breathing tube is matched to your age and throat size.  The tube is kept in place by a small cuff of air that inflates around the tube after it is inserted.

Corinna Underwood, Endotracheal Intubation, Healthline (Sept. 17, 2018), https://www.healthline.com/health/endotracheal-intubation.

[7]To extubate is "to remove a tube from a hollow organ or passageway, often from the airway."  Charles Patrick Davis, Extubate, MedicineNet (March 29, 2021), https://www.medicinenet.com/extubate/definition.htm.

esophagus, continuing to insufflate the stomach and not the lungs."  Complaint ¶ 28, at 6.

Dr. Leach then left to view R. Tolbert's chest x-rays.  See Complaint ¶ 29, at 7.  Consequently,

R. Tolbert "was never properly ventilated following her respiratory distress."  Complaint ¶ 30, at

7.  Further, Dr. Hamel, "the radiologist who was responsible for timely informing the code team

of the critical finding of misplacement of the umbilical catheter and the ETT."  Complaint ¶ 32, at

7.  "The nurses involved in the code failed to properly or accurately monitor or otherwise care for

baby Rose during the code event."  Complaint ¶ 31, at 7.  R. Tolbert "became hypoxic[8] which

progressed to anoxic brain injury,[9] organ failure, and death."  Complaint ¶ 34, at 7.  R. Tolbert was

pronounced dead at 2:31 a.m. on September 10, 2018.  See Complaint ¶ 33, at 7.  "On or about

February 6, 2019 . . . the claims set forth herein . . . were received by Indian Health Services, a

division of the United States of America Department of Health and Human Services . . . ."

Complaint ¶ 47, at 9.  The Indian Health Services did not "respond with a denial of this claim on

---

[8]"Hypoxia is a condition or state in which the supply of oxygen is insufficient for normal life functions."  Charles Patrick Davis, Hypoxia and Hypoxemia (Low Blood Oxygen), MedicineNet              (March                  1,                  2021), https://www.medicinenet.com/hypoxia_and_hypoxemia/article.htm.

[9]Anoxia

[O]ccurs when the brain is deprived of oxygen.  It's often used interchangeably with hypoxia, although hypoxia refers to a partial loss of oxygen and happens first, typically leading to anoxia or a total lack of oxygen.

. . . .

Cells in the brain are sensitive and easily damaged. A lack of oxygen starves the brain and prevents biochemical processes that allow your brain, heart, and kidneys to function. Anoxia can result in coma, seizures, and brain death.

Dan Brennan, What Are the Signs and Symptoms of Anoxia?, MedicineNet (Dec. 10, 2020), https://www.medicinenet.com/what_are_the_signs_and_symptoms_of_anoxia/article.htm

or before August 6, 2019 which is expiration of the six-month stay for suit . . . ."  Complaint ¶ 47, at 9.

## PROCEDURAL BACKGROUND

The Plaintiffs filed a Complaint for R. Tolbert's wrongful death.  See Complaint ¶ 1, at 1. The United States asks the Court to dismiss some of the Complaint's claims under the FTCA.  See Motion at 1-2.  The Plaintiffs oppose the United States' Motion.  See Plaintiffs' Response in Opposition to Defendant's Partial Motion to Dismiss for Lack of Subject Matter Jurisdiction at 1, filed September 1, 2020 (Doc. 53)("Response").

### 1.  The Complaint.

The Complaint does not divide its claims into Counts.  See Complaint ¶¶ 1-58, at 1-12. The Complaint notes that the "action arises under the current state of the Federal Tort Claims Act, Title 28, United States Code, Section 1346(b)."  Complaint ¶ 46, at 9.  The Plaintiffs "assert negligent credentialing and privileging of Defendant physicians."  Complaint ¶ 52, at 10.  The Plaintiffs ask for punitive damages and insist that the "the Federal Tort Claim Act violates the Equal Protection Clause of the 14th Amendment to the United States Constitution."  Complaint ¶¶ 53-55, at 10-11.  The Plaintiffs also allege that damages caps in the New Mexico Medical Malpractice Act, N.M.S.A. § 41-5-1, are unconstitutional.  See Complaint ¶¶ 56-58, at 11-12.  The Plaintiffs ask the Court "for Judgment against Defendants for reasonable compensatory damages, in an amount to be ascertained at trial, pre- and post-judgment interest, and for such other and further relief as this court deems appropriate."  Complaint ¶ 58, at 12.

### 2.  The Motion.

In the Motion, the Defendant United States of America asks the Court:

to dismiss (1) the claim of negligent failure to transfer Plaintiff Charlene Suina to

another medical facility; (2) the claims of negligent hiring, credentialing, privileging, training, and supervision of the medical personnel involved in the care of Plaintiff Suina and her daughter, Rose Sky Tolbert ("Baby Tolbert"); (3) the claim of an improperly equipped emergency room; and (4) the request for punitive damages and prejudgment interest.

Motion at 1-2.

The United States first argues that the Plaintiffs have not exhausted their administrative remedies "with respect to their claim of negligent failure to transfer Plaintiff Suina to another facility." Motion at 9. The United States contends that the Plaintiffs' SF-95s focus on negligence regarding "events *after* Plaintiff Suina's C-Section" but do not discuss "negligence *before* the C-section." Motion at 9 (emphasis in original). Accordingly, the United States insists that the Plaintiffs' "administrative claims provided insufficient notice to the government of a brand-new claim alleged in the complaint." Motion at 11 (citing Staggs v. United States, 425 F.3d 881, 883 (10th Cir. 2005)("Staggs"); Benally v. United States, 735 F. App'x 480, 482 (10th Cir. 2018)("Benally")). The United States acknowledges that the SF-95s are "extremely detailed," but asserts that:

> nowhere in the SF-95s did Plaintiffs mention that any actions before Baby Tolbert's birth fell below the standard of care. Nor did Plaintiffs allege Plaintiff Suina should have been transferred to a facility with a neonatal intensive care unit to give birth. Instead, the facts recited in the SF-95s focus on the events that occurred after the C-section, including the allegedly botched tubal ligation and the failure to resuscitate Baby Tolbert. Moreover, all of the alleged breaches in the standard of care outlined in the lengthy bulleted list relate to these postnatal events, as evidenced by Plaintiffs' contention that Baby Tolbert's death resulted from negligence "from the moment of her birth."

Motion at 11 (quoting Attachment A to SF-95 Re: Charlene Mary Suina, Individually, at 3, filed August 18, 2020 (Doc. 50-2)("Attachment to Suina SF-95")). The United States continues that the SF-95s' reference to the C-section did not discuss the failure to transfer claim. See Motion at 11. Accordingly, the United States concludes that, because the Plaintiffs have not exhausted their

failure to transfer claim, the Court should dismiss it for lack of subject matter jurisdiction.  See Motion at 12.

The United States also argues that the Court should dismiss the Plaintiffs' negligent hiring, credentialing, privileging, training, and supervision claims under the FTCA's discretionary function exception.  See Motion at 12.  The United States insists that, here, no federal statute, regulation, or policy "prescribes a course of action for an employee to file," and, therefore, the Plaintiffs have not met their burden "to allege a specific and mandatory duty violated by the defendant."  Motion at 12 (citing Aragon v. United States, 146 F.3d 819, 822 (10th Cir. 1998); Hammonds v. United States, No. CIV 16-1230, 2018 WL 1399183, at *5 (D.N.M. March 19, 2018)(Browning, J.)).

3.    **The Response.**

The Plaintiffs respond to the Motion.  See Response at 1.  The Plaintiffs argue that they "met all requirements for exhausting the required administrative remedies adherent to a Federal Tort Claims Act restricted case against a federal actor, and immunity for Defendant's medical negligence has been waived."  Response at 2.  The Plaintiffs note that, because the United States filed its Motion under rule 12(b)(1), the Court can consider matters outside the pleadings.  See Response at 3.  The Plaintiffs admit that, although "punitive damage and pre-judgment interest are understood to be currently without subject matter jurisdiction under the FTCA, but the issue is raised and preserved in the Complaint."  Response at 4.  The Plaintiffs argue that their SF-95s demonstrate that they were asserting medical negligence claims and that an SF-95 need not state legal theories.  See Response at 6.  The Plaintiffs emphasize that the United States "had notice of the facts and circumstances surrounding Plaintiffs' medical negligence claims, as set forth in Plaintiffs' SF-95s."  Response at 6.  The Plaintiffs explain that it is evident from the SF-95s that

the Plaintiffs' claims relate both to the pre-delivery and to the post-delivery periods.  See Response at 8.

Next, the Plaintiffs discuss the discretionary function exception under 28 U.S.C. § 2680(a). See Response at 9.  The Plaintiffs describe the applicable test: "First, the allegedly negligent acts or omissions must be discretionary in nature, involving 'an element of judgment or choice.'  *United States v. Gaubert*, 499 U.S. 315, 322 (1991).  Second, the government conduct must be 'based on considerations of public policy.'  *Id*. at 323."  Response at 9.  Here, the Plaintiffs argue that the discretionary function exception does not apply, because "negligent acts and omissions violated requirements which were specific and explicitly mandated by federal law and policy."  Response at 10.  Specifically, the Plaintiffs contend that laws, regulations, and policies impose requirements on the credentialing and privileging processes in Indian Health Facilities.  See Response at 11. The Plaintiffs insist that "Indian Health Service hospitals are required . . . to maintain credentialing and privileging policies and procedures consistent with Medicare Conditions of Participation (federal regulations) and meet the standards of a national accrediting organization."  Response at 13.  The Plaintiffs contend that the Indian Health Manual sets out hiring and credentialing requirements.  See Response at 14-15.  The Plaintiffs argue that the test's second prong is inapposite, because "statutes, regulations, and federal policy specifically prescribes or proscribes the conduct at issue . . . ."  Response at 16.

Turning to their claims based upon the "failure to have required equipment in the . . . emergency room," the Plaintiffs contend that, although the "specific breach here is the failure to have required equipment in the emergency room, . . . the claim itself is for the failure to properly operate the hospital."  Response at 16.  The Plaintiffs conclude by arguing that the FTCA's prohibition on prejudgment interest and punitive damages is "unconstitutional," although

they do not clarify which constitutional provision the FTCA violates.  Response at 18.

### 4.    **The Reply.**

The United States replies to the Response.  See Defendant United States' Reply to its Partial Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed September 10, 2020 (Doc. 55)("Reply").  The United States contends that, contrary to the Plaintiffs' assertions, the SF-95s "did not alert a legally trained reader that Plaintiffs would assert negligence for any acts preceding Baby Tolbert's delivery."  Reply at 1.  The United States maintains that the SF-95 does not discuss "that Dr. Lynch breached the standard of Care before or during the delivery."  Reply at 3.  The United States argues that, although the SF-95 alleges negligence before the delivery, "alleging negligence with regard to one time period does not alert a legally trained reader to infer negligence regard to a different time period."  Reply at 3-4 (citing Benally, 735 F. App'x at 486-87, and Gallegos v. Wood, No. CIV 13-1055 JB/KBM, 2017 WL 3701866, at *21 (D.N.M. Oct. 1, 2015)(Browning, J.)).  The United States therefore asks the Court to dismiss the Plaintiffs' negligence claim "as it relates to Plaintiff Suina's care before and during the delivery."  Reply at 5-6.

The United States then insists that the Court should dismiss the claim that Gallup Medical was "negligent in hiring, credentialing, privileging, training, or supervising any of its personnel" because the "discretionary function exception bars this claim" given that Gallup Medical did not "violate[] any mandatory and specific duties . . . ."  Reply at 1.  The United States admits that the Indian Health Manual ("I.H.M.") contains mandatory minimum qualifications for credentialing and privileging.  See Reply at 6 (citing I.H.M. § 3-1.4(C)).  The United States asserts, however, that the Plaintiffs "do not allege that any of the doctors and nurses listed in their Complaint failed to meet any of these minimum requirements."  Reply at 6.  Moreover, the United States argues

that, "given that the Manual contemplates weighing 'the training, experience, and qualifications of the applicant' against 'the staffing, facilities, and capabilities of the facility,' the facility still has discretion to make hiring, credentialing, and privileging decisions."  Reply at 8 (no citation for quotation).  The United States avers that "additional discovery would not assist in determining whether the discretionary function exception bars jurisdiction."  Reply at 10.  Similarly, the United States contends that the Plaintiffs have not shown that a mandatory duty controlled Gallup Medical's emergency room equipment.  See Reply at 11.  The United States therefore concludes that, because the Plaintiffs "have failed to identify any mandatory statutes or regulations applicable to the challenged conduct, the government's decisions in equipping the GIMC emergency room are presumptively grounded in public policy, and the discretionary function exception applies."  Reply at 11.  Last, the United States concludes that the Plaintiffs have waived their arguments about punitive damages and prejudgment interest, because they "'waived this issue by failing to make any argument or cite any authority to support [an] assertion' constitutes waiver."  Reply at 12 (quoting United States v. Hardwell, 80 F.3d 1471, 1492 (10th Cir. 1996))(alteration in Reply).  In sum, the United States

> requests an Order of this Court dismissing the following for lack of subject matter jurisdiction: (1) the claim of negligent failure to transfer; (2) the claims of negligent hiring, credentialing, privileging, training, and supervision; (3) the claim of breach of the standard of care in equipping the GIMC emergency room; and (4) the request for punitive damages and prejudgment interest.

Reply at 12.

### 5.    **The Hearing**.

The Court held a hearing on September 16, 2020.  See Clerk's Minutes at 1, filed September 16, 2020 (Doc. 58).  The United States began by arguing that the SF-95 focuses on facts that happened after, rather than before or during, the delivery.  See Transcript of Hearing at

3:21-4:5 (taken Sept. 16, 2020)(Lyman), filed September 28, 2020 (Doc. 60)("Tr."). The United States continued that it is asking the Court to dismiss the allegation that Suina should have been transferred to a facility with a NICU. See Tr. at 4:12-25 (Court, Lyman). The Court responded that the SF-95 in this case is the most detailed SF-95 that it has ever seen. See Tr. at 6:20-7:1 (Court). The United States insisted that it is not "sufficiently detailed to alert the Government that it needs to investigate that particular claim." Tr. at 8:10-13 (Lyman). The United States then argued that the SF-95 emphasizes the ease of the C-Section birth. See Tr. at 11:12-22 (Lyman). The United States noted that, "under New Mexico law, a claim of negligence doesn't automatically include pre-op and post-op breaches of care." Tr. at 9:19-21 (Lyman). The United States therefore asked the Court to hold "that there was no exhaustion as to the predelivery claim." Tr. at 9:23-25 (Lyman).

The Plaintiffs responded that "failure to transfer" is not a "claim"; instead, it "is an expert opinion about what the alternatives were that were available to properly treat Charlene Suina and deliver that baby." Tr. at 12:16-23 (Curtis). The Plaintiffs insisted that the SF-95s and the attached documents demonstrate that Suina had medical conditions which would make R. Tolbert's birth difficult. See Tr. at 13:8-18 (Curtis). The Court asked the Plaintiffs what equipment Gallup Medical lacked that it should have had. See Tr. at 14:3-5 (Court). The Plaintiffs responded that a NICU is necessary "for a baby at 35 weeks, for a mom with gestational diabetes." Tr. at 14:6-14 (Curtis). The Plaintiffs continued that the United States is "clearly on notice about predelivery issues in the SF-95." Tr. at 16:7-9 (Curtis). The Plaintiffs insisted that their SF-95 is very detailed and satisfies the FTCA's exhaustion requirement. See Tr. at 17:8-13 (Curtis). The Plaintiffs maintained that this claim is important, because "the idea of contemplating an emergency C-section and not conducting it for almost five hours is a very serious breach of the standard of care."

- 15 -

Tr. at 19:4-6 (Curtis).  The Plaintiffs explained that the SF-95 focuses more heavily on the post-delivery period because the death occurred post-delivery, but emphasized that the Defendants were also negligent pre-delivery.  See Tr. at 20:1-11 (Curtis).

The United States responded that it is not "required to delve into the medical records to try to figure out what other claims might be lurking therein."  Tr. at 20:21-23 (Lyman).  The United States insisted that it "'has no obligation to cast about in the wilderness for every possible source of liability lurking in an administrative claim . . . .'"  Tr. at 20:23-21:2 (Lyman)(quoting Benally v. United States, No. CIV 13-604 MV/SMV, 2016 WL 3200125, at *4 (D.N.M. May 20, 2016)(Vasquez, J.), aff'd, 735 F. App'x 480 (10th Cir. 2018)).  The United States continued that the SF-95 does not describe Suina's medical conditions and that the SF-95's mention of "a five-hour delay" does not provide the United States with notice about the "claim that this hospital was inadequate for this delivery."  Tr. at 23:4-25 (Lyman).  The United States suggests that, instead, "there are numerous indications in this SF-95 that the baby was healthy."  Tr. at 24:1-4 (Lyman).

The United States then detailed its arguments regarding the FTCA's discretionary function exception.  See Tr. at 29:3-10 (Lyman).  The United States noted that the Plaintiffs bear the burden to demonstrate that the discretionary function exception does not apply.  See Tr. at 29:14-20 (Lyman).  The United States submitted that, although the Plaintiffs argue that the Defendants violated mandatory provisions of the Indian Health Manual, the Plaintiffs do  not "point to any specific provision . . . that was actually violated."  Tr. at 30:2-7 (Lyman).  Instead, the United States observed that the Plaintiffs "just assert in a conclusory fashion that the defendants must have breached something because they hired these doctors who killed this baby."  Tr. at 32:7-9 (Lyman).  The United States averred that, beyond the minimum requirements, "the governing body of the hospital has the discretion to decide who to hire and who to give credentials to."  Tr. at 30:21-23

(Lyman).  The United States acknowledged that the Court has recognized a "very narrow exception to the general rule that issues involving hiring and credentialing are discretionary."  Tr. at 31:12-15 (Lyman).  Nonetheless, the United States noted that the United States Court of Appeals for the Tenth Circuit has held that "issues of hiring and personnel are discretionary because they involve issues, very policy oriented issues, such as weighing economic factors, trying to increase office diversity, trying to find a good balance of skills and experience for the position."  Tr. at 31:17-22 (Lyman).  The United States next asserted that the Plaintiffs do not address the discretionary function test's second prong in their briefing.  See Tr. at 32:23-33:3 (Lyman).  The United States argued that "decisions about what equipment to have . . . are classic discretionary functions because they require the agency to decide how to allocate its scarce resources."  Tr. at 34:15-18 (Lyman).  Regarding the Plaintiffs' equipment claim, the United States concluded that the Plaintiffs "haven't carried their burden to show that this was not a discretionary function," given that the Plaintiffs "haven't cited a single requirement relating to the placement or what kind of equipment or what kind of capabilities are required in an emergency room at an Indian Health Service Hospital . . . ."  Tr. at 35:13-18 (Lyman).

The Plaintiffs argued that their credentialing and privileging claims do not fall within the discretionary function exception.  See Tr. at 39:1-11 (Court, Curtis).  The Plaintiffs admitted that they do not have documentation to support their negligent credentialing, privileging, training, and supervision claims.  See Tr. at 42:14-43:7 (Court, Curtis).  The Court observed that these claims "are preserved by the SF-95, but there's not really anything right at the moment," and the Plaintiffs agreed.  Tr. at 43:8-12 (Court, Curtis).  The Plaintiffs contended that they cannot "get documents

under FOIA[10] or any other mechanism.  In fact, I won't get them in discovery, and you will see me back again asking for them." Tr. at 43:16-19 (Curtis).  The Plaintiffs asked the Court to take the "issue under advisement," because the Plaintiffs were "sure that we'll be in front of you within the next sixty days on the defendants providing the credentialing information to me to begin with." Tr. at 44:21-24 (Curtis).  The Plaintiffs noted that discovery would assist them in elaborating upon their claims before the Court.  See Tr. at 46:1-6 (Curtis).  The Plaintiffs continued that the discretionary function exception should not apply, because: (i) "there are mandatory requirements under Indian Health Service for credentialing and privileging of physicians;" Tr. at 46:8-10 (Curtis); and (ii) "[i]n training and supervision there are certain things that are one hundred percent disallowed by the law and by any policy or procedure followed at any federal institution," Tr. at 46:18-21 (Curtis).  The Plaintiffs then acknowledged that,

> if the Court makes a ruling that ROIA doesn't apply or that the federal confidentiality protections for peer review or confidentiality don't apply under the federal system, that would be great. . . .  In lieu of even keeping the claim, that would be such a drastic ruling.  But I don't think that that's what the courts have found in this jurisdiction or in any jurisdiction in the federal system.

Tr. at 47:12-21 (Curtis).  The Plaintiffs then summarized the applicable mandatory privileging and credentialing requirements:

> [T]here are certain . . . absolute requirements . . . that all hospitals, including Gallup Indian Medical Center, have to follow.  They have to verify the training. They have to verify the medical license.  They have to verify the DEA license. They have to have professional references. They have to.  I mean, CMS has rules that say you cannot put a person on your staff with credentials or any privileges unless you do these basic things.  I don't know if that process was followed because I don't have that information.  And so there is no way for me to prove whether mandatory rules, which exist, were met.

Tr. at 49:4-14 (Curtis).  Regarding the emergency room equipment, the Plaintiffs emphasized that

---

[10]The Freedom of Information Act, 5 U.S.C. § 552.

the United States "wants to make claims out of things that are not claims." Tr. at 49:21-22 (Curtis).

The Plaintiffs insisted that the lack of an x-ray machine in the Gallup Medical emergency room is important evidence of the Defendants' negligence, but is not an independent claim.  See Tr. at 50:5-51:16 (Curtis).   The Plaintiffs emphasized that the lack of an x-ray machine required Dr. Leach to leave R. Tolbert, who had not been ventilated properly, alone for five minutes.  See Tr. at 51:17-25 (Curtis).  The Court noted that the Plaintiffs were correct "that there can be a credentialing claim that is nondiscretionary, because we've seen that here in the District of New Mexico." Tr. at 54:14-18 (Court).

The United States addressed the Plaintiffs' argument that the FTCA's prohibition on prejudgment interest is unconstitutional.  See Tr. at 60:1-9 (Lyman).  The United States explained that the Plaintiffs do not "raise a distinct argument about why they're unconstitutional, cite any authority, cite any case law.  So I believe that they have waived this argument."  Tr. at 60:6-9 (Lyman).  The United States continued that it is "well established" that the applicable FTCA provisions are constitutional.  Tr. at 60:12-15 (Lyman).  The Court asked the Plaintiffs whether they were hoping to preserve their argument for appellate review, and the Plaintiffs agreed.  See Tr. at 60:24-61:2 (Court, Curtis).  The Plaintiffs argued that the FTCA "prohibits accountability for governmental actors" and "that it honestly flies in the face of democracy."  Tr. at 61:10-12 (Curtis).  The Plaintiffs continued that "we would wait until the conclusion of the case to have that discussion with the Court, and given an opportunity to, as counsel stated, have full briefing and argument solely on . . . obviously an enormous issue . . . ."  Tr. at 62:3-10 (Curtis).  The United States replied that, because the Plaintiffs could have briefed the issue fully in the Response, but did not, they have waived the issue.  See Tr. at 62:14-24 (Lyman).

The Court describe to the parties how it would likely decide the issues:

> I will dismiss these negligent hiring, credentialing, privileging, training, or supervising claims, because as a general rule they do fall into, I think, categories that are subject to the discretionary function exception, and I will probably find the FTCA to be constitutional even with its ban on punitive damages. I think Congress gets to make those decisions. I don't think the Constitution has a whole lot to say about that issue.

Tr. at 71:3-11 (Court).

### 6.    The Order.

In the Order, the Court grants in part and denies in part the Motion. See Order at 11, filed March 23, 2021 (Doc. 117). First, the Court does not dismiss the Plaintiffs' allegations regarding the failure to transfer claim, because the Court concludes that the SF-95 provides the United States with adequate notice. See Order at 2. Second, the Court dismisses the negligent training claim, and dismisses in part the negligent credentialing and privileging claims under the FTCA's discretionary function exception. See Order at 2. Third, the Court dismisses the emergency room equipment claim under the discretionary function exception. See Order at 2. Fourth, the Court dismisses the Plaintiffs' request for punitive damages and prejudgment interest under 28 U.S.C. § 2674. See Order at 2.

### LAW REGARDING THE FTCA

It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." United States v. Mitchell, 463 U.S. 206, 212 (1983)(citing United States v. Sherwood, 312 U.S. 584, 586 (1941); 14 Charles Wright, Arthur Miller & Edward Cooper, Federal Practice and Procedure § 3654, at 156-157 (1976)). See Garcia v. United States, 709 F. Supp. 2d 1133, 1137 (D.N.M. 2010)(Browning, J.)("The United States cannot be sued without its consent. Congressional consent -- a waiver of the traditional principle of sovereign immunity -- is a prerequisite for federal-court jurisdiction."). The law generally

places the burden of proving federal jurisdiction on the proponent of jurisdiction, and the party suing the United States thus similarly bears the burden of proving that sovereign immunity has been waived.  See James v. United States, 970 F.2d at 753.  See also Garcia v. United States, 709 F. Supp. 2d at 1138 ("The plaintiff bears the burden of proving that Congress has waived sovereign immunity for all of his claims.").  The terms of the United States' consent define the federal court's jurisdiction to entertain suits against the country.  See United States v. Orleans, 425 U.S. at 814; Ewell v. United States, 776 F.2d 246, 248 (10th Cir. 1985).  Although a "waiver of immunity should be neither extended nor narrowed beyond that which Congress intended," United States v. Kubrick, 444 U.S. 111, 117-18 (1979); see Ewell v. United States, 776 F.2d at 248, "[w]aivers of sovereign immunity are to be read narrowly," James v. United States, 970 F.2d at 753 (citing Engel v. United States (Estate of Johnson), 836 F.2d 940, 943 (5th Cir. 1988); Schmidt v. King, 913 F.2d 837, 839 (10th Cir. 1990)).  "A waiver of sovereign immunity 'cannot be implied and must be unequivocally expressed.'"  United States v. Mitchell, 445 U.S. 535, 538 (1980)(quoting United States v. King, 395 U.S. 1, 4, 89 (1969)).  See United States v. Nordic Vill., Inc., 503 U.S. at 33-34; United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 (10th Cir. 1996).

The Tenth Circuit has emphasized that all dismissals for lack of jurisdiction, including those for a failure to establish a waiver of sovereign immunity under the FTCA, should be without prejudice.  See Mecca v. United States, 389 F. App'x 775, 780 (10th Cir. 2010).[11]  It The Tenth

---

[11]Mecca v. United States is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.

Circuit has explained: "'A longstanding line of cases from this circuit holds that where the district court dismisses an action for lack of jurisdiction . . . the dismissal must be without prejudice.'" Mecca v. United States, 389 F. App'x at 780 (quoting Brereton v. Bountiful City Corp., 434 F.3d 1213, 1216 (10th Cir. 2006)). The Tenth Circuit held in Mecca v. United States that the district court improperly dismissed with prejudice the plaintiff's FTCA claims after it concluded that it lacked jurisdiction over those claims. See 389 F. App'x at 780-81 ("Here, because the district court found itself without jurisdiction over the FTCA claims, dismissal should have been entered without prejudice, even if the court deemed further amendment futile. We therefore remand with instructions to enter dismissal of these claims without prejudice.").

In 1948, Congress enacted the FTCA, which waives the United States' sovereign immunity for some tort actions against the United States seeking money damages. See 28 U.S.C. § 1346(b). See also Fed. Deposit Ins. v. Meyer, 510 U.S. 471, 475 (1994)(discussing the history of the FTCA); Warren v. United States, 244 F. Supp. 3d 1173, 1212 (D.N.M. 2017)(Browning, J.); Romanach v. United States, 579 F. Supp. 1017, 1019 (D.P.R. 1984)(Laffitte, J.). In enacting the FTCA, Congress waived the United States' sovereign immunity as to

> claims against the United States, for money damages accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be held liable to the claimant in accordance

---

> However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court finds that Mecca v. United States, 389 F. App'x 775, 780 (10th Cir. 2010), and the other unpublished opinions cited herein, all have persuasive value with respect to material issues and will assist the Court in its disposition of this Memorandum Opinion.

with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).  "The FTCA's waiver of sovereign immunity is limited, however."  Cortez

v. EEOC, 585 F. Supp. 2d 1273, 1284 (D.N.M. 2007)(Browning, J.).  "If the claim does not fall

within the FTCA's express provisions, or if it falls within one of its exceptions, the claim is not

cognizable under the FTCA, and the court must deny relief."  Cortez v. EEOC, 585 F. Supp. 2d at

1284 (citing Williams v. United States, 50 F.3d at 304-05).  Moreover, the only proper party in an

action under the FTCA is the United States.  See 28 U.S.C. § 2679(a); Romanach v. United States,

579 F. Supp. at 1018 n.1 (holding that no suit under the FTCA may lie against any agency of the

United States eo nomine); Painter v. FBI, 537 F. Supp. 232, 236 (N.D. Ga.

1982)(Forrester, J.)(holding that "[t]he FBI may not be sued eo nomine").

Even when the FTCA waives the United States' sovereign immunity, the United States is

liable for FTCA claims, if at all, only "in the same manner and to the same extent as a private

individual under like circumstances."  28 U.S.C. § 2674.  "The Tort Claims Act was designed

primarily to remove the sovereign immunity of the United States from suits in tort and, with certain

specific exceptions, to render the Government liable in tort as a private individual would be under

like circumstances."  Richards v. United States, 369 U.S. 1, 6 (1962).  The FTCA leaves untouched

the states' laws that might apply to the United States once Congress removes that immunity.  See

Richards v. United States, 369 U.S. at 6-7.  The Supreme Court of the United States of America

has noted:

> Rather, [the FTCA] was designed to build upon the legal relationships formulated
> and characterized by the States, and, to that extent, the statutory scheme is
> exemplary of the generally interstitial character of federal law.  If Congress had
> meant to alter or supplant the legal relationships developed by the States, it could
> specifically have done so to further the limited objectives of the Tort Claims Act.

Richards v. United States, 369 U.S. at 6-7.  Accordingly, "the United States is placed in the same

position as a private individual by rendering the United States liable for the tortious conduct of its employees if such conduct is actionable in the state in which the United States' action or inaction occurred." Cortez v. EEOC, 585 F. Supp. 2d at 1284.  See Garcia v. United States, No. CIV 08-0295 JB/WDS, 2010 WL 2977611, at *18 (D.N.M. June 15, 2010)(Browning, J.)("The law of the place where the alleged negligent conduct took place determines the scope of employment under the FTCA.")(citing 28 U.S.C. § 1346(b)).  See Richards v. United States, 369 U.S. at 9; Williams v. United States, 350 U.S. 857, 857 (1955); Henderson v. United States, 429 F.2d 588, 590 (10th Cir. 1970).

The United States' liability is coextensive with that of private individuals under the respective states' law, even if comparable government actors or public entities would have additional defenses or additional obligations under that state's law.  See United States v. Olson, 546 U.S. 43, 44-47 (2005); In re FEMA Trailer Formaldehyde Prod. Liab. Litig. (Miss. Plaintiffs), 668 F.3d 281, 288 (5th Cir. 2012)("Because the federal government could never be exactly like a private actor, a court's job in applying the standard is to find the most reasonable analogy.  Inherent differences between the government and a private person cannot be allowed to disrupt this analysis.")(citing LaBarge v. Cty. of Mariposa, 798 F.2d 364, 366-69 (9th Cir. 1986); United States v. Olson, 546 U.S. at 47)); DeJesus v. U.S. Dep't of Veterans Affairs, 479 F.3d 271, 283 n.9 (3d Cir. 2007)("Under the FTCA, the federal government can only be held liable for breaches of duties imposed on private, rather than state, parties."); Ewell v. United States, 776 F.2d at 248-49; Cox v. United States, 881 F.2d 893, 895 (10th Cir. 1989)(stating that "[t]his and other courts have applied the same rationale in holding that the United States may invoke the protection of a [private] recreational use statute"); Proud v. United States, 723 F.2d 705, 706 (9th Cir. 1984)("But appellants overlook the fact that in enacting the FTCA, Congress -- not the Hawaii Legislature -

- determined the tort liability of the United States.  And the FTCA specifically provides that the

federal government's tort liability is co-extensive with that of a private individual under state

law.").  The Tenth Circuit reasoned in Ewell v. United States:

> The main goal of the FTCA was to waive sovereign immunity so that the federal government could be sued as if it were a private person for ordinary torts. Congress was primarily concerned with allowing a remedy where none had been allowed.  There is no evidence that Congress was concerned with the prospect that immunities created solely for private persons would shield the United States from suit.  The Supreme Court, in United States v. Muniz, 374 U.S. 150 . . . (1963), considered whether it is appropriate to apply immunities created by state law to the United States when it is sued under the FTCA.  The Court was concerned with state laws that immunized prison officials from suits by prisoners and concluded that it is "improper to limit suits by federal prisoners because of restrictive state rules of immunity."  374 U.S. at 164 . . . .  The immunity under consideration in that case applied to state, county and municipal prison officials.  Noting its decision in Indian Towing Co. v. United States, 350 U.S. [61,] 65 [(1955)] . . . wherein the Court determined that federal liability had to be determined as if it were a private person and not as if it were a municipal corporation, it concluded that state law immunity applicable to state, county and municipal prison officials would not be applicable to a private person and, therefore, not applicable to the federal government in a suit under the FTCA.
>
> Thus, while immunities afforded state, county and municipal employees are not applicable to the federal government when sued under the FTCA, immunities created by state law which are available to private persons will immunize the federal government because it is liable only as a private individual under like circumstances.  It is evident, therefore, that the Utah district court was correct in granting the motion for summary judgment.

Ewell v. United States, 776 F.2d at 249.

The FTCA "does not apply where the claimed negligence arises out of the failure of the

United States to carry out a [federal] statutory duty in the conduct of its own affairs."  United States

v. Agronics Inc., 164 F.3d 1343, 1345 (10th Cir. 1999).  The Tenth Circuit has recognized that

"[o]ther courts invoke the same rule by the shorthand expressions of immune 'quasi-legislative'

or 'quasi-judicial' action."  United States v. Agronics Inc., 164 F.3d at 1345.  Thus, for example,

courts have rejected FTCA claims premised upon such administrative/regulatory acts or omissions

as: (i) the Federal Aviation Administration's failure to take enforcement action against an entity not complying with federal laws and rules; (ii) the Agriculture Department's failure to prohibit the exportation of disease-exposed cattle; and (iii) various agencies' noncompliance with proper rulemaking procedures.  See United States v. Agronics Inc., 164 F.3d at 1346 (collecting cases).

The Court examined the exceptions to the FTCA's waiver of sovereign immunity in Coffey v. United States, 906 F. Supp. 2d at 1157.  In that case, a plaintiff brought a wrongful death and negligence action against the United States Bureau of Indian Affairs ("BIA") based on its decision to contract with a county detention center.  See 906 F. Supp. 2d at 1121. The United States argued against liability on the grounds that the detention center was an independent contractor and that the United States' decision to contract with it fell within the FTCA's discretionary-function exemption.  See 906 F. Supp. 2d at 1121. The Court agreed on both points.  See 906 F. Supp. 2d at 1121.  It explained that the BIA's decision to contract with the detention center was "a matter of the BIA's judgment and choice, which is susceptible to policy analysis," and thus protected under the discretionary function exemption.  906 F. Supp. 2d at 1157.  It added that the United States "is liable under the FTCA for the actions of its employees only," thereby prohibiting liability for the detention center's actions.  906 F. Supp. 2d at 1164.

## LAW REGARDING PUNITIVE DAMAGES

A chronology of the Supreme Court's and the United States Court of Appeals for the Tenth Circuit's caselaw on the constitutional limitations on punitive damages reveals an increasingly restrictive view of punitive damages awards that greatly exceed compensatory damages.  The Court cannot, as a district court that must faithfully follow controlling constitutional cases, say that the Supreme Court has replaced the guideposts in BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), for constitutional analysis with the bright-line test in Exxon Shipping Co. v. Baker,

554 U.S. 471 (2008), which is now used in maritime cases, but even the Supreme Court's opinion in State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408 (2003), states that "[w]hen compensatory damages are substantial, then a lesser ratio [of punitive to compensatory], perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."  538 U.S. at 425 (emphasis added).  Coupled with the analysis of Exxon Shipping Co. v. Baker, which remains instructive, even if not controlling in constitutional cases, it may be difficult to justify under the Due Process Clause more than a one to one ratio in cases involving substantial compensatory, purely economic damages.

    **1.**    **The Caselaw from the Supreme Court and the Tenth Circuit Concerning Punitive Damages.**

In Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 262 (1989), the Supreme Court held that the Excessive Fines Clause of the Eighth Amendment to the Constitution does not apply to a punitive damages award in a civil case between private parties. See 492 U.S. at 262 (noting that "our cases long have understood [the Eighth Amendment] to apply primarily, and perhaps exclusively, to criminal prosecutions and punishments.").  The Supreme Court held that,

> even if we were prepared to extend the scope of the Excessive Fines Clause beyond the context where the Framers clearly intended it to apply, we would not be persuaded to do so with respect to cases of punitive damages awards in private civil cases, because they are too far afield from the concerns that animate the Eighth Amendment.

492 U.S. at 275.  Although it ultimately declined to review the punitive damages award in Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc. under the Due Process Clause of the Fourteenth Amendment to the Constitution, the Supreme Court nonetheless noted: "There is some authority in our opinions for the view that the Due Process Clause places outer limits on

the size of a civil damages award made pursuant to a statutory scheme." Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. at 277. Although only five justices joined in all parts of the majority opinion in Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., all nine justices concurred that the Due Process Clause might be used in future cases to limit punitive damages awards. See Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. at 280-282 (Brennan, J., concurring in part, joined by Marshall, J.)("I join the Court's opinion on the understanding that it leaves the door open for a holding that the Due Process Clause constrains the imposition of punitive damages in civil cases brought by private parties."); Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. at 282-283 (O'Connor, J., concurring in part, joined by Stevens, J.)("[N]othing in the Court's opinion forecloses a due process challenge to awards of punitive damages or the method by which they are imposed . . . ."). In Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1 (1991), the Supreme Court confronted the questions whether and to what extent the Due Process Clause might limit punitive damages awards in civil cases between private litigants. See 499 U.S. at 15. The Supreme Court held:

> One must concede that unlimited jury discretion -- or unlimited judicial discretion for that matter -- in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities. We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus. With these concerns in mind, we review the constitutionality of the punitive damages awarded in this case.

499 U.S. at 18-19 (internal citations omitted). The underlying facts of Pacific Mutual Life Insurance Co. v. Haslip centered on a life insurance agent for Pacific Mutual Insurance Company who sold life insurance to a number of employees of an Alabama municipality. See 499 U.S. at 4. Although the insureds' employer paid the insureds' premiums to the insurance agent, he

misappropriated most of the funds and failed to forward notices of lapsed coverage to the insureds. See 499 U.S. at 5. The insureds sued both the insurance agent and Pacific Mutual Insurance Company, and the jury awarded $1,040,000.00 in total damages to plaintiff Cleopatra Haslip, including $4,000.00 in out-of-pocket expenditures and compensatory damages of $200,000.00. See 499 U.S. at 6 n.2. Recognizing that the district court had adequately instructed the jury and that the appellate courts had properly analyzed the verdict for excessiveness, the Supreme Court ultimately held that the punitive damages award was constitutional. See 499 U.S. at 19-23. Specifically, the Supreme Court found:

> We are aware that the punitive damages award in this case is more than 4 times the amount of compensatory damages, is more than 200 times the out-of-pocket expenses of respondent Haslip, and, of course, is much in excess of the fine that could be imposed for insurance fraud under Ala. Code §§ 13A-5-11 and 13A-5-12(a) (1982), and Ala. Code §§ 27-1-12, 27-12-17, and 27-12-23 (1986). Imprisonment, however, could also be required of an individual in the criminal context. While the monetary comparisons are wide and, indeed, may be close to the line, the award here did not lack objective criteria. We conclude, after careful consideration, that in this case it does not cross the line into the area of constitutional impropriety. Accordingly, Pacific Mutual's due process challenge must be, and is, rejected.

499 U.S. at 23-24.

The Supreme Court affirmed a punitive damage award of ten million dollars in its next punitive damages case. See TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 446 (1993). The jury in TXO Production Corp. v. Alliance Resources Corp. awarded compensatory damages of only $19,000.00. See TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. at 446. In the plurality opinion, Justice Stevens, joined by Chief Justice Rehnquist and Justice Blackmun, emphasized that the potential harm from the defendant's conduct went beyond the damage that actually occurred: "It is appropriate to consider the magnitude of the potential harm that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as

the possible harm to the other victims that might have resulted if similar future behavior were not deterred." TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. at 460-61 (emphasis original). The defendant, TXO Production Corp., was a large oil and gas company conducting business in twenty-five states, whereas the plaintiff, Alliance Resource Corp., was a smaller company that owned mineral rights in a tract of land that TXO Production considered potentially profitable. See 509 U.S. at 447. TXO Production made a deal with Alliance Resource to acquire its interest, subject to a provision that Alliance Resource would return the consideration TXO Production paid if TXO Production's attorneys found that Alliance Resource's title had failed. See 509 U.S. at 447-48. Knowing that Alliance Resource's title was valid, TXO Production attempted to induce a third party to sign an affidavit stating otherwise, according to the Alliance Resources, so that TXO Production would not have to pay royalties on the oil-and-gas revenues generated on the property, pursuant to the parties' agreement. See 509 U.S. at 449. The jury was ultimately persuaded to agree with Alliance Resource, given its award.

Acknowledging "the shocking disparity between the punitive damage award and the compensatory award," Justice Stevens wrote:

> [T]he shock dissipates when one considers the potential loss to [Alliance Resources], in terms of reduced or eliminated royalties payments, had [TXO Production] succeeded in its illicit scheme. Thus, even if the actual value of the "potential harm" to [Alliance Resource] is not between $5 million and $8.3 million, but is closer to $4 million, or $2 million, or even $1 million, the disparity between the punitive award and the potential harm does not, in our view, "jar one's constitutional sensibilities."

509 U.S. at 462 (quoting Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. at 18). Noting Justice O'Connor's dissenting opinion, in which Justice White and Justice Souter joined, wherein she asserted the "plausible argument" that the sizeable punitive damage award "is explained by the jury's raw, redistributionist impulses stemming from antipathy to a wealthy, out-of-state, corporate

defendant," TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. at 468 (Kennedy, J., concurring),

Justice Kennedy wrote:

> There is, however, another explanation for the jury verdict, one supported by the record and relied upon by the state courts, that persuades me that I cannot say with sufficient confidence that the award was unjustified or improper on this record: TXO acted with malice.  This was not a case of negligence, strict liability, or respondeat superior.  TXO was found to have committed, through its senior officers, the intentional tort of slander of title.  The evidence at trial demonstrated that it acted, in the West Virginia Supreme Court's words, through a "pattern and practice of fraud, trickery and deceit" and employed "unsavory and malicious practices" in the course of its business dealings with respondent.  "The record shows that this was not an isolated incident on TXO's part -- a mere excess of zeal by poorly supervised, low level employees -- but rather part of a pattern and practice by TXO to defraud and coerce those in positions of unequal bargaining power."

TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. at 468-69 (Kennedy, J., concurring)(internal

citations omitted).

          **a.**      **BMW of North America, Inc. v. Gore.**

In BMW of North America, Inc. v. Gore, the Supreme Court found for the first time that a

punitive damages award was unconstitutionally excessive and in violation of the Due Process

Clause's substantive component.  See BMW of N. Am., Inc. v. Gore, 517 U.S. at 585-86.  Noting

that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a

person receive fair notice not only of the conduct that will subject him to punishment, but also of

the severity of the penalty that a State may impose," the Supreme Court set forth three guideposts

for lower courts to consider when determining the constitutionality of a punitive damages award.

See BMW of N. Am., Inc. v. Gore, 517 U.S. at 574-75.  The BMW of North America, Inc. v. Gore

guideposts are: (i) the reprehensibility of the defendant's conduct; (ii) "the disparity between the

harm or potential harm suffered by [the plaintiff] and his punitive damages award;" and (iii) "the

difference between this remedy and the civil penalties authorized or imposed in comparable cases."

517 U.S. at 575.

The plaintiff in BMW of North America, Inc. v. Gore purchased a BMW automobile and later learned that the vehicle had been repainted after it was damaged before its delivery to the plaintiff.  See 517 U.S. at 562.  The manufacturer admitted it was company policy not to disclose such damage to new cars when the cost of repair was less than three percent of the car's suggested retail price. See 517 U.S. at 562.  In addition to compensatory damages in the amount of four-thousand dollars, the jury awarded punitive damages in the amount of four-million dollars. See 517 U.S. at 565.  On appeal, the Supreme Court of Alabama remitted the punitive damages award to two-million dollars.  See 517 U.S. at 567.

With regard to the first guidepost, the reprehensibility of the defendant's conduct, the Supreme Court held that "BMW's conduct was not sufficiently reprehensible to warrant imposition of a $2 million exemplary damages award."  517 U.S. at 580.  Noting that "[t]he $2 million punitive damages awarded to Dr. Gore by the Alabama Supreme Court is 500 times the amount of his actual harm as determined by the jury," 517 U.S. at 582, the Supreme Court found the relationship between punitive and compensatory damages to be "breathtaking" and held that it "must surely 'raise a suspicious judicial eyebrow,'" 517 U.S. at 583.  With regard to the third guidepost, the Supreme Court held that "the $2 million economic sanction imposed on BMW is substantially greater than the statutory fines available in Alabama and elsewhere for similar malfeasance."  517 U.S. at 584.  Thus, the Supreme Court reversed and remanded the Supreme Court of Alabama's remitted amount.  See 517 U.S. at 586.

In the first punitive damages case the Tenth Circuit considered after BMW of North America, Inc. v. Gore, the Tenth Circuit remitted a punitive damages award to an amount "approximately six times the actual and potential damages plaintiffs suffered."  Cont'l Trend Res.,

Inc. v. OXY USA, Inc., 101 F.3d 634, 643 (10th Cir. 1996)(reversing district court's denial of remittitur and reducing punitive damages award of $30 million to $6 million).  A number of punitive damages decisions thereafter used the six to one ratio.  See United Phosphorous, Ltd. v. Midland Fumigant, Inc., 205 F.3d 1219, 1231 (10th Cir. 2000)(affirming as constitutional a punitive damages award of $653,217.00 where compensatory damages were $67,694.00, after noting that adding the plaintiff's lost profits to the compensatory damages would "bring[] the punitive to harm ratio down to less than 6:1"); Fed. Deposit Ins. Corp. v. Hamilton, 122 F.3d 854, 862 (10th Cir. 1997)("[W]e reverse the $1,200,000.00 punitive damage award entered by the district court, and order a remittitur to $264,000.00, an amount representing six times the actual damages suffered by the Hamiltons.").

On the other hand, also after BMW of North America, Inc. v. Gore, case law from the Tenth Circuit suggested that it would allow punitive to compensatory damages ratios of greater than ten to one.  See United Phosphorous, Ltd. v. Midland Fumigant, Inc., 205 F.3d at 1230 (10th Cir. 2000)(noting that "the 10:1 ratio is not a sacred line in the sand, across which no punitive award may venture without feeling the wrath of an appellate court's constitutional sword").  Indeed, in some cases, the Tenth Circuit permitted punitive to compensatory ratios greater than ten to one.  See Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d 1262, 1272-73 (10th Cir. 2000)(holding that punitive damages award of $295,000.00 was not constitutionally excessive despite compensatory damages of only $5,000.00, because "both the Supreme Court and this court acknowledge that low awards of compensatory damages may support a higher ratio if a particularly egregious act has resulted in a small amount of economic damages"); Bielicki v. Terminix Int'l Co., 225 F.3d 1159, 1165 (10th Cir. 2000)(affirming as constitutional the district court's award of punitive damages where "[t]he ratio between the punitive damages and compensatory damages

awarded by the jury is 12 to 1").

        **b.**      **State Farm Mutual Automobile Insurance Co. v. Campbell.**

The Supreme Court returned to the question of the constitutional limits on punitive damages in State Farm Mutual Automobile Insurance Co. v. Campbell, where the Supreme Court considered a bad-faith failure to settle claim brought by an insured against its insurer.  See 538 U.S. at 412.  The jury at the district-court level awarded one million dollars in compensatory damages and $145 million in punitive damages.  See 538 U.S. at 412.  The Supreme Court found the question whether punitive damages were excessive to be "neither close nor difficult."  538 U.S. at 418.  Although it found that "State Farm's handling of the claims against the Campbells merits no praise," 538 U.S. at 419, the Supreme Court found that the punitive damages award -- or at least the analysis of the first guidepost, reprehensibility -- was based more on State Farm's "nationwide policies than for the conduct directed toward the Campbells," 538 U.S. at 420.  The Supreme Court declined to impose any bright-line ratio of punitive to compensatory damages under the second guidepost, but held that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."  538 U.S. at 425.  With regard to the third guidepost, the Supreme Court found: "The most relevant civil sanction under Utah state law for the wrong done to the Campbells appears to be a $10,000 fine for an act of fraud, an amount dwarfed by the $145 million punitive damages award."  538 U.S. at 428 (internal citation omitted).  The Supreme Court noted that, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."  538 U.S. at 425.  All in all, the Supreme Court held in State Farm Mutual Automobile Insurance Co. v. Campbell:

      An application of the Gore guideposts to the facts of this case, especially in light

of the substantial compensatory damages awarded (a portion of which contained a punitive element), likely would justify a punitive damages award at or near the amount of compensatory damages. The punitive award of $145 million, therefore, was neither reasonable nor proportionate to the wrong committed, and it was an irrational and arbitrary deprivation of the property of the defendant.

538 U.S. at 429.

After the Supreme Court's holding in State Farm Mutual Automobile Insurance Co. v. Campbell, the Tenth Circuit affirmed an award with a ratio of twenty to one. See Haberman v. The Hartford Ins. Grp., 443 F.3d 1257, 1263 (10th Cir. 2006)(considering a $100,000.00 punitive damage award with actual damages of $5,000.00). Noting the Supreme Court's admonition in State Farm Mutual Automobile Insurance Co. v. Campbell that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," the Tenth Circuit nonetheless affirmed the twenty to one ratio. Haberman v. The Hartford Ins. Grp., 443 F.3d at 1272. The Tenth Circuit found it persuasive, with the reprehensibility of the defendant's conduct, that the compensatory damages were relatively low. See 443 F.3d at 1272 ("We are not convinced that the low award of compensatory damages in this case cannot support the more than single digit ratio.").

### c. Exxon Shipping Co. v. Baker.

Although the binding precedential value of the Supreme Court's most recent punitive damages decision in Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008), is limited to maritime cases, see Exxon Shipping Co. v. Baker, 554 U.S. at 513, some commentators view the decision as signaling an intention to adopt a bright-line punitive to compensatory damages ratio of one to one in all cases, see, e.g., Joni Hersch & W. Kip Viscusi, Punitive Damages by Numbers: Exxon Shipping Co. v. Baker, 18 Sup. Ct. Econ. Rev. 259, 260 (2010)(stating that, "[g]iven the earlier statements by the Court in State Farm v. Campbell," and "the Court's reliance in Exxon Shipping

Co. v. Baker on statistical analyses of punitive damages that are not specific to maritime cases, there is considerable likelihood that the 1:1 ceiling ultimately will have ramifications beyond maritime cases."); Michael L. Brooks, Uncharted Waters: The Supreme Court Plots the Course to a Constitutional Bright-Line Restriction on Punitive Awards in *Exxon Shipping Co. v. Baker*, 62 Okla. L. Rev. 497, 517-18 (2010)("[A]lthough the precise holding in Exxon may be narrow, the case is likely to have a substantial impact on the constitutional dimension of punitive damages."). But see Erwin Chemerinsky, A Narrow Ruling on Punitive Damages, Trial, Sept. 2008, at 62, 63 ("[T]he Court was clear that it was dealing only with punitive damages in maritime cases. At most, its reasoning can be applied to other areas of federal common law where punitive damages are allowed.").

Exxon Shipping Co. v. Baker was a lawsuit that commercial fishermen and native Alaskans brought for economic damages arising from the grounding of the supertanker Exxon Valdez on a reef off the Alaskan coast, which caused millions of gallons of crude oil to spill into Prince William Sound. See 554 U.S. at 476. After the United States Court of Appeals for the Ninth Circuit remitted the matter twice, the punitive damages award on appeal to the Supreme Court was $2.5 billion. See Exxon Shipping Co. v. Baker, 554 U.S. at 481. Total compensatory damages in the case were $507.5 million. See 554 U.S. at 515. The Supreme Court held that punitive damages in maritime cases should be limited to a one to one ratio. See 554 U.S. at 513. Although it did not decide Exxon Shipping Co. v. Baker on constitutional grounds, but rather pursuant to maritime law, the Supreme Court held: "In State Farm, we said that a single-digit maximum is appropriate in all but the most exceptional of cases, and '[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.'" Exxon Shipping Co. v. Baker, 554 U.S. at 514-15.

Justice Ginsburg appears to be among those who view <u>Exxon Shipping Co. v. Baker</u> as a sign of things to come in the Supreme Court's due-process jurisprudence.  In her dissent, she wrote:

> In the end, is the Court holding only that 1:1 is the maritime-law ceiling, or is it also signaling that any ratio higher than 1:1 will be held to exceed "the constitutional outer limit"?  On next opportunity, will the Court rule, definitively, that 1:1 is the ceiling due process requires in all of the States, and for all federal claims?

554 U.S. at 524 (Ginsburg, J., dissenting).

As constitutional scholar Erwin Chemerinsky has noted, the Supreme Court's "reasoning was less about maritime law and more about the need for predictable and consistent rules for punitive damages awards."  Chemerinsky, <u>A Narrow Ruling on Punitive Damages</u> at 62.  Along these lines, the Supreme Court expressly rejected the "verbal" approach to judicial review of punitive damages -- the approach taken in the Supreme Court's prior punitive damages jurisprudence -- in <u>Exxon Shipping Co. v. Baker</u>.  <u>Exxon Shipping Co. v. Baker</u>, 554 U.S. at 503-504.  After reviewing examples of state-law jury instructions on punitive damages, the Supreme Court noted:

> These examples leave us skeptical that verbal formulations, superimposed on general jury instructions, are the best insurance against unpredictable outliers.  Instructions can go just so far in promoting systemic consistency when awards are not tied to specifically proven items of damage (the cost of medical treatment, say), and although judges in the States that take this approach may well produce just results by dint of valiant effort, our experience with attempts to  produce consistency in the analogous business of criminal sentencing leaves us doubtful that anything but a quantified approach will work.

554 U.S. at 504.  The Supreme Court concluded that, rather than imposing caps on punitive damages, "the more promising alternative is to leave the effects of inflation to the jury or judge who assesses the value of actual loss, by pegging punitive to compensatory damages using a ratio or maximum multiple."  554 U.S. at 506.

2.      **Determining the Constitutional Limits on Punitive Damages Awards**.

Even in the context of a constitutional due-process analysis, the Supreme Court has recognized the value of "pegging punitive to compensatory damages using a ratio." Exxon Shipping Co. v. Baker, 554 U.S. at 506. See Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. at 23 (holding that, while "the punitive damages award in this case is more than 4 times the amount of compensatory damages" and "may be close to the line," the award "does not cross the line into the area of constitutional impropriety"); BMW of N. Am., Inc. v. Gore, 517 U.S. at 580-81 (adopting as a "guidepost" the requirement that "exemplary damages must bear a 'reasonable relationship' to compensatory damages"). Indeed, the Supreme Court has held: "Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 425. "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 425. Because the Supreme Court's reasoning in Exxon Shipping Co. v. Baker applies in cases outside the realm of maritime law, the Court will consider the reasoning, along with the guideposts identified in BMW of N. Am., Inc. v. Gore, mindful that the BMW of N. Am., Inc. v. Gore constitutional analysis controls the Court's analysis in non-maritime cases. Cf. Agostini v. Felton, 521 U.S. 203, 237 (1997)("[I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (citation omitted)).

a.   **The First** BMW of North America, Inc. v. Gore **Guidepost: "Some Wrongs Are More Blameworthy Than Others."**

The reprehensibility of the Defendant's conduct is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." BMW of N. Am., Inc. v. Gore, 517 U.S. at 575.  The Supreme Court has set forth five characteristics of conduct that may be relevant to the reprehensibility guidepost: (i) whether the harm was physical versus economic; (ii) whether the conduct evidences "an indifference to or reckless disregard of the health and safety of others"; (iii) the financial vulnerability of the target of the conduct; (iv) whether the conduct involved repeated action versus an isolated incident; and (v) whether "the harm was the result of intentional malice, trickery, or deceit, or mere accident." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 419.  Under these factors, more reprehensible conduct, such as violence or the threat of violence, and "trickery and deceit," is considered more deserving of substantial punitive damage awards. BMW of N. Am., Inc. v. Gore, 517 U.S. at 575.  Where a plaintiff experiences purely economic harm, on the other hand, a substantial punitive damage award is less justified. See BMW of N. Am., Inc. v. Gore, 517 U.S. at 575.  The Supreme Court has also noted, however, that "the infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty." BMW of N. Am., Inc. v. Gore, 517 U.S. at 577.  See Exxon Shipping Co. v. Baker, 554 U.S. at 494 (internal citations and quotations omitted)(recognizing that "[a]ction taken or omitted in order to augment profit represents an enhanced degree of punishable culpability").  Likewise, "heavier punitive awards have been thought to be justifiable when wrongdoing is hard to detect (increasing chances of getting away with it), or when the value of the injury and the corresponding compensatory award are small (providing low incentives to sue)." Exxon Shipping Co. v. Baker,

554 U.S. at 494.

> **b.    The Second BMW of North America, Inc. v. Gore Guidepost: Punitive Damages Must Bear a Reasonable Relationship to Compensatory Damages.**

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." BMW of N. Am., Inc. v. Gore, 517 U.S. at 580.   In the constitutional context -- as opposed to the maritime context -- the Supreme Court has eschewed a mathematical formula.  See BMW of N. Am., Inc. v. Gore, 517 U.S. at 582 ("Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula").  A punitive damages award of more than 500 times the compensatory damages, however, may be too great to pass constitutional muster.  See BMW of N. Am., Inc. v. Gore, 517 U.S. at 583 ("In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis.  When the ratio is a breathtaking 500 to 1, however, the award must surely 'raise a suspicious judicial eyebrow.'" (internal citation omitted)).   Even before Exxon Shipping Co. v. Baker, absent exceptional circumstances, a ratio of greater than ten to one was likely to be deemed constitutionally excessive.  See BMW of N. Am., Inc. v. Gore, 517 U.S. at 581 (noting that the difference between punitive and actual damages in TXO Prod. Corp v. Alliance Res. Corp. "suggested that the relevant ratio was not more than 10 to 1").  Indeed, in most cases, the maximum ratio of punitive to compensatory damages permitted by the Due Process Clause appears to be nine to one.  See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 425 ("Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.").  At the same time as it appeared to uphold a nine-to-one ratio of punitive to

compensatory damages generally, the Supreme Court in State Farm Mutual Automobile Insurance Co. v. Campbell also noted that: "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 425. Previously, the Supreme Court had affirmed a punitive damages award of "more than 4 times the amount of compensatory damages," although it noted that this award "may be close to the line." Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. at 23-24.

The Supreme Court noted several studies of punitive damage awards in Exxon Shipping Co. v. Baker, expressing its concern with "the stark unpredictability of punitive awards":

> Courts of law are concerned with fairness as consistency, and evidence that the median ratio of punitive to compensatory awards falls within a reasonable zone, or that punitive awards are infrequent, fails to tell us whether the spread between high and low individual awards is acceptable. The available data suggest it is not. A recent comprehensive study of punitive damages awarded by juries in state civil trials found a median ratio of punitive to compensatory awards of just 0.62:1, but a mean ratio of 2.90:1 and a standard deviation of 13.81. Even to those of us unsophisticated in statistics, the thrust of these figures is clear: the spread is great, and the outlier cases subject defendants to punitive damages that dwarf the corresponding compensatories. The distribution of awards is narrower, but still remarkable, among punitive damages assessed by judges: the median ratio is 0.66:1, the mean ratio is 1.60:1, and the standard deviation is 4.54. Other studies of some of the same data show that fully 14% of punitive awards in 2001 were greater than four times the compensatory damages, with 18% of punitives in the 1990s more than trebling the compensatory damages. And a study of "financial injury" cases using a different data set found that 34% of the punitive awards were greater than three times the corresponding compensatory damages.

554 U.S. at 499-500 (citations omitted). Relying on empirical studies of punitive damages awards, the Supreme Court determined that the median ratio for all types of cases -- ranging from those with the least blameworthy conduct triggering punitive damages to those featuring malice -- is less than one to one. See 554 U.S at 512 ("These studies cover cases of the most as well as the least blameworthy conduct triggering punitive liability, from malice and avarice, down to recklessness,

and even gross negligence in some jurisdictions. The data put the median ratio for the entire gamut of circumstances at less than 1:1 . . . .").

        **c.**    **The Third BMW of North America, Inc. v. Gore Guidepost: Civil or Criminal Penalties in Comparable Cases Provide Notice of Potentially Significant Punitive Damages.**

"Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness."  BMW of N. Am., Inc. v. Gore, 517 U.S. at 583.  While "[t]he existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action," the Supreme Court has cautioned that "[p]unitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award."  State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. at 428.  Nonetheless, courts should "accord 'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue."  Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 301 (1989)(O'Connor, J., concurring in part and dissenting in part).

        **d.**    **All Three BMW of North America, Inc. v. Gore Guideposts Need Not Be In Agreement.**

Tenth Circuit decisions suggest that all three BMW of North America, Inc. v. Gore guideposts need not agree to support a finding that a punitive damages award is constitutionally excessive.  For example, in both Continental Trend Resources, Inc. v. OXY USA, Inc., 101 F.3d at 641 and United Phosphorous, Ltd. v. Midland Fumigant, Inc., 205 F.3d at 1231, the Tenth Circuit found that, while the reprehensibility and ratio guideposts both supported their ultimate decision, the facts in those cases "d[id] not lend themselves to comparison with statutory penalties."  Cont'l Trend Res., Inc. v. OXY USA Inc., 101 F.3d at 641.  See United Phosphorous,

Ltd. v. Midland Fumigant, Inc., 205 F.3d at 1231 ("A finding of common law fraud does not lend itself to comparison with statutory penalties.").

### e. The Defendant's Wealth is Relevant to the Determination of Punitive Damages.

Beyond the BMW of North America, Inc. v. Gore factors, the Tenth Circuit also permits consideration of the defendant's wealth when determining whether the punitive damages awarded comport with the Due Process Clause.  See Cont'l Trend Res., Inc. v. OXY USA, Inc., 101 F.3d at 641.  On the one hand, the Tenth Circuit acknowledged that "the Supreme Court in BMW downplayed the defendant's wealth as a justification for increasing punitive damages."  101 F.3d at 641.  On the other hand, however, the Tenth Circuit found that the Supreme Court "places in the constitutional calculus the question of the minimum level of penalty necessary to achieve the state's goal of deterrence."  Cont'l Trend Res., Inc. v. OXY USA, Inc., 101 F.3d at 641.[12]

In Federal Deposit Insurance Corp. v. Hamilton, 122 F.3d 854 (10th Cir. 1997), the Tenth Circuit found that the wealth of the defendant in that case, NationsBank, "cut[] the other way," contrasted with the BMW of North America, Inc. v. Gore guideposts.  122 F.3d at 862.  The defendant's conduct was not significantly reprehensible given that the injury was economic and that "it arises out of a contractual relationship where the parties can and should contractually

---

[12] Thus, the Court in Continental Trend Resources, Inc. v. OXY USA, Inc. quoted BMW of North America, Inc. v. Gore:

> "The sanction imposed in this case cannot be justified on the ground that it was necessary to deter future misconduct without considering whether less drastic remedies could be expected to achieve that goal.  The fact that multimillion dollar penalty prompted a change in policy sheds no light on the question whether a lesser deterrent would have adequately protected the interests of Alabama consumers."

101 F.3d at 641 (quoting quoted BMW of North America, Inc. v. Gore, 517 U.S. at 584-85).

protect themselves by providing for explicit remedies in the event of breach." Fed. Deposit Ins. Corp. v. Hamilton, 122 F.3d at 862 (noting that, under these circumstances, "the permissible ratio of punitive damages to actual damages should be relatively modest").  Also, the Tenth Circuit found that there were not "any civil or criminal penalties applicable to the conduct engaged in by NationsBank," suggesting that "NationsBank was not on notice that its conduct could give rise to substantial non-compensatory liability." Fed. Deposit Ins. Corp. v. Hamilton, 122 F.3d at 862. Still, a punitive to compensatory ratio of six to one was permitted after remittitur, based, in part, on the Tenth Circuit's consideration of the defendant's wealth:

> Although we have been cautioned that the size of the defendant should not ordinarily be a very significant factor, we have also concluded that it is not irrelevant either.  OXY, 101 F.3d at 641.  NationsBank is undeniably a large financial institution, and the $44,000 in fraud damages cannot be expected to serve as much of a deterrent to any future misconduct.  Hence, constitutionally, a higher ratio of punitive to actual damages is warranted here than would be the case if the base level of compensatory damages were a significantly higher figure relative to the size of the defendant.

Fed. Deposit Ins. Corp. v. Hamilton, 122 F.3d at 862.  In Deters v. Equifax Credit Info. Servs., Inc., the Tenth Circuit stated:

> In assessing the reasonableness of the punitive damages award in the instant case, we must consider the purposes of such a remedy, namely to punish and deter.  In this respect, the wealth and size of the defendant are relevant considerations.  We agree with the district court that Equifax's gross operating revenue of $1.8 billion in 1996 could be considered in levying a substantial punitive damages award.

202 F.3d at 1233.

> **f.**      **Litigation Costs, Including Attorney's Fees, Are Appropriately Considered When Evaluating the Constitutionality of Punitive Damages Awards.**

The Tenth Circuit has also noted that "the costs of litigation in order to vindicate rights is an appropriate element to consider in justifying a punitive damages award." Cont'l Trend Res.,

Inc. v. v. OXY USA Inc., 101 F.3d at 642 (citing O'Gilvie v. Int'l Playtex, Inc., 821 F.2d 1438, 1447 (10th Cir. 1987), cert. denied, 486 U.S. 1032 (1988)).  Thus, because there was evidence in Continental Trend Resources, Inc. v. OXY USA Inc. that "OXY thought it could impose its corporate will on plaintiffs," and because the plaintiffs had to endure a three-week trial, a lengthy appellate process, and significant post-trial litigation, the Tenth Circuit felt it was appropriate to consider the likely legal costs in addition to the compensatory damages when evaluating whether the punitive damages award was excessive.  101 F.3d at 642 ("Nothing in BMW would appear to prohibit consideration of the cost of those legal proceedings in determining the constitutionally permissible limits on the punitive damages award.").

### LAW REGARDING THE DISCRETIONARY FUNCTION EXCEPTION

The FTCA contains several exceptions to its waiver of immunity.  See 28 U.S.C. § 2680. The Supreme Court has characterized § 2680(a) as the "boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals."  United States v. Varig Airlines, 467 U.S. 808.  These exceptions must be strictly construed in the United States' favor.  See U.S. Dep't of Energy v. Ohio, 503 U.S. 607, 615 (1992)("Waivers of immunity must be 'construed strictly in favor of the sovereign' and not 'enlarge[d] . . . beyond what the language requires.'"  (alterations in U.S. Dep't of Energy v. Ohio)(first quoting McMahon v. United States, 342 U.S. 25, 27 (1951); then quoting E. Transp. Co. v. United States, 272 U.S. 676, 686 (1927)).

The discretionary function exception provides that the FTCA shall not apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary-function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  Its application is a threshold

jurisdictional issue in any FTCA case.  See Johnson v. U.S. Dep't of Interior, 949 F.2d 332, 335

(10th Cir. 1991).  Cf. Warren v. United States, 244 F. Supp. 3d at 1233 (noting that, at the motion-

to-dismiss stage, in an FTCA case, a plaintiff "must establish more than . . . abstract negligence"

"and, instead, must also first establish that her claims are not based upon actions immunized from

liability under the FTCA's discretionary function exception").  In Berkovitz by Berkovitz v. United

States, the Supreme Court enunciated a two-prong analysis for determining when the FTCA's

discretionary function exception applies.  See 486 U.S. 531, 536 (1988)("Berkovitz"); Domme v.

United States, 61 F.3d at 789-90; Black Hills Aviation, Inc. v. United States, 34 F.3d 968, 972-73

(10th Cir. 1994); Kiehn v. United States, 984 F.2d 1100, 1102-03 (10th Cir. 1993).  First, the acts

or omissions must be "discretionary in nature, acts that 'involve an element of judgment or

choice.'"  United States v. Gaubert, 499 U.S. at 322 (quoting Berkovitz, 486 U.S. at 536).  Second,

the conduct must be "'based on considerations of public policy.'"  United States v. Gaubert, 499

U.S. at 323 (quoting Berkovitz, 486 U.S. at 537).  See Garling v. U.S. Envtl. Prot. Agency, 849

F.3d 1289, 1294-95(10th Cir. 2017)(unpublished).

An action is not discretionary where a statute, regulation, or policy mandates certain

conduct, because the employee has "no room for choice."  United States v. Gaubert, 499 U.S. 315,

324 (1991).  See Garcia v. U.S. Air Force, 533 F.3d at 1176 ("Conduct is not discretionary if 'a

federal statute, regulation, or policy specifically prescribes a course of action for an employee to

follow.  In this event, the employee has no rightful option but to adhere to the directive.'" (quoting

Berkovitz, 486 U.S. at 537)).  On the other hand,

> [w]here Congress has delegated the authority to an independent agency or to the
> Executive Branch to implement the general provisions of a regulatory statute and
> to issue regulations to that end, there is no doubt that planning-level decisions
> establishing programs are protected by the discretionary function exception, as is
> the promulgation of regulations by which the agencies are to carry out the

programs.

United States v. Gaubert, 499 U.S. at 323.

Berkovitz' second prong protects conduct if it was or could have been "'based on considerations of public policy.'"  Kiehn v. United States, 984 F.2d at 1105 (quoting Berkovitz, 486 U.S. at 537).  This principle is a result of the rule that the second prong requires that the challenged conduct must be, by its nature, "susceptible to policy analysis."  United States v. Gaubert, 499 U.S. at 325.  Where agency policy allows an employee to exercise discretion, there is a "strong presumption" that the acts authorized by the policy are grounded in public policy. United States v. Gaubert, 499 U.S. at 324.  Where a plaintiff alleges a negligent omission, it is "irrelevant whether the [omission] was a matter of 'deliberate choice,' or a mere oversight," Kiehn v. United States, 984 F.2d at 1105 (quoting Allen v. United States, 816 F.2d 1417, 1422 n.5 (10th Cir. 1987)), because "[t]he failure to consider some or all critical aspects of a discretionary judgment does not make that judgment less discretionary and does not make the judgment subject to liability," Kiehn v. United States, 984 F.2d at 1105.

The two-prong test in Berkovitz applies equally to all government employees, regardless of their rank or position: "[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case."  United States v. Varig Airlines, 467 U.S. at 813.  See United States v. Gaubert, 499 U.S. at 325 ("Discretionary conduct is not confined to the policy or planning level."); United States v. Varig Airlines, 467 U.S. at 811 ("'Where there is room for policy judgment and decision there is discretion.  It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.'")(quoting Dalehite v. United States, 346 U.S. 15, 35-36 (1953)).

In applying the <u>Berkovitz</u> analysis, the question of negligence is irrelevant: "When the government performs a discretionary function, the exception to the FTCA applies regardless of 'whether or not the discretion involved be abused.'" <u>Redman v. United States</u>, 934 F.2d 1151, 1157 (10th Cir. 1991)(quoting 28 U.S.C. § 2680(a)). A court must decide first whether the discretionary function exception shields the "government's conduct" before the court addresses the government's duties under the common law. <u>Domme v. United States</u>, 61 F.3d at 789. The Tenth Circuit has explained:

> Considering state tort law as a limit on the federal government's discretion at the jurisdictional stage impermissibly conflates the merits of plaintiffs' claims with the question whether the United States has conferred jurisdiction on the courts to hear those claims in the first place. Indeed, the only conceivable way plaintiffs might succeed on their theory is by pointing to a *federal* policy incorporating state tort law as a limit on the discretion of federal employees with the meaning of the FTCA.

<u>Sydnes v. United States</u>, 523 F.3d 1179, 1184 (10th Cir. 2008)(emphasis in original).

## ANALYSIS

First, the Court will not dismiss the Plaintiffs' allegations regarding the United States' failure to transfer Suina and R. Tolbert to a different hospital, because the Plaintiffs' SF-95s provided the United States with adequate notice of the Plaintiffs' claims. <u>See</u> 28 U.S.C. § 2675(a); Attachment A to SF-95 Re: Phillip Tolbert, Individually at 3, filed August 18, 2020 (Doc. 50-3)("Attachment to Tolbert SF-95"); Attachment A to SF 95 Re: Charlene Mary Suina and Phillip Tolbert, as Personal Representatives for the Estate of Rose Tolbert at 3, filed August 18, 2020 (Doc. 50-4)("Attachment to Estate SF-95");[13] Tr. at 21:21-22:6 (Curtis). Second, the Court will dismiss the negligent training claim, and dismiss in part the negligent credentialing and privileging

---

[13]The two SF-95s contain identical descriptions of the events at issue. <u>See</u> Attachment to Tolbert SF-95 at 3; Attachment to Estate SF-95 at 3.

claims under the discretionary function exception. Third, the Court will dismiss the emergency room equipment claim, because selecting emergency room equipment involves discretionary policy decisions. Fourth, the Court will dismiss the Plaintiffs' request for punitive damages and prejudgment interest, because 28 U.S.C. § 2674 prohibits the Court from awarding such damages against the United States in FTCA cases.

I.     **THE PLAINTIFFS' SF-95S PROVIDE SUFFICIENT NOTICE TO THE UNITED STATES OF THE PLAINTIFFS' CLAIMS.**

The Court has jurisdiction over this case, because the Plaintiffs have exhausted their administrative remedies. See 28 U.S.C. § 2675(a); Attachment to Tolbert SF-95 at 3; Attachment to Estate SF-95 at 3; Tr. at 21:21-22:6 (Curtis). The FTCA requires prospective plaintiffs to "have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency." 28 U.S.C. § 2675(a). An SF-95 "claim should give notice of the underlying facts and circumstances 'rather than the exact grounds upon which [the claimant] seeks to hold the government liable.'" Staggs, 425 F.3d at 884 (10th Cir. 2005)(alterations in original)(quoting Trentadue ex rel. Aguilar v. United States, 397 F.3d 840, 853 (10th Cir. 2005)). The SF-95 need only contain "(1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum certain damages claim." Cizek v. United States, 953 F.2d 1232, 1233 (10th Cir. 1992). Here, because the SF-95 provides a detailed summary of the events that the Plaintiffs allege led to R. Tolbert's death, and because the SF-95 asks for $15,000,000.00, the SF-95 satisfies the FTCA's administrative exhaustion requirement.

The United States insists that the Plaintiffs' "administrative claims did not alert a legally trained reader that Plaintiffs would assert negligence for any acts preceding Baby Tolbert's delivery." Reply at 1. The United States therefore asks the Court to dismiss "the claim of negligent

failure to transfer . . . ."   Motion at 1.   The Plaintiffs' SF-95s both state, however, that the

decedent's mother, "Charlene Mary Suina went to Gallup Indian Medical Center at 5:30 p.m."

Tolbert SF-95 Attachment at 3; Estate SF-95 Attachment at 3 (same).   The SF-95s provide the

following detailed discussion of the pre-delivery period:

> Charlene Mary Suina and Philip Tolbert were thirty-five weeks pregnant
> with baby Rose Sky Tolbert on September 9, 2017.   Charlene Mary Suina went to
> Gallup Indian Medical Center at 5:30 p.m. that evening because she didn't feel well
> and wanted to be checked out.   At 7:06 p.m., Ms. Suina was admitted to Labor and
> Delivery.   She told the providers that she "just doesn't feel right."   Because of fetal
> tachycardia and abdominal pain, the possibility of an emergent delivery was
> discussed.   Ms. Suina gave consent for a cesarean section and had previously
> consented to a bilateral tubal ligation post-delivery.
>
> Over 5 hours later, at 11:09 p.m., Ms. Suina is seen by Dr. Gienia Lynch,
> who notes that Ms. Suina was still in pain.   At 11:32 p.m., Dr. Lynch notes
> indications for a cesarean section.   Ms. Suina is taken to the operating room.
> MR. Tolbert is reached while working driving his semi-truck.   He heads for Gallup.

Tolbert SF-95 Attachment at 3; Estate SF-95 Attachment at 3 (same).   There are several facts in

this portion of the SF-95 that indicate that the pre-delivery period would be at issue in this

litigation.   First, the SF-95 states that Suina was "thirty-five weeks pregnant."   Tolbert SF-95

Attachment at 3.   Babies typically are born after the mother has been pregnant for forty weeks;

R. Tolbert, therefore, was five weeks premature.   See Why is 40 Weeks so Important, New York

Department                                        of                                        Health,

https://www.health.ny.gov/community/pregnancy/why_is_40_weeks_so_important.htm       (last

visited July 20, 2021); Tolbert SF-95 Attachment at 3.   Additionally, Suina told persons at Gallup

Medical that she "didn't feel right" and was experiencing abdominal pain.   See Tolbert SF-95

Attachment at 3.   The SF-95 also discusses R. Tolbert's fetal tachycardia.[14]   See Tolbert SF-95

---

[14]Fetal tachycardia is "an abnormal increase in the fetal heart rate.   It is variably defined as

Attachment at 3.   In addition, the SF-95 notes that it took around seven hours from when Suina arrived at the hospital complaining of pain to when she was taken to the operating room for a caesarean section.   See Tolbert SF-95 Attachment at 3.  In sum, the SF-95's detailed discussion of the predelivery period, including: (i) its indication that R. Tolbert was a premature baby; (ii) the length of time it took from when Suina arrived at the hospital to when she received a caesarean section; (iii) R. Tolbert's elevated heart rate; and (iv) Suina's complaints of abdominal pain and that she did not feel right, was enough to satisfy the "FTCA's eminently pragmatic written, claim-presentation requirement . . . that the written statement provide *due notice* that the agency should investigate the possibility of *particular* (potentially tortious) conduct" during the pre-delivery period.  Benally, 735 F. App'x at 485 (emphasis in original).  See Staggs, 425 F.3d at 884; Tolbert SF-95 Attachment at 4; Estate SF-95 Attachment at 4.  "[T]he long-held understanding that courts should liberally construe the universe of facts that the FTCA claimant provides" in an SF-95 bolsters the Court's conclusion.  Benally, 735 F. App'x at 485.

The Complaint also contains the following discussion of the United States' decision not to transfer Suina:

> Ms. Suina had a prior history of c-section and placental abruption, which was known by Dr. Lynch.  Dr. Lynch made a choice not to transfer Ms. Suina for the obvious required c-section of her premature 35-week old baby regardless of the lack of any neonatal intensive care unit at GIMC, or any qualified specialized neonatal staff to care for a premature baby.
>
>  . . . .
>
> Ms. Suina should have been transferred to a higher level of care for immediate c-section given her history, signs and symptoms, and the obvious need for a neonatal intensive care unit for the impending delivery of a pre-mature baby

---

a heart rate above 160-180 beats per minute (bpm) and typically ranges between 170-220 bpm . . . ."   Mostafa El-Fey & Yuranga Weerakkody, Fetal Tachycardia, Radiopaedia, https://radiopaedia.org/articles/fetal-tachycardia?lang=us (last visited July 29, 2021).

of a mother with gestational diabetes which carries an additional risk to the baby of lung immaturity, on top of the expected lung immaturity of simply being prematurely born.

It was a breach of the standard of care for Dr. Lynch and all other health care providers involved in the pre-birth care of Ms. Suina and baby Rose to fail to transfer them to a higher level of care, where a safe and appropriate immediate delivery care and a neonatal intensive care unit were available.

. . . .

Dr. Greenholz should know the level of care available at GIMC and should have transferred the baby to a higher level of care for neonatal intensive unit care and treatment if she was unable to provide the needed specialization to baby Rose, given her limitation as a general pediatrician. Dr. Greenholz's failures were a breach of the standard of care which contributed to cause baby Rose's wrongful death.

Complaint ¶¶ 3, 7-8, 12, at 2-4.  The SF-95s contain many of these facts; for example, they note that delivery occurred when Suina was "thirty-five weeks pregnant."[15]  Tolbert SF-95 Attachment at 3; Estate SF-95 Attachment at 3 (same).  Moreover, the Plaintiffs clarify that there "is no 'claim' for failure to transfer . . . .  The claim is for medical negligence and Defendant should be well aware it is for both the pre-delivery and post-delivery period."  Response at 8.  The FTCA does not require a plaintiff's complaint to mirror identically the SF-95.  See 28 U.S.C. § 2675(a); Staggs, 425 F.3d at 884.  Further, the Plaintiffs provide notice of their medical negligence claim in the SF-95s, see Tolbert SF-95 at 3; the Complaint's statement regarding the transfer bolsters their negligence claim and is not a standalone claim.   As the Court noted at the hearing, the SF-95s here are "about as detailed as any SF-95" that the Court has seen.  Tr. at 6:23-25 (Court).  Forbidding the Plaintiffs from including information about a possible transfer would penalize

---

[15]"Labour that starts before 37 weeks is considered premature.  If [a] baby is born early, he or she may need special care in [a] hospital."  You and Your Baby at 35 weeks pregnant, National Health Service (July 17, 2018),  https://www.nhs.uk/pregnancy/week-by-week/28-to-40-plus/35-weeks/.

improperly the Plaintiffs because they have "gone to the trouble of doing such a detailed Complaint . . . ."  Tr. at 6:15-20 (Court).  Accordingly, the Court will consider the Complaint's discussion of the Defendants' alleged "fail[ure] to transfer [Suina and baby R. Tolbert] to a higher level of care, where a safe and appropriate immediate delivery care and a neonatal intensive care were available."  Complaint ¶ 7, at 3.

The United States relies upon Benally to support its assertion that THE "Plaintiffs' administrative claims provided insufficient notice to the government of a brand-new claim alleged in the complaint."  Motion at 11 (citing Benally, 735 F. App'x at 486).  The facts here, however, are distinguishable from those in Benally, an unpublished case.  There, the SF-95 contained only one reference to the post-operative period -- it mentioned her "'surgery and . . . injury months later . . . .'"  735 F. App'x at 486 (quoting the record).  The SF-95 alleged that the surgery itself was negligently performed, but "made no reference to post-operative care or Dr. Poe," one of the defendants, "much less suggested negligent conduct by Dr. Poe during that post-operative period."  735 F. App'x at 486.  The Tenth Circuit therefore held that the plaintiff's SF-95 did not provide sufficient notice that she "intended to challenge the post-operative care that she received -- specifically, from Dr. Poe." 735 F. App'x at 486.

This case is distinguishable from Benally because, as described above, unlike the plaintiff in Benally, the Plaintiffs make detailed reference in their SF-95 to the pre-delivery period, providing two paragraphs discussing the pre-delivery period, in contrast to the passing reference to the post-operative period in the Benally SF-95.  See Tolbert SF-95 Attachment at 3.  The facts in the SF-95, including (i) its indication that R. Tolbert was a premature baby; (ii) the length of time it took from when Suina arrived at the hospital to when she received a caesarean section; (iii) R. Tolbert's elevated heart rate; and (iv) Suina's complaints of abdominal pain and that she

did not feel right, "suggested negligent conduct" in the preoperative period.  <u>Benally</u>, 735 F. App'x at 486.  <u>See</u> Tolbert SF-95 Attachment at 3.  Moreover, the Tenth Circuit's ruling implies that it was concerned that the post-operative period in <u>Benally</u> lasted for months and thereby would impose a high burden on the agency to investigate.  <u>See</u> 735 F. App'x at 487.  Thus, without notice that the claim encompassed the post-operative period, the agency was at a significant disadvantage, because there was a months-long period it had not investigated.  <u>See</u> 735 F. App'x at 487.  Here, by contrast the pre-delivery period was approximately seven hours, which does not impose the same burden on the agency.  <u>See</u> Tolbert SF-95 Attachment at 3.  Consequently, the <u>Benally</u> holding supports the Court's ruling in this case, because the Plaintiffs here supplied the amount of detail in their SF-95s that "explicitly . . . presented to the government . . . concerns related to" R. Tolbert's pre-"operative care," and the agency easily could have investigated the pre-delivery period, given that it lasted for only seven hours.  <u>Benally</u>, 735 F. App'x at 487.  <u>See</u> Tolbert SF-95 Attachment at 3.

## II.   THE COURT DISMISSES IN PART THE NEGLIGENT HIRING, CREDENTIALING, PRIVILEGING, TRAINING, AND SUPERVISION CLAIMS TO THE EXTENT THAT THESE CLAIMS FALL UNDER THE FTCA'S <u>DISCRETIONARY FUNCTION EXCEPTION</u>.

The FTCA instructs:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).   The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals."  <u>United States v. Varig</u>

Airlines, 467 U.S. at 808.  In Berkovitz, the Supreme Court enunciated a two-prong analysis for determining when the FTCA's discretionary function exception applies:  First, "[i]n examining the nature of the challenged conduct, a court must first consider whether the action is a matter of choice for the acting employee."  Berkovitz, 486 U.S. at 536.  Second, "assuming the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield."  Berkovitz, 486 U.S. at 536. Specifically, the Court evaluates whether the challenged conduct implicates public policy decisions that Congress sought to protect "from judicial second guessing."  Begay v. United States, No. CIV 15-0358 JB/SCY, 2016 WL 6394925, at *30 (D.N.M. Sept. 30, 2016) (Browning, J.)("Begay")(citing Berkovitz, 486 U.S. at 536).  The Court will "presume that a government agent's discretionary actions are grounded in policy, and it is up to the challenger to allege facts showing that the actions were actually not policy-oriented."  Hardscrabble Ranch, L.L.C. v. United States, 840 F.3d 1216, 1222 (10th Cir. 2016).

At the hearing, the Court stated that it would dismiss "the claims of negligent hiring,[16] credentialing, privileging, training, and supervision[17] of the medical personnel," because, "as a general rule they fall into . . . categories that are subject to the discretionary function exception." Tr. at 71:2-7 (Court).  See Begay, 2016 WL 6394925, at *31 ("Not all, most, or generic hiring and

---

[16]The United States asks the Court to dismiss the Plaintiffs' "claims of negligent hiring . . . ."  Motion at 1.  The Plaintiffs do not raise a negligent hiring claim in the Complaint. See Complaint ¶¶ 1-58, at 1-12.  Yet, at the hearing, the Court asked the Plaintiffs whether their "claims cover negligent hiring," and the Plaintiffs agreed.  Tr. at 36:11-14 (Court, Curtis).

[17]The United States asks the Court to dismiss the Plaintiffs' "claims of negligent . . . supervision."  Motion at 1.  The Plaintiffs do not raise a negligent supervision claim in the Complaint.  See Complaint ¶¶ 1-58, at 1-12.  Yet, at the hearing, when the Court asked the Plaintiffs whether their "claims cover negligent . . . supervision," the Plaintiffs agreed.  Tr. at 36:11-14 (Court, Curtis).

credential decisions can be brought against the United States.  As a rule, plaintiffs cannot generally challenge hiring and credentialing decisions, because they are discretionary."  After evaluating closely the Complaint and the briefing, the Court dismisses the negligent training claim, and dismisses in part the negligent credentialing and privileging claims under the discretionary function exception.

First, regarding the negligent training claim, the Complaint alleges that the hospital's nursing staff

> were either not properly trained to manage the medical care of a premature baby, such as baby Rose that requires neonatal intensive care unit level care and/or were negligent in the care of pre-mature baby Rose.  Additionally, given their failure in training and/or in the provision of medical care to baby Rose, they contributed to cause her wrongful death.

Complaint ¶ 13, at 4.  In the Response, the Plaintiffs do not discuss in detail whether the discretionary function exception applies to the negligent training claim, but focus instead on the negligent hiring and credentialing claims.  See Response at 9-16.  "The Court and Courts of Appeals have previously concluded that decisions about training are discretionary functions, as the" relevant agency "must weigh the costs, time, and benefits of training."  De Baca v. United States, 399 F. Supp. 3d 1052, 1223 (D.N.M. 2019)(Browning, J.)(citing Kelly v. United States, 241 F.3d 755, 763 (9th Cir. 2001); Redmon By & Through Redmon v. United States, 934 F.2d 1151, 1156 (10th Cir. 1991); and Garcia v. United States, 709 F. Supp. 2d 1133, 1151-52 (D.N.M. 2010)(Browning, J.)), aff'd sub nom. Ohlsen v. United States, 998 F.3d 1143 (10th Cir. 2021)).

Applying the Berkovitz test, the Court concludes that the discretionary function exception bars the Plaintiffs' negligent training claim, because the manner in which a hospital trains its medical staff to care for premature babies generally "appears to be a function that carries with it a large measure of discretion," Garcia v. United States, 709 F. Supp. 2d at 1151, and the Plaintiffs

have not identified, nor has the Court discovered, any statutes or regulations to the contrary, see Response at 9-16; Reply at 8-9 ("Plaintiffs have provided no language regarding training that GIMC must provide to its medical staff.").   The Plaintiffs insist that the Defendants were "not properly trained to manage the medical care of a premature baby."  Complaint ¶ 13, at 4.  Chapter 13 of the I.H.M. contains some specific provisions regarding training for medical staff attending to maternal and child health.  See, e.g., I.H.M. 3-13.2 ("Each practitioner should have experienced at least 30 supervised deliveries during training or on-the-job experience in order to have independent obstetric privileges."); I.H.M. 3-13.7 (requiring training for hospital staff "include[s] identification of abuse/neglect; medical evaluation, and appropriate elements regarding medical record entries and testimony relevant to the medicolegal aspects of" child abuse and neglect).  By contrast, regarding premature babies, the I.H.M. does not specify the required training for staff. See I.H.M. Ch. 13.  In general, a hospital's training of its doctors and nurses "involves substantial policy considerations."   Garcia v. United States, 709 F. Supp. 2d at 1152.  Here, Gallup Medical may have considered several factors, including cost, the training their existing staff had received elsewhere, how regularly premature babies are born in the area the that hospital services, and how regularly full term babies are born in the area which the hospital services, when deciding what training regarding premature babies to provide its medical staff.   Here, the discretionary function exception applies to the negligent training claim, because there is no mandatory regulation and because hospital training decisions are otherwise "a matter of choice for the acting employee" and "involve[] an element of judgment . . . of the kind that the discretionary function exception was designed to shield."  Berkovitz, 486 U.S. at 536.   Consequently, the Court dismisses the Plaintiffs' negligent training claim.  See Tr. at 71:2-7 (Court).  See also Complaint ¶ 13, at 4.

Second, the Complaint details the following negligent credentialing and privileging claims:

Defendants Lynch, Greenholz, Leach, Rubaii, Alvarez-Colon, and Hamel were credentialed to be members of the Medical Staff of GIMC and granted privileges to perform specific medical conduct at GIMC on September 9 and 10, 2017, which caused their involvement in the care and treatment of baby Rose and her mother Charlene Suina.

. . . .

Plaintiffs are prohibited from publicly accessing information on GIMC's credentialing and privileging of the above physicians until after the filing of the lawsuit, and as such the only good faith basis Plaintiffs have to assert negligent credentialing and privileging of Defendant physicians is the gross negligence and/or reckless disregard for the safety of their patients shown by their conduct in treating baby Rose and her mother Charlene Suina.

Complaint ¶¶ 51-52, at 10.     Here, as in <u>Begay</u>, the Court holds that "the discretionary-function exception does not apply to [Indian Health Services] ["]IHS["] conduct hiring and credentialing . . . under I.H.M. 3-1.4(C)(5)." <u>Begay</u>, 2016 WL 6394925, at *32.  The I.H.M. states:

Members of the medical staff and others who must apply for clinical privileges must hold an active and unrestricted State license, certification, or registration, as applicable, to practice in their professional field. The term "unrestricted" means that there are no restrictions, special considerations, periods of monitoring, or probationary requirements associated with license, certification, or registration that restricts or inhibits the ability of the practitioner to practice his/her profession in the specialty or clinical area for which the practitioner is being hired.  This includes any stipulations that may have a potentially significant adverse impact on patients, the medical staff, or the efficiency of the facility.

In general, providers with any restrictions on any State license, certification, or registration will not be granted medical staff membership or clinical privileges.  However, exceptions may be granted on a case-by-case basis by the Area Director.

I.H.M. § 3-1.4(C)(5).  Similarly, the I.H.M. provides that "all licensed practitioners who provide care at IHS facilities must maintain current licensure and credentials, and be proficient of their granted privileges . . . ."   I.H.M. 3-1.2(A).   These "mandatory . . . regulations" control the privileging and credentialing of IHS doctors, because they require specifically that the IHS verify that its doctors possess valid licenses.  <u>United States v. Gaubert</u>, 499 U.S. 315, 328 (1991).  When

discussing the licensure issue, the Plaintiffs argue that they "must have some discovery to determine whether a negligent hiring/credentialing and privileging case exists . . . ."  Response at 15.   The Court agrees with the Plaintiffs, because "[t]he Court deems the discretionary-function . . . exception[] [a] jurisdictional issue[] on which the Tenth Circuit would direct the Court to permit discovery."   De Baca v. United States, 403 F. Supp. 3d 1098, 1128 (D.N.M. 2019)(Browning, J.).

Nonetheless, generally, "as a rule, plaintiffs cannot generally challenge . . . credentialing decisions."  Begay, 2016 WL 6394925, at *31. This general rule applies to the Plaintiffs' other privileging and credentialing allegations.  See Complaint ¶¶ 51-52, at 10; Response at 12-14. The remaining statutes and regulations to which the Plaintiffs cite relating to these claims do not avoid the discretionary-function exception, because they involve "the consideration of alternatives, the weighing of factors, or the application of policy priorities bounded by practical concerns," such that "the language leaves to the decisionmaker's discretion how best to fulfill" the regulations. Clark v. United States, 695 F. App'x 378, 385-86 (10th Cir. 2017).  See Response at 12-14 (collecting statutes and regulations).  Accordingly, the Plaintiffs' negligent credentialing and privileging claims may proceed on a limited basis under the I.H.M.'s mandatory licensure requirements, I.H.M. § 3-1.2(A) and I.H.M. § 3-1.4(C)(5).  See also Response at 15 (arguing that the "Plaintiffs have shown there are actually many specific regulations that mandate behavior for credentialing of physicians"); Tr. at 71:2-7 (Court).  All remaining privileging and licensing claims are dismissed.  See  Complaint ¶¶ 51-52, at 10; Tr. at 71:2-7 (Court).

## III.   THE PLAINTIFFS' CLAIMS REGARDING THE EMERGENCY ROOM EQUIPMENT ARE DISMISSED, BECAUSE SELECTING EQUIPMENT IS DISCRETIONARY AND IMPLICATES PUBLIC POLICY DECISIONS.

The United States argues that the Plaintiffs have not met "their burden to show that the

discretionary function exception does not bar their claim that the . . . emergency room lacked proper equipment," and the Court agrees because, as a general rule, equipment selection falls under the discretionary function exception to the FTCA's waiver of sovereign immunity.  Motion at 17. See Complaint ¶ 29, at 7.  The Plaintiffs respond that the United States "conflates the specific factual problem identified in the Complaint -- the improperly equipped emergency room -- with the Plaintiffs' '*Failure to Properly Operate the Hospital*' claim."  Response at 16 (citing Complaint ¶ 7, at 3)(emphasis in Response).  The Complaint alleges that a "baby's x-rays should be viewable in any emergency room, and a physician leading the code and leaving the baby to view an x-ray would be evidence of an improperly equipped emergency room which would be a breach of the standard of care in properly operating" a hospital.  Complaint ¶ 29, at 7.

First, the Plaintiffs, do not identify, and the Court has not discovered, any "mandatory statutes or regulations" controlling the United States' conduct in equipping an emergency room. United States v. Gaubert, 499 U.S. at 328.  The Court concludes that, absent a mandatory regulation, the selection of an emergency room's equipment is "precisely the sort of policy-based decision protected by the discretionary function exception."  Black Hills Aviation, Inc. v. United States, 34 F.3d at 976.  See Boyle v. United Techs. Corp., 487 U.S. 500, 511 (1988)(holding that selecting military equipment's design fell under the discretionary exception, because it involves "the balancing of many technical, military, and even social considerations . . .").  The Tenth Circuit has applied the discretionary function exception to equipment selection decisions only in the military context.  See, e.g., Black Hills Aviation, Inc. v. United States, 34 F.3d at 976; Creek Nation Indian Hous. Auth. v. United States, 905 F.2d 312, 313 (10th Cir. 1990)("The government's choice of design for the 2000 pound bombs clearly falls within the 'selection of the appropriate design for military equipment' aspect of the discretionary function exception.")(no citation for

quotation).  The Court concludes that the Tenth Circuit's rationales regarding military equipment apply here, because Gallup Medical's decision regarding how to equip its emergency room involves balancing policy considerations, including "what staff members might need the equipment most frequently, how to facilitate access by other staff members with less frequent needs, the need for the equipment to be available for consultations with specialists, and the desire to keep emergency room traffic to a minimum."  Response at 18.  See Thune v. United States, 872 F. Supp. 921, 924 (D. Wyo. 1995)(Brimmer, J.)(concluding that the discretionary function exception applied where the government actor's "decision . . . was based on many different factors before him at that time").  Accordingly, the Court dismisses this claim under the discretionary function exception, because the Plaintiffs "do not meet their burden of proving that Congress has waived sovereign immunity for" the emergency room equipment issue, "as the Tenth Circuit requires for the requested relief."  Begay, 2016 WL 6394925, at *31.  See Response at 16.

## IV.  THE COURT DISMISSES THE PLAINTIFFS' REQUEST FOR PUNITIVE DAMAGES AND PREJUDGMENT INTEREST, BECAUSE THE FTCA FORBIDS PUNITIVE DAMAGES AND PREJUDGMENT INTEREST.

The Plaintiffs insist that the United States "should be subject to punitive damages for its utter indifference in properly staffing and managing the Indian Health Service Hospitals, including Gallup Indian Medical Center which contributed to cause the wrongful death of baby Rose Sky Tolbert."  Complaint ¶ 53, at 10.  The Court disagrees WITH THE Plaintiffs' assertion, because the FTCA prohibits the Court from subjecting the United States to punitive damages.  See 28 U.S.C. § 2674.  The FTCA states, in pertinent part, that the "United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."  28 U.S.C. § 2674.  See Molzof v. United States, 502 U.S.

301, 312 (1992)(holding that § "2674 bars the recovery only of what are *legally* considered 'punitive damages' under traditional common-law principles")(emphasis in original)(no citation for quotation); Beller v. United States, 296 F. Supp. 2d 1277, 1279 (D.N.M. 2003)(Johnson, J.)(explaining that "the Government's liability is subject to the limitation that it is not liable for punitive damages"). In the FTCA, Congress provides a limited sovereign immunity waiver:

> The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress. A necessary corollary of this rule is that when Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed, and exceptions thereto are not to be lightly implied.

Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 287 (1983). Accordingly, at the hearing, the Court explained that it would hold the FTCA's prohibition on prejudgment interest and punitive damages "to be constitutional . . . . I think Congress gets to make those decisions. I don't think the Constitution has a whole lot to say about that issue." Tr. at 71:9-11 (Court). Because the FTCA expressly prohibits claims for punitive damages and prejudgment interest, the Court lacks subject matter jurisdiction over those claims.

Moreover, although the Plaintiffs argue that 28 U.S.C. § 2674 "is an unconstitutional limitation on the United States' liability," they devote just two sentences of their seventeen-page brief to this argument, with which, if the Court agreed, would have far-ranging consequences. See Response at 17. The Plaintiffs neither cite which constitutional provision 28 U.S.C. § 2674 allegedly violates, nor provide any supporting case law. See Response at 17. Punitive damages have their critics and, if anything, the Constitution restrains punitive damages rather than protecting punitive damages. See Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. at 18-19; BMW of N. Am., Inc. v. Gore, 517 U.S. at 585-86; Cont'l Trend Res., Inc. v. OXY USA, Inc.,

101 F.3d at 643.  Punitive damages -- which are to punish and send a message to society -- play a different role than compensatory damages, which are to make a person whole.  See <u>TXO Prod. Corp. v. Alliance Res. Corp.</u>, 509 U.S. at 446.  Because society can punish in different ways other than giving a plaintiff a windfall, it is hard to make an argument that Congress and society cannot choose the punishment to use.   Consequently, the Court dismisses the Plaintiffs' claims for punitive damages and prejudgment interest.  <u>See</u> Complaint ¶ 53, at 10; <u>id.</u> at 12 (no paragraph numbering)(requesting "pre- and post-judgment interest").

**IT IS ORDERED** that: (i) Defendant United States' Partial Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed August 18, 2020 (Doc. 50), is granted in part and denied in part; (ii) the allegations regarding the Defendant United States of America's failure to transfer are not dismissed, <u>see</u> Complaint ¶¶ 3, 7-8, 12, at 2-4; (iii) the negligent training claim is dismissed, <u>see</u> Complaint ¶ 13, at 4; (iv) the negligent credentialing and privileging claims are dismissed in part, <u>see</u> Complaint ¶ 52, at 10, and are limited to alleged violations of I.H.M. § 3-1.2(A) and I.H.M. § 3-1.4(C)(5); (v) the emergency-room-equipment claim is dismissed, <u>see</u> Complaint ¶ 29, at 7; and (vi) the Plaintiffs' request for punitive damages and prejudgment interest is dismissed, <u>see</u> Complaint at 12 (no paragraph numbering); <u>id.</u> ¶ 53, at 10.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Lisa K. Curtis
Julia Gabrielle Coulloudon
Laura Callanan
Curtis & Co. Law Firm
Albuquerque, New Mexico

-- and --

Brandon W. Vigil
Law Office of Brandon W. Vigil
Albuquerque, New Mexico

      *Attorneys for the Plaintiffs*

Fred Federici
  Acting United States Attorney
Elizabeth M. Martinez
Kimberly N. Bell
Christine Hyojin Lyman
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Defendant United States of America*