**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

PHILLIP TOLBERT and THEDORE W.
BARUDIN, *Personal Representative for the
Estate of Rose Sky Tolbert*,

       Plaintiffs,

vs.                                                                                  No. CIV 19-0830 JB/LF

GALLUP INDIAN MEDICAL CENTER;
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; THE UNITED STATES OF
AMERICA; GIENIA LYNCH; JANET M.
GREENHOLZ; SAFIA RUBAII; GILBERTO
ALVAREZ-COLON; ROBERT LEACH;
TERENCE H. HAMEL and REGINA
WILLIAMS,

       Defendants.

**<ins>MEMORANDUM OPINION AND ORDER</ins>**

**THIS MATTER** comes before the Court on Plaintiffs' First Motion to Compel Regarding

Defendant's Answers and Responses to the Estate of Rose Sky Tolbert's First Set of

Interrogatories and Requests for Production and Memorandum of Law, filed November 20, 2020

(Doc. 84)("Motion"). The Court held a hearing on the Motion on June 15, 2021. <ins>See</ins> Clerk's

Minutes at 1, filed July 1, 2021 (Doc. 168). The primary issue is whether the Court should order

the Defendant United States of America to provide Plaintiffs Phillip Tolbert and Theodore W.

Barudin, the personal representative for Rose Sky Tolbert's estate (collectively, "the Plaintiffs"),

with information and documents regarding credentialing, privileging, personnel files, employment

information, contracts or other documents establishing a relationship between Gallup Indian

Medical Center ("Gallup Medical") and the named medical providers -- Defendants Gienia Lynch,

Janet M. Greenholz, Safia Rubaii, Gilberto Alvarez-Colon, Robert Leach, Terence H. Hamel, and

Regina Williams ("Medical Defendants") -- risk management files, and incident reports, where 28

U.S.C. § 1675(c) forbids disclosure of "[m]edical quality assurance records created by or for any Indian health program or a health program of an urban Indian organization as part of a medical quality assurance program . . . ."  The Court orders the United States to provide a privilege log to the Plaintiffs describing the requested documents.  If the parties cannot settle this issue following the privilege log's provision, the Plaintiffs may renew their request for an in-camera review.  Accordingly, the Court grants in part and denies in part the Motion.

## **FACTUAL BACKGROUND**

The Court takes its facts from the Complaint, filed September 9, 2019 (Doc. 1).  The Court accepts the factual allegations as true for the purposes of the Motion.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Sanders v. Mountain Am. Fed. Credit Union, 689 F.3d 1138, 1141 (10th Cir. 2012)(concluding that a court accepts "all facts pleaded by the non-moving party as true and grants all reasonable inferences from the pleadings in that party's favor").  The Court does not, however, accept as true the legal conclusions within the Complaint.  See Ashcroft v. Iqbal, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

1.      **The Parties.**

P. Tolbert and Suina are R. Tolbert's parents, and reside in Gallup, New Mexico.  See Complaint ¶ 36, at 7.  The United States "through the Indian Health Services, does business and operates a healthcare facility called "Gallup Indian Medical Center" ("Gallup Medical") in Gallup, New Mexico."  Complaint ¶ 37, at 7.  "The events giving rise to this complaint occurred at Gallup Indian Medical Center, which is part of the United States Health and Human Services Department and the Indian Health Service located in Gallup, New Mexico on September 9-10, 2017."  Complaint ¶ 45, at 9.  R. Tolbert's mother, Suina, had given birth to six children before giving

birth to R. Tolbert.  <u>See</u> Complaint ¶ 2, at 1.  During her previous births, Suina experienced c-sections and placental abruption.  <u>See</u> Complaint ¶ 3, at 2.

Suina and Gallup Medical were aware that Suina had gestational diabetes[1] and a positive anti-kell antibody.[2]  Complaint ¶ 2, at 1.  Gallup Medical does not have a neonatal[3] intensive care unit ("NICU"), nor does it have "any qualified specialized neonatal staff to care for a premature baby."  Complaint ¶ 3, at 2.

## 2. **The Delivery**.

Suina arrived at Gallup Medical "at approximately 5:30 p.m. on September 9, 2017." Complaint ¶ 2, at 1.  Suina was thirty-five weeks pregnant, about five weeks short of a full-term pregnancy[4]  <u>See</u> Complaint ¶ 2, at 1.  Because Suina and R. Tolbert had high heart rates, Gallup

---

[1]Gestational diabetes is:

> [a] diabetic condition that appears during pregnancy and usually goes away after the birth of the baby. Gestational diabetes is best controlled by dietary adjustment. Gestational diabetes can cause birth complications. One complication is macrosomia, in which the baby is considerably larger than normal due to large deposits of fat; such a baby can grow too large to be delivered through the vagina. Gestational diabetes also increases the risk of low blood sugar, low serum calcium and low serum magnesium in the baby immediately after delivery. The key to prevention is careful control of the mother's blood sugar levels. If the mother maintains normal blood sugar levels, it is less likely that the fetus will develop . . . abnormalities.

Jay W. Marks, <u>Medical Definition of Gestational diabetes</u>, MedicineNet (June 3, 2021), https://www.medicinenet.com/what_not_to_eat_when_pregnant_pictures_slideshow/article.htm

These antibodies can cause disorders in newborns.

[3]Neonatal means "of, relating to, or affecting the newborn and especially the human infant during the first month after birth."  <u>Neonatal</u>, Merriam Webster, https://www.merriam-webster.com/dictionary/neonatal (last visited July 26, 2021).

[4]A typical pregnancy

Medical Obstetrician Dr. Gienia Lynch conducted a drug screen, which came back negative.  <u>See</u> Complaint ¶ 3, at 2.  Dr. Lynch was unable to diagnose "the cause of the abnormal condition of her patient," Suina.  Complaint ¶ 9, at 3.  At 7:20 p.m., Suina called P. Tolbert; P. Tolbert was a truck driver and "was driving a route out of state."  Complaint ¶ 4, at 2.  Suina informed P. Tolbert during the call that she and R. Tolbert had elevated heart rates.  <u>See</u> Complaint ¶ 4, at 2.  "Dr. Lynch came into the room at the time of the call and told the parents that an emergen[cy] cesarean section would need to be consented to . . . ."  Complaint ¶ 4, at 2.  Suina consented to the emergency cesarean section.  <u>See</u>  Complaint ¶ 4, at 2.

From 7:20 p.m. to 10:00 p.m., Suina did not see Dr. Lynch and "became very distressed at the lack of attention to her or the baby."  Complaint ¶ 5, at 2.  Dr. Lynch then "activate[d] the c-section team" some time after 10:09 p.m.  Complaint ¶ 5, at 2.  Suina went into the operating room at 11:14 p.m.  <u>See</u> Complaint ¶ 5, at 2.  Dr. Janet Greenholz, a pediatrician, was present for R. Tolbert's birth.  <u>See</u> Complaint ¶ 11, at 3.  A nurse-midwife substituted for an assistant surgeon during the delivery, because there was no assistant surgeon available.  <u>See</u> Complaint ¶ 6, at 2-3.  R. Tolbert was delivered at 11:43 p.m. "over six hours after arrival."  Complaint ¶ 5, at 2.

---

lasts for about 280 days or 40 weeks.  A preterm or premature baby is delivered before 37 weeks of your pregnancy. . . .  Late preterm infants are born between 34 and 37 weeks.  Babies born before 39 weeks have a greater chance of breathing problems, low blood sugar and other problems that may result in being admitted to a neonatal intensive care unit (NICU).

<u>Why is 40 Weeks so Important</u>, New York Department of Health, https://www.health.ny.gov/community/pregnancy/why_is_40_weeks_so_important.htm (last visited July 20, 2021).

3. **Gallup Medical's Post-Delivery Treatment of R. Tolbert and Suina and R. Tolbert's Death.**

"The physicians, nurses and other Gallup Medical staff assessed, cared for, diagnosed and treated baby Rose as if she was a full-term baby, rather than the pre-term (premature) baby of a mother who had gestational diabetes and other complications in her pregnancy." Complaint ¶ 10, at 3. "Dr. Greenholz did basic post-delivery checks that, while partially appropriate for a full-term baby, were wholly inappropriate for a pre-mature baby of a mother with gestational diabetes and other pregnancy complications necessitating emergency c-section." Complaint ¶ 12, at 3. "Proper orders for lab and other studies and orders to the nurses for intensive monitoring and care for her patient were not made by Dr. Greenholz." Complaint ¶ 12, at 4. Following the birth, R. Tolbert's "cord blood" was "sent to the lab . . . for analysis," but "was never analyzed. Complaint ¶ 12, at 3.

After the birth, Dr. Lynch performed surgery on Suina. See Complaint ¶ 20, at 5. Suina had consented to a tubal ligation surgery. See Complaint ¶ 20, at 5. "Dr. Lynch destroyed the fallopian tubes during the surgery, rather than 'tying her tubes' as was the understood surgery." Complaint ¶ 20, at 5 (no citation for quotation). "This extension of the surgery meant that the surgery would never be reversible." Complaint ¶ 20, at 5. "There was no consent for the extended and irreversible surgery." Complaint ¶ 20, at 5. "The lack of consent and the extension of the surgery by Dr. Lynch . . . caused Phillip Tolbert and Charlene Suina" to be "incapable of ever having a child together, now that baby Rose has died." Complaint ¶ 20, at 5.

R. Tolbert "was treated in every way as a normal term baby although she was not by the nursing and other health care staff at Gallup Medical." Complaint ¶ 14, at 4. Regina Williams, a Register Nurse ("R.N."), was caring for R. Tolbert, and did not "compress and expel the amniotic

fluid from her system."  Complaint ¶ 14, at 4.  "There are no oxygen saturations listed for baby Rose in her medical record."  Complaint ¶ 16, at 5.  "There are no arterial blood gas readings for baby Rose in her medical record."  Complaint ¶ 17, at 5.  "There were no medications given to baby Rose . . . ."  Complaint ¶ 18, at 5.  R. Tolbert's lungs were not fully matured after the birth.  See Complaint ¶ 21, at 5.

R. Tolbert then "was handed to her grandmother in a room to hold."  Complaint ¶ 15, at 5.  R. Tolbert's grandmother "became terrified that suddenly" R. Tolbert "was not breathing."  Complaint ¶ 19, at 5.  R. Tolbert began "aspirating amniotic fluid" and went "into respiratory distress at approximately 1:40 a.m.," about two hours after the birth.  Complaint ¶ 21, at 5.  When R. Tolbert's "respirations decreased . . . initially they were ignored."  Complaint ¶ 22, at 5.  A code "was eventually called," but "there is no code sheet for the code conducted by Gallup Medical physicians, nurses and staff."  Complaint ¶ 24, at 6.  Dr. Safia Rubaii, an Emergency Physician, "initiated an umbilical venous catheterization during the code event, but never checked the catheter's placement despite having an x-ray to review."  Complaint ¶ 25, at 6.  "[T]he catheter was wrongly placed into the artery of the umbilical cord, such that all medication delivered into the catheter traveled to the wrong part of" R. Tolbert's "body, and she did not receive the benefit of the medication given during the code . . . ."  Complaint ¶ 25, at 6.  Dr. Robert Leach, a Doctor of Osteopathic Medicine, then "attempted to place an endotracheal tube [("ETT") [5] . . . into baby

---

[5] An endotracheal tube is used during endotracheal intubation, which

is often an emergency procedure that's performed on people who are unconscious or who can't breathe on their own.  EI maintains an open airway and helps prevent suffocation.

In a typical EI, you're given anesthesia.  Then, a flexible plastic tube is

Rose, which 'came out.'"   Complaint ¶ 26, at 6 (no citation for quotation).   Dr. Leach again

attempted to place the endotracheal tube, but placed ETT into R. Tolbert's esophagus, rather than

in her trachea.   See Complaint ¶ 27, at 6.   "Instead of extubating[6] the ETT, which is required to

remove it from the esophagus so it may be properly placed into the trachea, the ETT was simply

pulled back by Gilberto Alvarez-Colon, M.D., a pediatrician also participating in the code."

Complaint ¶ 28, at 6.   "Simply pulling the ETT back will result in placing it higher in the

esophagus, continuing to insufflate the stomach and not the lungs."   Complaint ¶ 28, at 6.

Dr. Leach then left to view R. Tolbert's chest x-rays.   See Complaint ¶ 29, at 7.   Consequently,

R. Tolbert "was never properly ventilated following her respiratory distress."   Complaint ¶ 30, at

7.   Further, Dr. Hamel, "the radiologist who was responsible for timely informing the code team

of the critical finding of misplacement of the umbilical catheter and the ETT."   Complaint ¶ 32, at

7.   "The nurses involved in the code failed to properly or accurately monitor or otherwise care for

baby Rose during the code event."   Complaint ¶ 31, at 7.   R. Tolbert "became hypoxic[7] which

---

placed into your trachea through your mouth to help you breathe.

The trachea, also known as the windpipe, is a tube that carries oxygen to
your lungs.  The size of the breathing tube is matched to your age and throat size.
The tube is kept in place by a small cuff of air that inflates around the tube after it
is inserted.

Corinna   Underwood,   Endotracheal   Intubation,   Healthline   (Sept.   17,   2018),
https://www.healthline.com/health/endotracheal-intubation.

[6]To extubate is "to remove a tube from a hollow organ or passageway, often from the
airway."   Charles   Patrick   Davis,   Extubate,   MedicineNet   (March   29,   2021),
https://www.medicinenet.com/extubate/definition.htm.

[7]"Hypoxia is a condition or state in which the supply of oxygen is insufficient for normal
life functions."   Charles   Patrick   Davis,   Hypoxia and Hypoxemia (Low Blood Oxygen),
MedicineNet                         (March                         1,                         2021),
https://www.medicinenet.com/hypoxia_and_hypoxemia/article.htm.

progressed to anoxic brain injury,[8] organ failure, and death."  Complaint ¶ 34, at 7.  R. Tolbert was

pronounced dead at 2:31 a.m. on September 10, 2018.  See Complaint ¶ 33, at 7.  "On or about

February 6, 2019 . . . the claims set forth herein . . . were received by Indian Health Services, a

division of the United States of America Department of Health and Human Services . . . ."

Complaint ¶ 47, at 9.  The Indian Health Services did not "respond with a denial of this claim on

or before August 6, 2019 which is expiration of the six-month stay for suit . . . ."  Complaint ¶ 47,

at 9.

## PROCEDURAL BACKGROUND

The Plaintiffs ask the Court to order the United States to produce documents, or, in the

alternative, to conduct an in-camera review to determine whether the documents are privileged.

See Motion at 11.  The United States has refused to produce the documents, citing privilege under

25 U.S.C. § 1675.  See Defendant United States of America's Response in Opposition to Plaintiffs'

First Motion to Compel Regarding Defendant's Answers and Responses to the Estate of Rose Sky

Tolbert's First Set of Interrogatories and Requests for Production at 1, filed December 11, 2020

---

[8]Anoxia

[O]ccurs when the brain is deprived of oxygen.  It's often used interchangeably
with hypoxia, although hypoxia refers to a partial loss of oxygen and happens first,
typically leading to anoxia or a total lack of oxygen.

. . . .

Cells in the brain are sensitive and easily damaged. A lack of oxygen starves the
brain and prevents biochemical processes that allow your brain, heart, and kidneys
to function. Anoxia can result in coma, seizures, and brain death.

Dan Brennan, What Are the Signs and Symptoms of Anoxia?, MedicineNet (Dec. 10, 2020),
https://www.medicinenet.com/what_are_the_signs_and_symptoms_of_anoxia/article.htm

(Doc. 94)("Response").  The Court held a hearing on the Motion on June 15, 2021.  See Clerk's Minutes at 1, filed July 1, 2021 (Doc. 168).

1.      **The Motion to Compel.**

The Plaintiffs explain that the "Plaintiffs' Interrogatories Nos. 1, 3, 5, 9 and Requests for Production Nos. 1, 2, 3, 5, 7, 8, 9 request information and documents regarding credentialing, privileging, personnel files, employment information, contracts or other documents establishing a relationship between GIMC and the named medical providers, risk management files, and incident reports."  Motion at 4.  The Plaintiffs note that the United States has not produced the requested information, because the United States argues that "the requested information and documents are absolutely precluded from discovery pursuant to 25 U.S.C. § 1675."  Motion at 4.  The Plaintiffs insist, however, that 25 U.S.C. § 1675 does not apply to the requested documents.  See Motion at 4.

First, the Plaintiffs argue that any medical quality assurance records may be disclosed, because the Court and "plaintiffs' counsel in this case as officers of the Court, are enforcing and tasked under the law with the protection of the public health and safety," and, therefore, fall under § 1675's law-enforcement-agency exception.  Motion at 5.  Second, the Plaintiffs insist that they have a negligent credentialing claim under New Mexico law.  See Motion at 6.  Accordingly, the Plaintiffs contend that they "must be permitted to gather evidence to support this claim through discovery of documents and testimony regarding credentialing, privileging, personnel files, employment information, contracts or other documents establishing a relationship between GIMC and the named medical providers, risk management files, and incident reports."  Motion at 6. Third, the Plaintiffs contend that the Medical Defendants' depositions waived privilege under 25 U.S.C. § 1675, because "the witnesses testified about credentialing, privileging, personnel files,

employment information, contracts or other documents establishing a relationship between them

and GIMC, risk management files, and incident reports."  Motion at 6-7.  The Plaintiffs aver that,

because "witness testimony was allowed regarding this information . . . Plaintiffs are entitled to

the documents upon which that testimony is based."  Motion at 8.  Fourth, the Plaintiffs assert that

25 U.S.C. § 1675 is analogous to the New Mexico Review Organization Immunity Act, N.M.S.A.

§§ 41-9-1 through 41-9-7 ("ROIA"), and, therefore, the Court should use a ROIA analysis to the

statute "[g]iven the total lack of Federal District of New Mexico and 10th Circuit authority."  The

Plaintiffs contend that, under ROIA,

> a party invoking ROIA to immunize from discovery data and information acquired
> by a review organization bears the sole burden "to prove that the data or information
> was generated exclusively for peer review and for no other purpose, and that
> opinions were formed exclusively as a result of peer review deliberations. If the
> evidence was neither generated nor formed exclusively for or as a result of peer
> review, it shall not be immune from discovery unless it is shown to be otherwise
> available by the exercise of reasonable diligence."  [Sw. Cmty. Health Servs. v.
> Smith, 1988-NMSC-035, ¶ 17, 107 N.M. 196, 200, 755 P.2d 40, 44].  After an in-
> camera review, if certain documents are ruled to be confidential, they may still be
> discoverable if they are critical to the opposing party's claims.  Id. ¶ 18.  Thus, if
> the success or failure of a litigant's cause of action would likely turn on the evidence
> adjudged to fall within the scope of Section 41-9-5, then the trial court shall compel
> production of such evidence.  Id.

Motion at 8.  The Plaintiffs then note that only one document on the United States' privilege log

is marked as privileged under § 1675, yet "other documents and information responsive to

Plaintiffs' eleven (11) interrogatories and requests for production exist but were neither produced

nor included on Defendant's privilege log . . . ."  Motion at 10.  The Plaintiffs insist, therefore, that

the United States must produce a privilege log, provide the documents in discovery, or submit the

documents to the Court for in-camera review.  See Motion at 10.  Last, the Plaintiffs ask the Court

to conduct an in-camera review of the documents, because the Plaintiffs contend that the United

States' "privilege log is not only incomplete and legally insufficient, but also attempts to apply

multiple conflicting claims of privilege . . . ."  Motion at 11-12.

2.    **The Response**.

The United States opposes the Motion, because the United States contends that "it seeks discovery of privileged information and material that is absolutely protected from discovery under the" Indian Health Services ("I.H.S.") "medical quality assurance statute."  Response at 1.  The United States argues that the Court should deny the Motion, because the information that the Plaintiffs request is "absolutely protected from discovery by the I.H.S. medical quality assurance statute, 25 U.S.C. § 1675."  Response at 3.  The United States first argues that § 1675(d)(1)(F)'s exception, which allows disclosure of medical quality assurance records to law enforcement agencies, does not apply to Plaintiffs' counsel or to the Court.  See Response at 3.  The United States argues that only the state and federal executive branches contain law enforcement agencies. See Response at 5.  The United States continues that the Federal Tort Claims Act ("FTCA"), discretionary function exception prohibits negligent credentialing claims.  See Response at 5-6.

The United States then emphasizes that, in In re: United States, 864 F.2d 1153 (5th Cir. 1989), the United States Court of Appeals for the Fifth Circuit granted a writ of mandamus against the district court where the district court compelled the United States to provide "medical quality assurance records in the context of a FTCA medical malpractice claim after the government had failed to raise timely objections."  Response at 6.  The United States insists that, instead, "there is no possibility of waiver" of § 1675 privilege, because the statute does not provide for waiver. Response at 9.

The United States insists that, because the discretionary function exception bars negligent credentialing claims, evidence related to the Plaintiffs' negligent credentialing claim is irrelevant. See Response at 7.  The United States argues that the Medical Defendants' personnel files are

protected under the Privacy Act, 5 U.S.C. § 522(a).  See Response at 8.  The United States insists

that "none of these documents relate to the medical training or credentialing of providers or provide

any evaluation of the providers' skills as medical providers."  Response at 8.  The United States

explains that the information that the Plaintiffs request regarding the Medical Defendants' pay and

benefits in the personnel files are also irrelevant.  See Response at 9.

The United States disagrees with the Plaintiffs' contention that § 1675 and ROIA are

analogous.  See Response at 10.  The United States submits that, "[i]n addition to turning

federalism on its head, a simple review of the two statutory schemes and resulting court opinions

concerning them reveals that they are not" analogous.  Response at 10.  The United States

emphasizes the differences between ROIA's and § 1675's texts.  See Response at 10.  The United

States notes that, although "the New Mexico legislature may not require its state courts to observe

specific rules of procedure or evidence, Congress has plenary authority to do so before federal

courts determining federal causes of action."  Response at 11.  The United States also contends

that § 1675 provides broader privilege than does ROIA.  See Response at 11 (citing Parker v.

United States, No. CIV 18-0123, 2020 WL 729211, at *9 (D. Neb. Feb. 13, 2020)(Nelson, M.J.)).

Last, the United States insists that it need not provide a privilege log, because the records which

the Plaintiffs seek are not subject to discovery.  See Response at 12 (citing Fed. R. Civ. P. 26(b)(5)).

The United States concludes by renewing its request for the Court to deny the Motion to Compel.

See Response at 13.

### 3.     **The Reply.**

The Plaintiffs reply.  See Plaintiffs' Reply to Defendant's Response in Opposition to

Plaintiffs' First Motion to Compel at 1, filed January 4, 2021 (Doc. 99)("Reply").  The Plaintiffs

note that the United States "continues to impermissibly refuse to provide discoverable information

- 12 -

requested by Plaintiffs . . . ." Reply at 1.  The Plaintiffs insist that the United States' interpretation of § 1675 is "overly broad," "unsupported, and should be rejected."  Reply at 2.  The Plaintiffs then reiterate their arguments from the Motion that the Court and the Plaintiffs' counsel fall under § 1675's law-enforcement exception.  See Reply at 3.  The Plaintiffs elaborate, explaining that they enforce laws and protect the public health and safety, because

> individual cases have the ability to make broad, significant societal change.  Here, Plaintiffs' claims that I.H.S. and the Gallup Indian Medical Center (GIMC) have a pattern of retaining substandard medical providers to provide care to this country's Native American population, has the ability to bring about a broader societal change.  This case is about more than just these Plaintiffs; it can have an impact on the medical care I.H.S. and GIMC provides to a much broader population.  Defendant's attempt to narrowly characterize this case as only being about "obtain[ing] compensation" misses the mark.

Reply at 3 (no citation for quotation).  The Plaintiffs then insist that their negligent credentialing claim is valid.  See Reply at 3-4.  The Plaintiffs also argue that the United States' citation to In re: United States is inapposite, because that case is a "Fifth Circuit case applying a Department of Defense statute," and "is plainly nonbinding on this Court in an I.H.S. case."  Reply at 3-4.

Next, the Plaintiffs reiterate their argument that the documents they seek are discoverable under New Mexico law and are necessary to prove their negligent credentialing claim.  See Reply at 3-4.  The Plaintiffs also contend that, even if the requested documents are privileged, the United States has waived privilege, because the Medical Defendants "testified at length regarding credentialing privileging, personnel files, employment information, contracts or other documents establishing a relationship between them and GIMC, risk management files, and incident reports." Reply at 4.  The Plaintiffs then insist that, under the ROIA, the Court should compel the United States to produce the documents.  See Reply at 5.  Last, the Plaintiffs ask the Court, in the alternative, to conduct an in-camera review, because the United States "refuses to produce either

the documents themselves or a legally sufficient privilege log," and, therefore, the Plaintiffs contend that the Court should examine the documents to determine whether a the § 1675 privilege applies.  Reply at 7.

### 4.    The Order.

The Court addressed the Plaintiffs' negligent hiring, credentialing, privileging, training, and supervision claim in its Order, filed March 23, 2021 (Doc. 117).  In the Order, the Court "dismiss[es] the negligent training claim, and dismiss[es] in part the negligent credentialing and privileging claims under the discretionary function exception" to the FTCA.  Order at 2.  The Court explains that "'mandatory . . . regulations' control the privileging and credentialing of IHS doctors . . . ."  Order at 8 (quoting United States v. Gaubert, 499 U.S. 315, 328 (1991)).  The Court continues:

> When discussing the licensure issue, the Plaintiffs argue that they "must have some discovery to determine whether a negligent hiring/credentialing and privileging case exists . . . ." Response at 15.  The Court agrees with the Plaintiffs, because "[t]he Court deems the discretionary-function . . . exception[] for jurisdictional issues on which the Tenth Circuit would direct the Court to permit discovery."  De Baca v. United States, 403 F. Supp. 3d 1098, 1128 (D.N.M. 2019)(Browning, J.). Nonetheless, "as a rule, plaintiffs cannot generally challenge . . . credentialing decisions." Begay, 2016 WL 6394925, at *31. This general rule applies to the Plaintiffs' other privileging and credentialing allegations. See Complaint ¶¶ 51-52, at 10; Response at 12-14.  The remaining statutes and regulations to which the Plaintiffs cite relating to these claims do not avoid the discretionary function exception, because they involve "the consideration of alternatives, the weighing of factors, or the application of policy priorities bounded by practical concerns," such that "the language leaves to the decisionmaker's discretion how best to fulfill" the regulations.  Clark v. United States, 695 F. App'x 378, 385-86 (10th Cir. 2017). See Response at 12-14 (collecting statutes and regulations) . . . . All remaining privileging and licensing claims are dismissed.  See Complaint ¶¶ 51-52, at 10; Tr. at 71:2-7 (Court).

Order at 8-9.  The Indian Health Manual's ("I.H.M.") mandatory regulations include § 3-1.4(C)(5) states:

Members of the medical staff and others who must apply for clinical privileges must hold an active and unrestricted State license, certification, or registration, as applicable, to practice in their professional field. The term "unrestricted" means that there are no restrictions, special considerations, periods of monitoring, or probationary requirements associated with license, certification, or registration that restricts or inhibits the ability of the practitioner to practice his/her profession in the specialty or clinical area for which the practitioner is being hired. This includes any stipulations that may have a potentially significant adverse impact on patients, the medical staff, or the efficiency of the facility. In general, providers with any restrictions on any State license, certification, or registration will not be granted medical staff membership or clinical privileges. However, exceptions may be granted on a case-by-case basis by the Area Director.

I.H.M. 3-1.4(C)(5). <u>See</u> Order at 8. Relatedly, "the IHM provides that 'all licensed practitioners who provide care at IHS facilities must maintain current licensure and credentials, and be proficient of their granted privileges . . . .'" Order at 8 (quoting I.H.M. 3-1.2(A)). The Court therefore concludes that "the Plaintiffs' negligent credentialing and privileging claims may proceed on a limited basis under the I.H.M.'s mandatory licensure requirements." Order at 9.

**5.     <u>The Hearing</u>.**

At the hearing, the Plaintiffs maintained that the United States had "simply refused to provide anything that might be considered credentialing information, personnel files; . . . anything that falls under any type of analysis that was done after the baby was born . . . of what might have gone wrong." Transcript of Hearing at 111:12-17 (taken June 15, 2021), filed June 30, 2021 (Doc. 167)(Curtis)("Tr."). The Plaintiffs explained that, in Interrogatory No. 1, they request "credentialing and any personnel or employment file maintained by the defendant through GIMC . . . for the doctors and the one nurse . . . that were involved" in R. Tolbert's death. Tr. at 111:17-24 (Curtis). The Plaintiffs insisted that, under ROIA, "anything that was not obtained solely for the purpose of peer review should not be withheld and is, in fact, discoverable." Tr. at 112:19-20 (Curtis).

- 15 -

The Plaintiffs then clarified that "personnel records are not quality assurance records."  Tr. at 112:21-22 (Curtis).  The Plaintiffs note that, for their negligent credentialing claim, the "records are relevant and are, in fact, critical."  Tr. at 113:18-20 (Curtis).  The Plaintiffs noted that, for example, Dr. Leach "had 26 jobs as an emergency room physician before coming to GIMC.  And we believe his testimony says he didn't think his contract was going to be renewed . . . specifically because of this case."  Tr. at 114:16-20 (Curtis).  The Plaintiffs insisted that this information would be present in Dr. Leach's personnel record and is necessary for their case.  See Tr. at 114:20-22 (Curtis).  The Plaintiffs explained that, at present, "all we have is somebody saying 'We didn't do anything wrong,' and we're not allowed to test it."  Tr. at 115:17-19 (Curtis)(no citation for quotation).  The Plaintiffs then discussed United Tort Claimants v. Quorum Health Resources, No. CIV 11-0449 (M.D. Tenn.), where, the Plaintiffs assert, that the United States District Court for the Middle District of Tennessee "found that you can't have a negligent credentialing case without documents and provided all of those documents to us."  Tr. at 116:9-14 (Curtis).  The Plaintiffs also argued that the United States waived any privilege that might exist, because Williams, Dr. Leach, and Dr. Alvarez-Colon testified already during their depositions about these issues.  See Tr. at 116:15-24 (Curtis).

The Plaintiffs then distinguished between credentialing and privileging, noting that "doctors can only do the things they're privileged to do in a hospital."  Tr. at 117:2-6 (Curtis).  Again discussing Dr. Leach, the Plaintiffs explained that he "is the person that intubated" R. Tolbert and asked "does he have privileges to intubate? . . .  I'm guessing he doesn't have privileges to intubate neonates, but I don't know that because I don't have the documents."  Tr. at 117:6-14 (Curtis).  The Plaintiffs suggested that the Medical Defendants' privileges "are likely set out in a separate set of documents for each of these physicians."  Tr. at 117:16-18 (Curtis).  The

Plaintiffs asked that the Court conduct an in-camera review if it has any doubt whether the requested documents are privileged.  See Tr. at 118:9-12 (Curtis).

The Plaintiffs then discussed the remaining interrogatories, first describing Interrogatory No. 3 and stating that it requests "contracts between the USA" and the Medical Defendants and explaining that "these are clearly not quality assurance documents."  Tr. at 119:20-23 (Curtis).  In Interrogatory No. 5, the Plaintiffs stated that they requested information on the processes used to investigate the decedent's death, including incident reports.  See Tr. at 120:8-17 (Curtis).  In Interrogatory No. 9, the Plaintiffs stated that they "want other claims, complaints, whether or not litigation was initiated" against the Medical Defendants, noting that the Plaintiffs had discovered a Board of Nursing Complaint against Williams.  See Tr. at 121:4-14 (Curtis).

Next, the Court asked the United States to explain § 1675's purpose.  See Tr. at 124:11-25 (Court, Martinez).  The United States argued that the statute is "far-reaching," and is intended to "encourage organizations and providers to review materials and correct practices."  Tr. at 125:4-13 (Court, Martinez).  The Court responded that a "medical quality assurance program doesn't seem to be everything that's in your files.  It's got to be this program they're trying to protect."  Tr. at 123:12-15 (Court).  The United States responded that the IHS "has interpreted this very broadly" to "cover credentialing of providers" and "medical reviews of cases."  Tr. at 126:16-21 (Martinez).  The United States clarified its position on the Motion:

> [I]t is the United States' position that it is prohibited -- absolutely prohibited from disclosing this information under 25 U.S.C. § 1675; and two, under the discretionary function exception to the FTCA, plaintiffs' negligent credentialing and privileging claims should be dismissed as a jurisdictional matter and there is no reason, therefore, for the United States to produce any information they're seeking pursuant to this motion to compel.  They are pressing the Court to have us disclose this information and . . . if we were ordered to do so, I believe that the United States would be put into a position where it would have to seek a writ of mandamus similar to what the United States had to do in the case of In Re: United

States . . . .

Tr. at 130:8-24 (Martinez).  The United States continued that the Medical Defendants meet the IHM's licensing requirements, and, therefore, the "limited claim that the Court left open, also should be dismissed."  Tr. at 132:8-15 (Martinez).  The Court asked the United States whether its arguments were on three grounds -- the statute, relevancy (tied to mootness) and proportionality -- and the United States agreed.  See Tr. at 132:16-22 (Court, Martinez).

The Court informed the parties that, although it would give the issue further consideration, its reaction was that the statute

> doesn't cover maybe as broadly as the Government thinks, but when it does cover something, it is absolute. . . . [T]he exclusion you're trying to come up with, Ms. Curtis, about law enforcement, I don't think that's going to work.  I think Congress, when it covers a document or covers the activity, I think is pretty close to, for our purposes, absolute as being over.  It's going to be hard to get a civil plaintiffs' lawyer to get those documents.

Tr. at 133:10-19 (Court).  The Plaintiffs again emphasized New Mexico law in response to the Court's concerns, but the Court replied that "just because New Mexico has a claim for credentialing doesn't mean you get to blow past a Congressional statute."  Tr. at 136:19-25 (Court, Curtis).  The Court continued that it agreed with the Plaintiffs that their requests were relevant, but stated that "if you're going to lose . . . it's on this statute."  Tr. at 139:8-12 (Court).

Last, the Court then asked the United States why it asserts that the Plaintiffs' requests are not relevant, given the partial negligent credentialling and privileging claim that remains following the Court's Order.  See Tr. at 139:14-22 (Court).  The United States responded that the partial remaining claim "relates to whether the providers were licensed at the time. . . . [D]uring discovery the United States provided to Plaintiff evidence that every one of these providers was, in fact, licensed as required by the IHS and the Indian Health Manual."  Tr. at 139:23-140:4

(Martinez).  The United States emphasized that it had "pending before the Court a motion to address that one remaining part of the plaintiffs' negligent credentialing claim."  Tr. at 140:7-10 (Martinez).  The Plaintiffs responded that the IHM's requirements were more detailed than the United States has represented.  See Tr. at 141:13-23 (Curtis).

### 6.   The Memorandum Opinion.

The Court filed a Memorandum Opinion in relation to its previous Order.  See Memorandum Opinion at 1, filed August 17, 2021 (Doc. 185)("MO").  The MO more fully detailed the Court's rationale for its decision in the Order, but did not change the Order's outcome.  See MO at 1 n.1.  The Court held:

> (i) Defendant United States' Partial Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed August 18, 2020 (Doc. 50), is granted in part and denied in part; (ii) the allegations regarding the Defendant United States of America's failure to transfer are not dismissed, see Complaint ¶¶ 3, 7-8, 12, at 2-4; (iii) the negligent training claim is dismissed, see Complaint ¶ 13, at 4; (iv) the negligent credentialing and privileging claims are dismissed in part, see Complaint ¶ 52, at 10, and are limited to alleged violations of I.H.M. § 3-1.2(A) and I.H.M. § 3-1.4(C)(5); (v) the emergency-room-equipment claim is dismissed, see Complaint ¶ 29, at 7; and (vi) the Plaintiffs' request for punitive damages and prejudgment interest is dismissed, see Complaint at 12 (no paragraph numbering); id. ¶ 53, at 10.

MO at 63.

## LAW REGARDING THE FTCA

It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."  United States v. Mitchell, 463 U.S. 206, 212 (1983)(citing United States v. Sherwood, 312 U.S. 584, 586 (1941); 14 Charles Wright, Arthur Miller & Edward Cooper, Federal Practice and Procedure § 3654, at 156-157 (1976).  See Garcia v. United States, 709 F. Supp. 2d 1133, 1137 (D.N.M. 2010)(Browning, J.)("The United States cannot be sued without its consent.  Congressional consent -- a waiver of the traditional principle

of sovereign immunity -- is a prerequisite for federal-court jurisdiction."). The law generally places the burden of proving federal jurisdiction on the proponent of jurisdiction, and the party suing the United States thus similarly bears the burden of proving that sovereign immunity has been waived. See James v. United States, 970 F.2d at 753. See also Garcia v. United States, 709 F. Supp. 2d at 1138 ("The plaintiff bears the burden of proving that Congress has waived sovereign immunity for all of his claims."). The terms of the United States' consent define the federal court's jurisdiction to entertain suits against the country. See United States v. Orleans, 425 U.S. at 814; Ewell v. United States, 776 F.2d 246, 248 (10th Cir. 1985). Although a "waiver of immunity should be neither extended nor narrowed beyond that which Congress intended," United States v. Kubrick, 444 U.S. 111, 117-18 (1979); see Ewell v. United States, 776 F.2d at 248, "[w]aivers of sovereign immunity are to be read narrowly," James v. United States, 970 F.2d at 753 (citing Engel v. United States (Estate of Johnson), 836 F.2d 940, 943 (5th Cir. 1988); Schmidt v. King, 913 F.2d 837, 839 (10th Cir. 1990)). "A waiver of sovereign immunity 'cannot be implied and must be unequivocally expressed.'" United States v. Mitchell, 445 U.S. 535, 538 (1980)(quoting United States v. King, 395 U.S. 1, 4, 89 (1969)). See United States v. Nordic Vill., Inc., 503 U.S. at 33-34; United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 (10th Cir. 1996).

The Tenth Circuit has emphasized that all dismissals for lack of jurisdiction, including those for a failure to establish a waiver of sovereign immunity under the FTCA, should be without prejudice. See Mecca v. United States, 389 F. App'x 775, 780 (10th Cir. 2010)(unpublished). It has explained: "'A longstanding line of cases from this circuit holds that where the district court dismisses an action for lack of jurisdiction . . . the dismissal must be without prejudice.'" Mecca v. United States, 389 F. App'x at 780 (quoting Brereton v. Bountiful City Corp., 434 F.3d 1213, 1216 (10th Cir. 2006)). The Tenth Circuit held in Mecca v. United States that the district court

improperly dismissed with prejudice the plaintiff's FTCA claims after it concluded that it lacked jurisdiction over those claims.  See 389 F. App'x at 780-81 ("Here, because the district court found itself without jurisdiction over the FTCA claims, dismissal should have been entered without prejudice, even if the court deemed further amendment futile.  We therefore remand with instructions to enter dismissal of these claims without prejudice.").

In 1948, Congress enacted the FTCA, which waives the United States' sovereign immunity for some tort actions against the United States seeking money damages.  See 28 U.S.C. § 1346(b); Fed. Deposit Ins. v. Meyer, 510 U.S. 471, 475 (1994); Warren v. United States, 244 F. Supp. 3d 1173, 1212 (D.N.M. 2017)(Browning, J.); Romanach v. United States, 579 F. Supp. 1017, 1019 (D.P.R. 1984)(Laffitte, J.).  In enacting the FTCA, Congress waived the United States' sovereign immunity as to

> claims against the United States, for money damages accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be held liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).  "The FTCA's waiver of sovereign immunity is limited, however."  Cortez v. EEOC, 585 F. Supp. 2d 1273, 1284 (D.N.M. 2007)(Browning, J.).  "If the claim does not fall within the FTCA's express provisions, or if it falls within one of its exceptions, the claim is not cognizable under the FTCA, and the court must deny relief."  Cortez v. EEOC, 585 F. Supp. 2d at 1284 (citing Williams v. United States, 50 F.3d at 304-05).  Moreover, the only proper party in an action under the FTCA is the United States.  See 28 U.S.C. § 2679(a); Romanach v. United States, 579 F. Supp. at 1018 n.1 (holding that no suit under the FTCA may lie against any agency of the United States eo nomine); Painter v. FBI, 537 F. Supp. 232, 236 (N.D. Ga.

1982)(Forrester, J.)(holding that "[t]he FBI may not be sued eo nomine").

Even when the FTCA waives the United States' sovereign immunity, the United States is liable for FTCA claims, if at all, only "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. "The Tort Claims Act was designed primarily to remove the sovereign immunity of the United States from suits in tort and, with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances." Richards v. United States, 369 U.S. 1, 6 (1962). The FTCA leaves untouched the states' laws that might apply to the United States once Congress removes that immunity. The Supreme Court has noted:

> Rather, [the FTCA] was designed to build upon the legal relationships formulated and characterized by the States, and, to that extent, the statutory scheme is exemplary of the generally interstitial character of federal law. If Congress had meant to alter or supplant the legal relationships developed by the States, it could specifically have done so to further the limited objectives of the Tort Claims Act.

Richards v. United States, 369 U.S. at 6-7. Accordingly, "the United States is placed in the same position as a private individual by rendering the United States liable for the tortious conduct of its employees if such conduct is actionable in the state in which the United States' action or inaction occurred." Cortez v. EEOC, 585 F. Supp. 2d at 1284. Cf. Garcia v. United States, No. CIV 08-0295 JB/WDS, 2010 WL 2977611, at *18 (D.N.M. June 15, 2010)(Browning, J.)("The law of the place where the alleged negligent conduct took place determines the scope of employment under the FTCA." (citing 28 U.S.C. § 1346(b)). See Richards v. United States, 369 U.S. at 9; Williams v. United States, 350 U.S. 857, 857 (1955); Henderson v. United States, 429 F.2d 588, 590 (10th Cir. 1970).

The United States' liability is coextensive with that of private individuals under the respective states' law, even if comparable government actors or public entities would have

additional defenses or additional obligations under that state's law.  See United States v. Olson, 546 U.S. 43, 44-47 (2005); In re FEMA Trailer Formaldehyde Prod. Liab. Litig. (Miss. Plaintiffs), 668 F.3d 281, 288 (5th Cir. 2012)("Because the federal government could never be exactly like a private actor, a court's job in applying the standard is to find the most reasonable analogy.  Inherent differences between the government and a private person cannot be allowed to disrupt this analysis." (citing LaBarge v. Cty. of Mariposa, 798 F.2d 364, 366-69 (9th Cir. 1986); United States v. Olson, 546 U.S. at 47)); DeJesus v. U.S. Dep't of Veterans Affairs, 479 F.3d 271, 283 n.9 (3d Cir. 2007)("Under the FTCA, the federal government can only be held liable for breaches of duties imposed on private, rather than state, parties."); Ewell v. United States, 776 F.2d at 248-49; Cox v. United States, 881 F.2d 893, 895 (10th Cir. 1989)(stating that "[t]his and other courts have applied the same rationale in holding that the United States may invoke the protection of a [private] recreational use statute"); Proud v. United States, 723 F.2d 705, 706 (9th Cir. 1984)("But appellants overlook the fact that in enacting the FTCA, Congress -- not the Hawaii Legislature -- determined the tort liability of the United States.  And the FTCA specifically provides that the federal government's tort liability is co-extensive with that of a private individual under state law.").  The Tenth Circuit reasoned in Ewell v. United States:

> The main goal of the FTCA was to waive sovereign immunity so that the federal government could be sued as if it were a private person for ordinary torts.  Congress was primarily concerned with allowing a remedy where none had been allowed.  There is no evidence that Congress was concerned with the prospect that immunities created solely for private persons would shield the United States from suit.  The Supreme Court, in United States v. Muniz, 374 U.S. 150 . . . (1963), considered whether it is appropriate to apply immunities created by state law to the United States when it is sued under the FTCA.  The Court was concerned with state laws that immunized prison officials from suits by prisoners and concluded that it is "improper to limit suits by federal prisoners because of restrictive state rules of immunity."  374 U.S. at 164 . . . .  The immunity under consideration in that case applied to state, county and municipal prison officials.  Noting its decision in Indian Towing Co. v. United States, 350 U.S. [61]at 65 [(1955)] . . . wherein the Court

determined that federal liability had to be determined as if it were a private person and not as if it were a municipal corporation, it concluded that state law immunity applicable to state, county and municipal prison officials would not be applicable to a private person and, therefore, not applicable to the federal government in a suit under the FTCA.

Thus, while immunities afforded state, county and municipal employees are not applicable to the federal government when sued under the FTCA, immunities created by state law which are available to private persons will immunize the federal government because it is liable only as a private individual under like circumstances. It is evident, therefore, that the Utah district court was correct in granting the motion for summary judgment.

Ewell v. United States, 776 F.2d at 249.

The FTCA "does not apply where the claimed negligence arises out of the failure of the United States to carry out a [federal] statutory duty in the conduct of its own affairs." United States v. Agronics Inc., 164 F.3d 1343, 1345 (10th Cir. 1999). The Tenth Circuit has recognized that "[o]ther courts invoke the same rule by the shorthand expressions of immune 'quasi-legislative' or 'quasi-judicial' action." United States v. Agronics Inc., 164 F.3d at 1345. Thus, for example, courts have rejected FTCA claims premised upon such administrative/regulatory acts or omissions as: (i) the Federal Aviation Administration's failure to take enforcement action against an entity not complying with federal laws and rules; (ii) the Agriculture Department's failure to prohibit the exportation of disease-exposed cattle; and (iii) various agencies' noncompliance with proper rulemaking procedures. See United States v. Agronics Inc., 164 F.3d at 1346 (collecting cases).

The Court examined the exceptions to the FTCA's waiver of sovereign immunity in Coffey v. United States, 906 F. Supp. 2d at 1157. In that case, a plaintiff brought a wrongful death and negligence action against the United States Bureau of Indian Affairs ("BIA") based on its decision to contract with a county detention center. See 906 F. Supp. 2d at 1121. The United States argued against liability on the grounds that the detention center was an independent contractor and that

the United States' decision to contract with it fell within the FTCA's discretionary-function exemption.  See 906 F. Supp. 2d at 1121. The Court agreed on both points.  See 906 F. Supp. 2d at 1121.  It explained that the BIA's decision to contract with the detention center was "a matter of the BIA's judgment and choice, which is susceptible to policy analysis," and thus protected under the discretionary function exemption.  906 F. Supp. 2d at 1157.  It added that the United States "is liable under the FTCA for the actions of its employees only," thereby prohibiting liability for the detention center's actions.  906 F. Supp. 2d at 1164.

## LAW REGARDING THE DISCRETIONARY FUNCTION EXCEPTION

The FTCA contains several exceptions to its waiver of immunity.  See 28 U.S.C. § 2680. The Supreme Court has characterized § 2680(a) as the "boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals."  United States v. Varig Airlines, 467 U.S. 808.  These exceptions must be strictly construed in the United States' favor.  See U.S. Dep't of Energy v. Ohio, 503 U.S. 607, 615 (1992)("Waivers of immunity must be 'construed strictly in favor of the sovereign' and not 'enlarge[d] . . . beyond what the language requires.'"  (alterations in U.S. Dep't of Energy v. Ohio)(first quoting McMahon v. United States, 342 U.S. 25, 27 (1951); then quoting E. Transp. Co. v. United States, 272 U.S. 676, 686 (1927)).

The discretionary function exception provides that the FTCA shall not apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary-function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."   28 U.S.C. § 2680(a).   Its application is a threshold jurisdictional issue in any FTCA case.  See Johnson v. U.S. Dep't of Interior, 949 F.2d 332, 335 (10th Cir. 1991).  Cf. Warren v. United States, 244 F. Supp. 3d at 1233 (noting that, at the motion-

- 25 -

to-dismiss stage, in an FTCA case, a plaintiff "must establish more than . . . abstract negligence" "and, instead, must also first establish that her claims are not based upon actions immunized from liability under the FTCA's discretionary function exception"). In Berkovitz by Berkovitz v. United States, the Supreme Court enunciated a two-prong analysis for determining when the FTCA's discretionary function exception applies. See 486 U.S. at 536; Domme v. United States, 61 F.3d at 789-90; Black Hills Aviation, Inc. v. United States, 34 F.3d 968, 972-73 (10th Cir. 1994); Kiehn v. United States, 984 F.2d 1100, 1102-03 (10th Cir. 1993). First, the acts or omissions must be "discretionary in nature, acts that 'involve an element of judgment or choice.'" United States v. Gaubert, 499 U.S. at 322 (quoting Berkovitz by Berkovitz v. United States, 486 U.S. at 536). Second, the conduct must be "'based on considerations of public policy.'" United States v. Gaubert, 499 U.S. at 323 (quoting Berkovitz by Berkovitz v. United States, 486 U.S. at 537). See Garling v. U.S. Envtl. Prot. Agency, 849 F.3d 1289, 1294-95, 2017 WL 894432, at *3 (10th Cir. 2017)(unpublished).

An action is not discretionary where a statute, regulation, or policy mandates certain conduct, because the employee has "no room for choice." United States v. Gaubert, 499 U.S. 315, 324 (1991). See Garcia v. U.S. Air Force, 533 F.3d at 1176 ("Conduct is not discretionary if 'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive.'" (quoting Berkovitz by Berkovitz v. United States, 486 U.S. at 537)). On the other hand,

> [w]here Congress has delegated the authority to an independent agency or to the Executive Branch to implement the general provisions of a regulatory statute and to issue regulations to that end, there is no doubt that planning-level decisions establishing programs are protected by the discretionary function exception, as is the promulgation of regulations by which the agencies are to carry out the programs.

United States v. Gaubert, 499 U.S. at 323.

Berkovitz by Berkovitz v. United States' second prong protects conduct if it was or could have been "'based on considerations of public policy.'"  Kiehn v. United States, 984 F.2d at 1105 (quoting Berkovitz by Berkovitz v. United States, 486 U.S. at 537).  This principle is a result of the rule that the second prong requires that the challenged conduct must be, by its nature, "susceptible to policy analysis."  United States v. Gaubert, 499 U.S. at 325.  Where agency policy allows an employee to exercise discretion, there is a "strong presumption" that the acts authorized by the policy are grounded in public policy.  United States v. Gaubert, 499 U.S. at 324.  Where a plaintiff alleges a negligent omission, it is "irrelevant whether the [omission] was a matter of 'deliberate choice,' or a mere oversight," Kiehn v. United States, 984 F.2d at 1105 (quoting Allen v. United States, 816 F.2d 1417, 1422 n.5 (10th Cir. 1987)), because "[t]he failure to consider some or all critical aspects of a discretionary judgment does not make that judgment less discretionary and does not make the judgment subject to liability," Kiehn v. United States, 984 F.2d at 1105.

The two-prong test in Berkovitz by Berkovitz v. United States applies equally to all government employees, regardless of their rank or position: "[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case."  United States v. Varig Airlines, 467 U.S. at 813.  See United States v. Gaubert, 499 U.S. at 325 ("Discretionary conduct is not confined to the policy or planning level."); United States v. Varig Airlines, 467 U.S. at 811 ("'Where there is room for policy judgment and decision there is discretion.  It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.'" (quoting Dalehite v. United States, 346 U.S. 15, 35-36 (1953))).

- 27 -

In applying the <u>Berkovitz by Berkovitz v. United States</u> analysis, the question of negligence is irrelevant: "When the government performs a discretionary function, the exception to the FTCA applies regardless of 'whether or not the discretion involved be abused.'"  <u>Redman v. United States</u>, 934 F.2d 1151, 1157 (10th Cir. 1991)(quoting 28 U.S.C. § 2680(a)).  A court must decide first whether the discretionary function exception shields the "government's conduct" before the court addresses the government's duties under the common law.  <u>Domme v. United States</u>, 61 F.3d at 789.  The Tenth Circuit has explained:

> Considering state tort law as a limit on the federal government's discretion at the jurisdictional stage impermissibly conflates the merits of plaintiffs' claims with the question whether the United States has conferred jurisdiction on the courts to hear those claims in the first place.  Indeed, the only conceivable way plaintiffs might succeed on their theory is by pointing to a *federal* policy incorporating state tort law as a limit on the discretion of federal employees with the meaning of the FTCA.

<u>Sydnes v. United States</u>, 523 F.3d 1179, 1184 (10th Cir. 2008).

## LAW REGARDING DISCOVERY

Discovery's proper scope is "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. . . ."  Fed. R. Civ. P. 26(b)(1).  The factors that bear upon proportionality are: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26 (b)(1).

Discovery's scope under rule 26 is broad.  <u>See</u> <u>Gomez v. Martin Marietta Corp.</u>, 50 F.3d 1511, 1520 (10th Cir. 1995); <u>Sanchez v. Matta</u>, 229 F.R.D. 649, 654 (D.N.M. 2004)(Browning, J.)("The federal courts have held that the scope of discovery should be broadly and liberally construed to achieve the full disclosure of all potentially relevant information.").  The

federal discovery rules reflect the courts' and Congress' recognition that "mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." Hickman v. Taylor, 329 U.S. 495, 507 (1947).  A district court is not, however, "required to permit plaintiff to engage in a 'fishing expedition' in the hope of supporting his claim." McGee v. Hayes, 43 F. App'x 214, 217 (10th Cir. 2002)(unpublished)[9](quoting Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1169 (10th Cir. 2000)).  "Discovery . . . is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support." Rivera v. DJO, LLC, No. CIV 11-1119 JB/RHS, 2012 WL 3860744, at *1 (D.N.M. Aug. 27, 2012)(Browning, J.)(internal quotation marks omitted)(quoting Tottenham v. Trans World Gaming Corp., No. CIV 00-7697(WK), 2002 WL 1967023, at *2 (S.D.N.Y. 2002)(Knapp, J.)).  "[B]road discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." Gomez v. Martin Marietta Corp., 50 F.3d at 1520 (internal quotation marks omitted)(quoting Scales v. J.C. Bradford & Co., 925 F.2d 901, 906 (6th Cir. 1991)).

The 2000 amendments to rule 26(b)(1) began narrowing the substantive scope of discovery

---

[9]McGee v. Hayes is an unpublished United States Court of Appeals for the Tenth Circuit opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that McGee v. Hayes and the other unpublished cases cited herein have persuasive value with respect to a material issue and will assist the Court in its preparation of this Memorandum Opinion and Order.

and injected courts deeper into the discovery process.  See Simon v. Taylor, No. CIV 12-0096 JB/WPL, 2015 WL 2225653, at *23 (D.N.M. April 30, 2015)(Browning, J.).  Before the 2000 amendments, rule 26(b)(1) defined the scope of discovery as follows:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending actions, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.  The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1)(1996).  The 2000 amendments made the following changes, shown here with the deleted language stricken and the added material underlined:

> Parties may obtain discovery regarding any matter, not privileged, that ~~which~~ is relevant ~~to the subject matter involved in the pending actions, whether it relates to~~ the claim or defense of ~~the party seeking discovery or to the claim or defense of~~ any ~~other~~ party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.  <u>For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant</u> ~~The~~ information ~~sought~~ need not be admissible at the trial if <u>discovery</u> the ~~information sought~~ appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1).   Putting aside the last sentence's changes -- which the advisory committee's notes make clear was a housekeeping amendment to clarify that inadmissible evidence must still be relevant to be discoverable -- the 2000 amendments have two effects: (i) they narrow the substantive scope of discovery in the first sentence; and (ii) they inject courts into the process in the entirely new second sentence.

> In 1978, the Committee published for comment a proposed amendment, suggested by the Section of Litigation of the American Bar Association, to refine the scope of discovery by deleting the "subject matter" language.  This proposal was withdrawn, and the Committee has since then made other changes in the discovery rules to address concerns about overbroad discovery.  Concerns about

costs and delay of discovery have persisted nonetheless, and other bar groups have repeatedly renewed similar proposals for amendment to this subdivision to delete the "subject matter" language. Nearly one-third of the lawyers surveyed in 1997 by the Federal Judicial Center endorsed narrowing the scope of discovery as a means of reducing litigation expense without interfering with fair case resolutions. [Federal Judicial Center, T. Willging, J. Shapard, D. Stienstra, & D. Miletich, Discovery and Disclosure Practice, Problems, and Proposals for Change] 44–45 (1997). The Committee has heard that in some instances, particularly cases involving large quantities of discovery, parties seek to justify discovery requests that sweep far beyond the claims and defenses of the parties on the ground that they nevertheless have a bearing on the "subject matter" involved in the action.

The amendments proposed for subdivision (b)(1) include one element of these earlier proposals but also differ from these proposals in significant ways. The similarity is that the amendments describe the scope of party-controlled discovery in terms of matter relevant to the claim or defense of any party. The court, however, retains authority to order discovery of any matter relevant to the subject matter involved in the action for good cause. The amendment is designed to involve the court more actively in regulating the breadth of sweeping or contentious discovery. The Committee has been informed repeatedly by lawyers that involvement of the court in managing discovery is an important method of controlling problems of inappropriately broad discovery. Increasing the availability of judicial officers to resolve discovery disputes and increasing court management of discovery were both strongly endorsed by the attorneys surveyed by the Federal Judicial Center. See Discovery and Disclosure Practice, supra, at 44. Under the amended provisions, if there is an objection that discovery goes beyond material relevant to the parties' claims or defenses, the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action. The good-cause standard warranting broader discovery is meant to be flexible.

**The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action. The dividing line between information relevant to the claims and defenses and that relevant only to the subject matter of the action cannot be defined with precision. A variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action. For example, other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard. Information about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information. Similarly, information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable. In each instance, the determination whether such information is discoverable because it is relevant**

**to the claims or defenses depends on the circumstances of the pending action.**

The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings. In general, it is hoped that reasonable lawyers can cooperate to manage discovery without the need for judicial intervention. When judicial intervention is invoked, the actual scope of discovery should be determined according to the reasonable needs of the action. The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested.

The amendments also modify the provision regarding discovery of information not admissible in evidence. As added in 1946, this sentence was designed to make clear that otherwise relevant material could not be withheld because it was hearsay or otherwise inadmissible. The Committee was concerned that the "reasonably calculated to lead to the discovery of admissible evidence" standard set forth in this sentence might swallow any other limitation on the scope of discovery. Accordingly, this sentence has been amended to clarify that information must be relevant to be discoverable, even though inadmissible, and that discovery of such material is permitted if reasonably calculated to lead to the discovery of admissible evidence. As used here, "relevant" means within the scope of discovery as defined in this subdivision, and it would include information relevant to the subject matter involved in the action if the court has ordered discovery to that limit based on a showing of good cause.

Finally, a sentence has been added calling attention to the limitations of subdivision (b)(2)(i), (ii), and (iii). These limitations apply to discovery that is otherwise within the scope of subdivision (b)(1). The Committee has been told repeatedly that courts have not implemented these limitations with the vigor that was contemplated. See 8 Federal Practice & Procedure § 2008.1 at 121. This otherwise redundant cross-reference has been added to emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery. Cf. Crawford-El v. Britton, [523 U.S. 574] (1998)(quoting Rule 26(b)(2)(iii) and stating that "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly").

Fed. R. Civ. P. 26 advisory committee's notes (emphasis added).

One gets the impression from reading the advisory committee's notes that the amendment was not intended to exclude a delineable swath of material so much as it is intended to send a signal to district judges to become more hands-on in the process of regulating -- mostly limiting

-- discovery on relevance grounds alone.  The two effects of the 2000 amendments might, thus, be only one effect: directing district judges to roll up their sleeves and manage discovery, and to do so on a relevance basis.  The change in substantive scope from "subject matter," to "claim or defense," would, therefore, seem to add teeth to the relevance standard instead of narrowing that standard.  It is not surprising that the Supreme Court of the United States of America and Congress want to increase judicial presence: "relevance" is a liberal concept in the context of trial.  Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

Of course, regardless of the Court's musings about the rules, courts should also seek to give substantive content to amendments.  Read literally, the rule does not permit parties to discover information relevant only to the claim or defense of another party; they must use discovery only to investigate their own claims and defenses.  More problematically, however, the rule may prevent using the Federal Rules' compulsory discovery process to obtain "background" information not specifically relevant to any one claim or defense -- e.g., a plaintiff naming a pharmaceutical company as a defendant and then using discovery to educate itself generally about medicine, biochemistry, and the drug industry by using the defendant's expertise.

In In re Cooper Tire & Rubber Co., 568 F.3d 1180 (10th Cir. 2009), the United States Court of Appeals for the Tenth Circuit clarified that the 2000 amendments to rule 26 "implemented a two-tiered discovery process; the first tier being attorney-managed discovery of information relevant to any claim or defense of a party, and the second being court-managed discovery that can include information relevant to the subject matter of the action."  568 F.3d at 1188.  The Tenth Circuit further stated that,

> when a party objects that discovery goes beyond that relevant to the claims or defenses, "the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action." This good-cause standard is intended to be flexible. When the district court does intervene in discovery, it has discretion in determining what the scope of discovery should be. "[T]he actual scope of discovery should be determined according to the reasonable needs of the action. The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested."

568 F.3d at 1188-89 (citations and footnote omitted)(alteration in In re Cooper Tire & Rubber Co.)(quoting the advisory committee's notes to the 2000 amendments to Fed. R. Civ. P. 26(b)(1)).

The 2015 amendments to rule 26(b)(1) continued this process of narrowing discovery's substantive scope and injecting courts further into the discovery process. The 2015 amendment made notable deletions and additions, both of which emphasized the need to make discovery proportional to the needs of the case. See Fed. R. Civ. P. 26(b)(1). Rule 26(b)(1), provides:[10]

> *(1)*    *Scope in General.* Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense ~~including the existence, description, nature, custody, condition and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. All discovery is subject to the limitations imposed by Rule 26(b)(2)(C)~~ and <u>proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.</u>

---

[10]The deletions are stricken and the additions are underlined.

Fed. R. Civ. P. 26(b)(1) (alterations added).  The Committee Notes state that the first deletion does not make a substantive change. Rather, the deletion was made because "[d]iscovery of such matters is so deeply entrenched" in standard discovery that including it would be "clutter."  Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.[11]

Regarding the second deletion, the Committee Notes explain that the former provision for discovery of relevant but inadmissible information that appears "reasonably calculated to lead to the discovery of admissible evidence" is also deleted.[12]  Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.

> The phrase has been used by some, incorrectly, to define the scope of discovery. As the Committee Note to the 2000 amendments observed, use of the "reasonably calculated" phrase to define the scope of discovery "might swallow any other limitation on the scope of discovery."  The 2000 amendments sought to prevent such misuse by adding the word "Relevant" at the beginning of the sentence, making clear that "'relevant' means within the scope of discovery as defined in this subdivision. . . ."  The "reasonably calculated" phrase has continued to create problems, however, and is removed by these amendments.  It is replaced by the direct statement that "Information within this scope of discovery need not be admissible in evidence to be discoverable."  Discovery of nonprivileged information not admissible in evidence remains available so long as it is otherwise within the scope of discovery.

---

[11]The Court regrets this deletion.  Moving things out of the statute's text often creates mischief, especially for courts that rely heavily on the text's plain language.  The drafters might be astonished how often the Court sees objections to interrogatories and requests that seek basic information about documents.  The rule is well-established because the deleted language was in the rule; now that the language is not in the rule, the rule may be eroded or, more likely, ignored or overlooked by those who do not spend time in advisory notes' thicket.  What the advisory comments describe as "clutter" is a simple instruction to practitioners who do not practice in federal court every day for every case.  This deletion might incrementally increase unnecessary litigation rather than shorten it.  Some of the amendments seem more designed to help the nation's large corporations, represented by some of the nation's most expensive law firms, cut down expenses than they are to help courts and practitioners in more routine cases.

[12]Arguably, older lawyers will have to learn a new vocabulary and ignore the one they have used for decades.  If the changes were not made to change the scope of discovery, it is unclear what the benefit of all this re-arrangement really is.

Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment.  The deletion, therefore, does not necessarily change discovery's scope, but clarifies it.  Accordingly, "[r]elevance is still to be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on' any party's claim or defense."  State Farm Mut. Auto. Ins. v. Fayda, 14 Civ. 9792 (WHP)(JCF), 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015)(Francis IV, M.J.)(internal quotation marks omitted)(quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)).

The most notable addition to rule 26(b) is the proportionality concept.  Rule 26(b)(2)(C)(iii) has always limited overly burdensome discovery and required proportionality.  See Fed. R. Civ. P. 26(b)(2)(C)(iii) (pre-2015 version).  The proportionality requirement was relocated to rule 26(b)(1) to address the "explosion" of information that "has been exacerbated by the advent of e-discovery."[13]  Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.  Describing

---

[13]This relocation -- rather than substantive change -- is one reason that the Court is skeptical that the 2015 amendments will make a considerable difference in limiting discovery or cutting discovery costs.  Courts have been bringing common sense and proportionality to their discovery decisions long before the 2015 amendments.  See Aguayo v. AMCO Ins., 59 F. Supp. 3d 1225, 1275 (D.N.M. 2014)(Browning, J.)("[T]he Court expects that discovery and motion practice bear some proportionality to the case's worth."); Cabot v. Wal-Mart Stores, Inc., No. CIV 11-0260 JB/RHS, 2012 WL 592874, at *11-12 (D.N.M. Feb. 16, 2012)(Browning, J.)(limiting the scope of discovery because it was unduly burdensome in relation to the relevance and need).  The real import of the rule is that it will likely lead to more "proportionality" objections and more disputes that the district courts will have to resolve, which is what the drafters apparently intended.  It is unclear how more judicial involvement in discovery can be squared with a federal court docket that is at a breaking point already.  It is also unclear what was wrong with the old goal of discovery being largely self-executing.  The new rules also require attorneys to learn the new vocabulary of "proportionality," delete their old stock legal sections from their briefs and rewrite these new sections to use the correct language.  Older lawyers must be particularly alert to read and learn the new rules, read the comments, and understand the drafting's thrust.  Finally, given that "proportionality" is a very subjective standard, it will be hard for any court to sanction any attorney for raising this objection.  In sum, the rules are just as likely to increase discovery's cost as to decrease it.

how e-discovery is the driving factor in the 2015 amendment, the Committee Notes state:

> The burden or expense of proposed discovery should be determined in a realistic way.  This includes the burden or expense of producing electronically stored information.  Computer-based methods of searching such information continue to develop, particularly for cases involving large volumes of electronically stored information.  Courts and parties should be willing to consider the opportunities for reducing the burden or expense of discovery as reliable means of searching electronically stored information become available.

Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.

Chief Justice Roberts' 2015 Year-End Report on the Federal Judiciary indicates that the addition of proportionality to rule 26(b) "crystalizes the concept of reasonable limits on discovery through increased reliance on the common-sense concept of proportionality."[14]  Chief Justice John

---

[14]The Rules Enabling Act, 28 U.S.C. §§ 2071 to 77, empowers the federal courts to prescribe rules for the conduct of their business.  See 28 U.S.C. § 2071.  The Judicial Conference -- the federal judiciary's policy-making body -- has overall responsibility for formulating those rules.  See Chief Justice John Roberts, 2015 Year-End Report on the Federal Judiciary at 6, Supreme Court of the United States, available at http://www.supremecourt.gov/publicinfo/yearend/year-endreports.aspx (last visited May 1, 2019)("2015 Year-End Report").  The Chief Justice leads the Judicial Conference.  The Judicial Conference's Committee on Rules of Practice and Procedure, known as the Standing Committee, solicits guidance from advisory committees and conferences to draft proposed rules and amendments for the Judicial Conference's consideration.  See 2015 Year-End Report.  Chief Justice Roberts, a former clerk for Chief Justice William Rehnquist, appointed the Honorable David Campbell, Senior United States District Judge for the United States District Court for the District of Arizona, also a former Chief Justice Rehnquist clerk and President George W. Bush appointee, to chair the Civil Rules Advisory Committee.  Judge Campbell and David Levi, now Professor of Law at Duke University School of Law and Director of the Bolch Judicial Institute, former Dean of the Duke University School of Law, a former clerk to Justice Lewis Powell, and former chief judge of the United States District Court for the Eastern District of California, appointed as United States Attorney by President Ronald Reagan and appointed to the Eastern District of California by President George W. Bush, led the effort to increase proportionality and hands-on judicial case management in the 2015 amendments.  See Report to the Standing Committee at 4, Advisory Committee on Civil Rules (May 8, 2013), available at http://www.uscourts.gov/rules-policies/archives/committeereports/advisory-committee-rules-civil-procedure-may-2013.  After the Judicial Conference concurred on the 2015 amendments, it sent the proposed rules and amendments to the Supreme Court, which approved them.  Chief Justice Roberts submitted the proposed rules to Congress for its examination.  See 2015 Year-End Report at 6.  Because Congress

Roberts, <u>2015 Year-End Report on the Federal Judiciary</u> at 6, available at http://www.supremecourt.gov/publicinfo/year-end/year-endreports.aspx (last visited May 1, 2019)("2015 Year-End Report").  Chief Justice Roberts states that the proportionality concept seeks to "eliminate unnecessary or wasteful discovery," and to impose "careful and realistic assessment of actual need."  2015 Year-End Report at 7.  This assessment may, as a practical matter, "'encourage judges to be more aggressive in identifying and discouraging discovery overuse' by emphasizing the need to analyze proportionality before ordering production of relevant information."  <u>State Farm Mut. Auto. Ins. v. Fayda</u>, 2015 WL 7871037, at *2 (quoting Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2015 amendment).  The burden of demonstrating relevance remains on the party seeking discovery, and the newly revised rule "does not place on the party seeking discovery the burden of addressing all proportionality considerations."  Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2015 amendment.  <u>See</u> <u>Dao v. Liberty Life Assurance Co. of Boston</u>, Case No. 14-cv-04749-SI (EDL), 2016 WL 796095, at *3 (N.D. Cal. Feb. 23, 2016)(LaPorte, M.J.)(observing that the 2015 amendment "reinforces the Rule 26(g) obligation of the parties to consider these factors in making discovery requests,

---

did not intervene by December 1, 2015, the new rules took effect.  Some scholars have noted that the rules reflect the conservative nature of those who have participated in drafting the amendments.  <u>See</u> Edward A. Purcell, Jr., <u>From the Particular to the General: Three Federal Rules and the Jurisprudence of the Rehnquist and Roberts Courts</u>, 162 U. Pa. L. Rev. 1731, 1742 (2014)(stating that the conservative "Rehnquist and Roberts Courts" issued decisions that "regularly burdened plaintiffs while protecting corporate" defendants).  In particular, the New Mexico Trial Lawyer published an article asserting that the amendments favored corporate defendants, which was partially the result of Chief Justice Roberts' appointment of "corporate-minded judges to the Rules Advisory Committee that drafted the amendments."  Ned Miltenberg & Stuart Ollanik, <u>The Chief Umpire is Changing the Strike Zone</u>, at 1, The New Mexico Trial Lawyer (Jan./Feb. 2016).  The Court shares some of the concerns with the new amendments being pro-business and giving corporations new tools to limit plaintiffs' discovery.

responses or objections"); <u>Williams v. U.S. Envt'l Servs., LLC</u>, CIVIL ACTION NO. 15-168-RLB, 2016 WL 617447, at *1 n.2 (M.D. La. Feb. 16, 2016)(Bourgeois, M.J.).  In general, "the parties' responsibilities . . . remain the same" as they were under the rule's earlier iteration so that the party resisting discovery has the burden of showing undue burden or expense.  Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2015 amendment.  <u>See</u> <u>Dao v. Liberty Life Assurance Co. of Boston</u>, 2016 WL 796095, at *3 (noting that, "while the language of the Rule has changed, the amended rule does not actually place a greater burden on the parties with respect to their discovery obligations").

Like with the 2000 amendments, it is unsurprising that the drafters are unable to articulate precise language narrowing the discovery's substantive scope.  Instead of being Aristotelian and trying to draft rules, the drafters largely opt to make federal judges Plato's enlightened guardians. They have decided that no single general rule can adequately consider the infinite number of possible permutations of different claims, defenses, parties, attorneys, resources of parties and attorneys, information asymmetries, amounts in controversy, availabilities of information by other means, and other factors.  They have dropped all discovery disputes into judges' laps.  The drafters have decided that this determination requires the individualized judgment of someone on the scene, and that presence is what the rulemakers want when they: (i) encourage district judges to take a firmer grasp on the discovery's scope; and (ii) put their thumbs on the scale in favor of narrower discovery in the rule's definition of the scope of discovery.

### LAW REGARDING PRIVILEGE CHOICE OF LAW

In a diversity case, state law governs the availability of the various privileges.  <u>See</u> Fed. R. Evid. 501; <u>Frontier Refining, Inc. v. Gorman-Rupp Co.</u>, 136 F.3d 695, 699 (10th Cir. 1998). Pursuant to the Federal Rules of Evidence, however, "the principles of the common law as they

may be interpreted by the courts of the United States in the light of reason and experience"

normally govern the existence and scope of a privilege.  Fed. R. Evid. 501.

Rule 501 states:

> The common law -- as interpreted by United States courts in light of reason and experience -- governs a claim of privilege unless any of the following provides otherwise:
>
> - the United States Constitution;
>
> - a federal statute; or
>
> - rules prescribed by the Supreme Court.
>
> But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.

Fed. R. Evid. 501.

Some cases involve both federal and state law claims.  Rule 501's text suggests that, where

there are both federal and state claims, federal privilege law should apply to federal claims and

state privilege law should apply to state law claims.  See Motley v. Marathon Oil Co., 71 F.3d

1547, 1551 (10th Cir. 1995)("Motley asserted both federal and state causes of action.  As to state

causes of action, a federal court should look to state law in deciding privilege questions." (citing

White v. Am. Airlines, Inc., 915 F.2d 1414, 1424 (10th Cir. 1990))). Applying that rule, however,

is unhelpful in many instances where the privilege asserted goes to evidence that is relevant to

both a federal and a state law claim.

Where a privilege is asserted for evidence relevant both to federal and pendent state law

claims, most circuit courts have either held that federal privilege law governs or approved of such

an approach without explicitly adopting it.  See In re Sealed Case (Medical Records), 381 F.3d

1205, 1212-13 (D.C. Cir. 2004)("The usual solution by the courts' in such cases 'has been a

preference for federal privilege law when it conflicts with state privilege law.'")(quoting 3 J. McLaughlin, Weinstein's Federal Evidence § 501.02[2][c], at 501-14 (2d ed. 2004)); Virmani v. Novant Health Inc., 259 F.3d 284, 287 n.3 (4th Cir. 2001)("We agree with our sister circuits that in a case involving both federal and state law claims, the federal law of privilege applies."); Pearson v. Miller, 211 F.3d 57, 61 (3d Cir. 2000)(concluding that, where there is a conflict between federal and state privilege law because of the existence of federal and pendent state law claims, the United States Court of Appeals for the Third Circuit "has resolved this potential conflict in favor of federal privilege law," because "applying two separate disclosure rules with respect to different claims tried to the same jury would be unworkable" (quoting Wm. T. Thompson Co. v. General Nutrition Corp., 671 F.2d 100, 104 (3d Cir. 1982))); Hancock v. Dodson, 958 F.2d 1367, 1373 (6th Cir. 1992)("The existence of pendent state law claims does not relieve [courts] of [their] obligation to apply the federal law of privilege."); Hancock v. Hobbs, 967 F.2d 462, 466 (11th Cir. 1992)("Courts that have confronted this issue in the context of the discoverability of evidence have uniformly held that the federal law of privilege governs even where the evidence sought might be relevant to a pendent state claim."); Religious Tech. Ctr. v. Wollersheim, 971 F.2d 364, 367 n.10 (9th Cir. 1992)(applying federal privilege law in a case involving both federal and pendent state law claims); von Bulow v. von Bulow, 811 F.2d 136, 141 (2d Cir. 1987)(declaring that, where the evidence sought "is relevant to both the federal and state claims," courts "consistently have held that the asserted privileges are governed by the principles of federal law"); Mem'l Hosp. for McHenry Cty. v. Shadur, 664 F.2d 1058, 1061 n.3 (7th Cir. 1981).

The Tenth Circuit has differed from the other Courts of Appeals to the extent that it has held that, where there are federal and state law claims, "[a]s to state causes of action, a federal court should look to state law in deciding privilege questions."  Motley v. Marathon Oil Co., 71

F.3d at 1551.  This rule would require a court considering evidence relevant only to state claims to apply state privilege law, even if there were other federal claims in the case.  The Court concluded in Vondrak v. City of Las Cruces, 760 F. Supp. 2d 1170 (D.N.M. April 8, 2009)(Browning, J.), that, "where there is a federal cause of action and pendent state-law claims, and where the asserted privilege relates to evidence that is relevant both to the federal and state-law claims . . . federal privilege law should apply . . . ."  760 F. Supp. 2d at 1175.  See Dorato v. Smith, 163 F. Supp. 3d 837, 882 (D.N.M. 2015)(Browning, J.).  At least one treatise has approved of this approach as the "majority view."  Edward J. Imwinkelried, The New Wigmore: Evidentiary Privileges § 4.2.3 (citing Vondrak v. City of Las Cruces)("The majority view is that the federal law prevails and applies to the testimony relevant to both the federal and state claim.").  The Court reaffirms that the weight of Courts of Appeals' authority, combined with the practical considerations involved with running discovery and trials, indicate that the better rule is the Vondrak v. City of Las Cruces rule and concludes that federal privilege law applies under such circumstances.

First, at the discovery phase, any attempt to bifurcate privileges along the border between federal and state law claims is hollow if the allegedly privileged evidence impacts both sets of claims.  If, for example, state law protects the evidence as privileged, but federal law does not protect the same evidence, a court would be in the conundrum of preventing the discovery of evidence as to the state law claims because of the state law privilege, while simultaneously ordering the disclosure of the same evidence as non-privileged as to the federal law claims. Thus, as a practical matter, the federal privilege law is going to determine discovery in federal court to avoid this problem.

Second, it would be difficult and impracticable -- although not impossible -- to apply two

different bodies of privilege law in front of one jury.  See Hancock v. Hobbs, 967 F.2d at 467.  In this case, for example, if one privilege law dictated that some records were privileged, while the other body of privilege law dictated a contrary result, a court applying state law to the state claims and federal law to the federal claims would have to admit the same evidence for one set of claims and exclude the same evidence for the other claims. The Court would then give a limiting instruction to the jury, but such a limiting instruction would be of limited value, given that evidence which should have been privileged would have been heard, and the privilege effectively lost.

In many respects, privileges protect the disclosure of information, not the use of information already disclosed, for whatever reason -- voluntary waiver; inadvertent disclosure; waiver by a third party; compelled disclosure; Freedom of Information Act, 5 U.S.C. § 552, claims; or other methods.  It does not make much sense to talk about "privileged" evidence once it is disclosed, for whatever reason.  Once the evidence is floating around out there, there is often nothing of the privilege to protect; the confidentiality is lost.  Once that loss occurs, the usual need to get to the truth, and the normal federal evidentiary rules of relevancy and materiality, take over. Thus, once there is a federal claim, the federal court has an overriding need to allow the discovery of all evidence that is relevant and not privileged under federal law.  And once the federal court orders the production of that evidence for the federal claim, the evidence is really no longer "privileged," even under state law.  The confidentiality has been lost or waived; it is no longer special evidence at all.  The parties can use it if it is relevant and material, without regard to the fact that it was once privileged under state law.  The New Mexico physician-patient privilege, for example, provides that "[a] patient has a privilege to refuse to disclose, or to prevent any other person from disclosing," certain communications. N.M. R. Evid. 11-504. This privilege does not address whether a party who already possesses such information may use it at trial.

In light of such considerations, the Court concludes that the best course of action is to have federal privilege law control when there are federal claims and the evidence allegedly subject to a privilege is relevant to both the federal and state claims.  In federal-question cases, the Court has supplemental jurisdiction over the state-law claims.  See In re Sealed Case (Medical Records), 381 F.3d at 1213. "[W]here the primary source of the court's jurisdiction is the federal claim, to which the state claim is merely pendent (supplemental), it seems appropriate that the federal evidentiary interest -- whether in privilege or production -- should be primary as well."  In re Sealed Case (Medical Records), 381 F.3d at 1213.

The Court's opinion in Vondrak v. City of Las Cruces, provides an example of this approach.  In that case, the defendant police officers and city sought a deposition and records on the plaintiff's injuries from his treating neurologist.  See 760 F. Supp. 2d at 1172.  The plaintiff opposed the defendants' attempt by asserting the attorney-client and physician-patient privileges.  See 760 F. Supp. 2d at 1175.  Because the Court determined that New Mexico and federal law on the relevant privileges would lead to different results, it had to determine "whether federal or state law governs the asserted privilege." 760 F. Supp. 2d at 1175.  The Court concluded that federal privilege law would apply because the information on the plaintiff's injuries was relevant to his state and federal civil rights claims.  See 760 F. Supp. 2d at 1177.

Although the Tenth Circuit has not addressed this issue since the Court decided Vondrak v. City of Las Cruces, the Court does not believe that it would hold to the contrary.  The Tenth Circuit has stated the general rule that, where a case involves federal and state law claims, state privilege applies to the state law claims.  See Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1369 (10th Cir. 1997).  It has not, however, held that state privilege law should preclude the use of evidence when federal law requires the production of the evidence and allows for its use.  The

Tenth Circuit in <u>Motley v. Marathon Oil Co.</u>, 71 F.3d at 1547, did not discuss whether the evidence at issue would have been relevant to the federal claim.  Nor did the Tenth Circuit suggest that any party contended that the evidence was relevant to the federal claim.  While the Court must make its best effort to follow Tenth Circuit precedent, there is no Tenth Circuit law governing this question.

## ANALYSIS

The United States must produce a privilege log for all of the documents it asserts are privileged under 25 U.S.C. § 1675 so that the Plaintiffs, and, if necessary, the Court, can evaluate whether the documents were produced "to assess the quality of medical care."  25 U.S.C. § 1675(a)(2).  25 U.S.C. § 1675 defines medical quality assurance records as: "[T]he proceedings, records, minutes, and reports that -- **(A)** emanate from quality assurance program activities described in paragraph (2); and **(B)** are produced or compiled by or for an Indian health program or urban Indian organization as part of a medical quality assurance program." 25 U.S.C. § 1675(a)(3)(bold in original).  A "medical quality assurance program" is

> any activity carried out before, on, or after March 23, 2010, by or for any Indian health program or urban Indian organization to assess the quality of medical care, including activities conducted by or on behalf of individuals, Indian health program or urban Indian organization medical or dental treatment review committees, or other review bodies responsible for quality assurance, credentials, infection control, patient safety, patient care assessment (including treatment procedures, blood, drugs, and therapeutics), medical records, health resources management review, and identification and prevention of medical or dental incidents and risks.

25 U.S.C. § 1675(a)(2).  The statute instructs that "[n]o part of any medical quality assurance record described in subsection (b) may be subject to discovery or admitted into evidence in any judicial or administrative proceeding, except as provided in subsection (d)."   25 U.S.C. § 1675(c)(1).  The statute provides exceptions to this general principle:

Subject to paragraph (2), a medical quality assurance record described in subsection (b) may be disclosed, and an individual referred to in subsection (c) may give testimony in connection with such a record, only as follows:

(A)     To a Federal agency or private organization, if such medical quality assurance record or testimony is needed by such agency or organization to perform licensing or accreditation functions related to any Indian health program or to a health program of an urban Indian organization to perform monitoring, required by law, of such program or organization.

(B)     To an administrative or judicial proceeding commenced by a present or former Indian health program or urban Indian organization provider concerning the termination, suspension, or limitation of clinical privileges of such health care provider.

(C)     To a governmental board or agency or to a professional health care society or organization, if such medical quality assurance record or testimony is needed by such board, agency, society, or organization to perform licensing, credentialing, or the monitoring of professional standards with respect to any health care provider who is or was an employee of any Indian health program or urban Indian organization.

(D)     To a hospital, medical center, or other institution that provides health care services, if such medical quality assurance record or testimony is needed by such institution to assess the professional qualifications of any health care provider who is or was an employee of any Indian health program or urban Indian organization and who has applied for or been granted authority or employment to provide health care services in or on behalf of such program or organization.

(E)     To an officer, employee, or contractor of the Indian health program or urban Indian organization that created the records or for which the records were created.  If that officer, employee, or contractor has a need for such record or testimony to perform official duties.

(F)     To a criminal or civil law enforcement agency or instrumentality charged under applicable law with the

> protection of the public health or safety, if a qualified representative of such agency or instrumentality makes a written request that such record or testimony be provided for a purpose authorized by law.
>
> **(G)** In an administrative or judicial proceeding commenced by a criminal or civil law enforcement agency or instrumentality referred to in subparagraph (F), but only with respect to the subject of such proceeding.

25 U.S.C. § 1675(d)(1).  Having conducted extensive research, the Court has discovered no legislative history providing further insight into the statute's purpose.

At the hearing, the Plaintiffs argued that "personnel records are not quality assurance records" and "should be provided."  Tr. at 112:21-25 (Curtis).  The Court cannot, without the documents and in-camera review, assess whether the requested documents are medical quality assurance records and cannot therefore evaluate whether the documents were produced "to assess the quality of medical care."  25 U.S.C. § 1675(a)(2).  The Court will provide some guidance on the issue so the parties can perhaps resolve their dispute without the Court having to do an in-camera review.  The Court stands ready, however, to do its job and conduct an in-camera review if the parties require the Court to undertake that task for some or all disputes.

## I.   THE UNITED STATES MUST PROVIDE A PRIVILEGE LOG DESCRIBING THE WITHHELD DOCUMENTS.

The United States refuses to produce the requested documents or a privilege log, because it argues that an absolute privilege applies.  See Response at 12.  See also Reply at 6 ("Defendant refuses to produce either the documents themselves or a legally sufficient privilege log.").  Rule 26 of the Federal Rules of Civil Procedure governs disclosure:

> (5)   *Claiming Privilege or Protecting Trial-Preparation Materials.*
>
> (A)   *Information Withheld.* When a party withholds information otherwise discoverable by claiming that the information is

privileged or subject to protection as trial-preparation material, the party must:

(i)     expressly make the claim; and

(ii)    describe the nature of the documents, communications, or tangible things not produced or disclosed -- and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

(B)    *Information Produced.* If information produced in discovery is subject to a claim of privilege or of protection as trial-preparation material, the party making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The producing party must preserve the information until the claim is resolved.

Fed. R. Civ. P. 26(5) (emphasis in original).  Here, the United States argues that a privilege applies, see Response at 12, and insists that, because "the information is not otherwise discoverable," it need not provide a privilege log,  Response at 12.  The Court disagrees, because the information would "otherwise" be "discoverable" absent the privilege laid out in § 1675.  Moreover, rule 26(b)(5) "requires that a party who withholds information on the grounds that it is privileged or subject to protection as trial-preparation material must identify, in some detail, which information is privileged and describe it in a way that allows the opposing party to ascertain the applicability of the privilege."  Clayton v. Vanguard Car Rental U.S.A., Inc., No. CIV 09-0188 JB/ACT, 2009 WL 5851088, at *3 (D.N.M. Dec. 16, 2009)(Browning, J.).  The Tenth Circuit has held that "[t]he party seeking to assert the attorney-client privilege or the work product doctrine as a bar to

discovery has the burden of establishing that either or both is applicable." <u>Barclaysamerican Corp.</u> <u>v. Kane</u>, 746 F.2d 653, 656 (10th Cir. 1984).

Here, although the United States asserts privilege under 25 U.S.C. § 1675, rather than attorney-client privilege, a privilege log is necessary, because the United States' "conclusory claims of . . . 'statutory' privileges fail" given that the United States has not carried "its burden of showing the Court *which* documents should not be produced and *why*." <u>Atlas Res., Inc. v. Liberty</u> <u>Mut. Ins. Co.</u>, No. CIV 09-1113 WJ/RLP, 2010 WL 11552891, at *1 (D.N.M. May 4, 2010)(Puglisi, C.M.J.)(emphasis in original). <u>See</u> <u>Roybal v. United States</u>, No. CIV 13-610 KG/GBW, 2014 WL 12597405, at *3 (D.N.M. Apr. 3, 2014)(Wormuth, M.J.)(reviewing the United States' privilege log and concluding that, where the United States asserted statutory privilege under 38 U.S.C. § 5705, it "bears the burden of demonstrating that it is justified in withholding the documents at issue"). In similar cases on § 1675 privilege, privilege logs have assisted courts in deciding whether documents are privileged. <u>See, e.g.</u>, <u>Parker v. United States</u>, 2020 WL 729211, at *7; <u>Soto v. United States</u>, No. CIV 13-2359 BAS DHB, 2014 WL 4704594, at *3 (S.D. Cal. Sept. 22, 2014)(Bartick, M.J.)(concluding that, "under the plain language of 25 U.S.C. § 1675(a)(3), the three documents identified as 'reports' in Defendant's privilege log are medical quality assurance records subject to the protection of the quality assurance privilege"). Relatedly, in cases under 10 U.S.C. § 1102(j)(1), a nearly identical statute that protects medical quality assurance records from the Department of Defense, courts have also relied upon privilege logs to determine which documents are privileged. <u>See</u> <u>Harris-Reese v. United States</u>, No. CIV TDC 19-1971, 2021 WL 409742, at *2 (D. Md. Feb. 5, 2021)(Simms, M.J.)(concluding that documents are "privileged medical quality assurance records and should not be produced" by the United States, where it "produced a privilege log that is sufficiently particular and is consistent

with the law"); <u>Wheeler v. United States</u>, No. 17-2249 JTM, 2018 WL 2008865, at *2 (D. Kan. Apr. 30, 2018)(O'Hara, M.J.)(granting the plaintiffs' request "to require defendant to identify which bates-numbered documents are responsive to which requests and/or interrogatories, to identify documents withheld in a privilege log, and to provide a sworn signature page with defendant's interrogatory answers").   Likewise, here, the Court concludes that providing a privilege log will allow the Plaintiffs -- and, if necessary, the Court -- to assess what documents exist that are responsive to their requests for production.   Nonetheless, although the United States did not provide a privilege log, the Court will not consider the privilege waived, because "[p]reventing a party from invoking the privilege and requiring the production of materials that a party is otherwise entitled to shield from discovery is a harsh remedy."   <u>United States v. Bd. of Cty. Comm'rs of the Cty. of Dona Ana</u>, No. CIV 08-0501 JB/ACT, 2009 WL 2426194, at *5 (D.N.M. July 20, 2009)(Browning, J.).

## II.   IF THE PARTIES CANNOT AGREE AFTER PRODUCING THE PRIVILEGE LOG, THE COURT MAY CONDUCT AN IN-CAMERA REVIEW OF THE DOCUMENTS.

As the Court has ordered in the past, here "[s]hould the parties need or seek a full document-by-document determination, the parties may need to submit a privilege log," and, if they still without the Court's intervention, cannot agree on what is privileged and what needs to be produced, "provide those documents for in-camera inspection, so that the Court may determine with specificity whether and to which documents each privilege may apply."   <u>Tanner v. McMurray</u>, 405 F. Supp. 3d 1115, 1225 (D.N.M. 2019)(Browning, J.).   The Supreme Court "has long held the view that in-camera review is a highly appropriate and useful means of dealing with claims of governmental privilege."   <u>Kerr v. U. S. Dist. Ct. for N. Dist. of California</u>, 426 U.S. 394, 405-06 (1976)(citing <u>United States v. Nixon</u>, 418 U.S. 683, 706 (1974), and <u>United States v. Reynolds</u>,

345 U.S. 1 (1953)).  Here, should the parties remain unable to agree after a privilege log is produced, "it would seem that an in-camera review of the documents is a relatively costless and eminently worthwhile method to insure that the balance between" the United States' "claims of irrelevance and privilege and plaintiffs' asserted need for the documents is correctly struck." Kerr v. U. S. Dist. Ct. for N. Dist. of California, 426 U.S. at 405.

### III.    25 U.S.C. § 1675 GENERALLY DOES NOT PROTECT EMPLOYMENT APPLICATIONS FROM DISCOVERY.

Employment applications are not part of a medical quality assurance program.  Instead, applications are used to assess potential candidates for employment.  Under the statutory language, "records are protected only to the extent that they stem from an activity designed to assess the quality of medical care and were not created or maintained outside the medical quality assurance program." Dayton Newspapers, Inc. v. Dep't of Air Force, 35 F. Supp. 2d 1033, 1036 (S.D. Ohio 1998)(Rice, C.J.).  By contrast, employment applications are generally created and maintained outside of a medical quality assurance program.  See E.E.O.C. v. Med-Nat'l, Inc., 186 F.R.D. 609, 617 (D. Haw. 1999)(Yamashita, M.J.)(concluding that "employment applications were clearly created and maintained outside the medical quality assurance program").  Here, employment applications may be relevant to the Plaintiffs' remaining negligent credentialing and privileging claims, to the extent that they demonstrate whether the United States violated I.H.M. § 3-1.4(c)(5) or I.H.M. § 3-1.2(A).  See MO at 58.  For example, an employment application could demonstrate whether a Medical Defendant represented that he or she held a current active and unrestricted State license when he or she applied to work at Gallup Medical.  See MO at 58.  Accordingly, the Court concludes that, in general, employment applications are not medical quality assurance records, and

may be relevant to the Plaintiffs' remaining claims.

## IV.  GENERALLY, RECORDS ARISING FROM THE IHS' CREDENTIALING AND PRIVILEGING REVIEW ARE UNAVILABLE UNDER 25 U.S.C. § 1675.

A "medical quality assurance program" consists of "any activity . . . to assess the quality of medical care" and specifically includes activities conducted by "review bodies responsible for . . . credentials." 25 U.S.C. § 1675(a)(2).  The IHS Manual provides that one of the "principal purposes and intended results" of the oversight of credentialing and clinical privileging process is "to provide quality health care to American Indian and Alaska Native patients."  IHS Manual § 3-1.1(B)(2).  The IHS Manual defines "credentialing" as an "ongoing process" that includes information "utilized by the medical staff and governing body to evaluate competency and appropriately grant medical staff membership and/or clinical privileges."  IHS Manual § 3-1.1(D)(1).  In turn, "clinical privileges" are "based on the review of an individual practitioner's professional training, licensure, experience, and expertise."  IHS Manual § 3-1.1(D)(3).  Because credentialing and privileging oversight "is directly related to the provision of quality medical care," IHS Manual § 3-1.1(B)(2), the Court concludes that such records are records of a "medical quality assurance program" and are therefore generally privileged, 25 U.S.C. § 1675(a)(2).  See Parker v. United States, 2020 WL 729211, at *7.

## V.  25 U.S.C. § 1675(d)(1)(F)'s EXCEPTION FOR CRIMINAL OR CIVIL LAW ENFORCEMENT DOES NOT APPLY TO THE COURT OR THE PLAINTIFFS.

Section 1675(d)(1)(F) allows the United States to disclose records protected under the statute to "a criminal or civil law enforcement agency or instrumentality charged under applicable law with the protection of the public health or safety, if a qualified representative of such agency or instrumentality makes a written request that such record or testimony be provided for a purpose authorized by law." 25 U.S.C. § 1675(d)(1)(F).  The Court explained at the hearing that it did not

> think the exclusion . . . about law enforcement . . . is going to work.  I think
> Congress, when it covers a document or covers the activity, I think is pretty close
> to, for our purposes, absolute . . . .  It's going to be hard to get a civil plaintiffs'
> lawyer to get those documents.

Tr. at 133:7-19 (Court).  The Court stated that neither the Plaintiffs nor the Court "are . . . civil or

criminal law enforcement agencies," noting that, instead, the Department of Justice ("DOJ") falls

under that exception.  Tr. at 137:1-13 (Court).  In the United States, law enforcement agencies are

part of the executive branches of state and federal governments, including state police departments,

the DOJ, and the Federal Bureau of Investigations -- not Article III courts or private actors like the

Plaintiffs.  See U.S. Const. art. II § 1; N.M. Const. art. V § 4.  Moreover, neither the Court nor the

Plaintiffs are "charged . . . with the protection of the public health or safety," as 25 U.S.C.

§ 1675(d)(1)(F) requires.  Cf. U.S. Const. art. III § 2 (giving Article III courts the power to

adjudicate "cases" and "controversies").  While the Court and private parties acting as private

attorneys general play an important role in enforcing the law, they are not law enforcement

agencies.  If the Court were to accept the Plaintiffs' argument, the exception would swallow the

rule, because all plaintiffs and courts would have access to documents Congress specifically sought

to protect from discovery.  The Plaintiffs admitted that they were making a "philosophic argument"

regarding their status or the Court's status as a law enforcement agency.  Tr. at 138:20-24 (Curtis).

The Court concludes that the argument is not persuasive, and, to the extent the documents that the

Plaintiffs request are privileged under § 1675, they are not discoverable under § 1675(d)(1)(F)'s

law-enforcement-agency exception.

## VI.   THE ROIA IS INAPPLICABLE IN THIS CASE, BECAUSE FEDERAL PRIVILEGE LAW APPLIES IN FTCA CASES.

"Before determining whether a privilege applies, the Court must decide whether federal or

state law governs the asserted privilege."  Vondrak v. City of Las Cruces, 760 F. Supp. 2d 1170,

1175 (D.N.M. 2009)(Browning, J.).   The Court has federal question jurisdiction in this case, because the Plaintiffs brought this case under the FTCA.  See Complaint ¶¶ 1-50, at 1-10.  Where, as here, the Court is "a federal court sitting in a non-diversity case," the Court is not "a local tribunal.  In some cases it may see fit for special reasons to give the law of a particular state highly persuasive or even controlling effect, but in the last analysis its decision turns upon the law of the United States, not that of any state."  D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp., 315 U.S. 447, 471 (1942)(Jackson, J., concurring).

"While the Tenth Circuit Court of Appeals has not yet considered this question, district courts in the Tenth Circuit have consistently held that federal common law applies to the issue of privilege in FTCA cases."  Cutting v. United States, No. CIV 07-2053, 2008 WL 1775278, at *1 (D. Colo. April 14, 2008)(Hegarty, M.J.).   The Court concludes that § 1675's medical quality assurance privilege applies in this case, rather than ROIA's, because: (i) the Court has federal-question jurisdiction in this case under the FTCA; (ii) rule 501 of the Federal Rules of Evidence instructs that a federal statute should govern privilege claims in cases for which federal law supplies the rule of decision; and (iii) although the FTCA uses State substantive tort law to define the available tort, State substantive tort law controls because of federal law, see 28 U.S.C. § 1346(b)(1)[15]; Hill v. SmithKline Beecham Corp., 393 F.3d 1111, 1117 (10th Cir. 2004)("State

---

[15]The statute provides, in relevant part:

[T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

substantive law applies to suits brought against the United States under the FTCA."), and state law therefore does not provide the rule of decision.

Under rule 501, common law "governs a claim of privilege unless any of the following provides otherwise: the United States Constitution; a federal statute; or rules prescribed by the Supreme Court." Fed. R. Evid. 501. Here, there is a federal statute on point -- 25 U.S.C. § 1675 -- that defines medical quality assurance privilege. Rule 501 further states that, "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501. The Court concludes that federal law governs the asserted privilege, because this case is a federal question case, and federal law supplies the rule of decision. See Tanner v. McMurray, 405 F. Supp. 3d 1115, 1222 (D.N.M. 2019)(Browning, J.)("Because the information at issue bears on Tanner's federal § 1983 claims as well as on her state law claims, the Court concludes that federal privilege law applies and that" the Patient Safety and Quality Improvement Act of 2005, Pub. L. 19-41 "and not ROIA, provides the applicable privilege law."); Syposs v. United States, 179 F.R.D. 406, 410-11 (W.D.N.Y. 1998)(Foschio, M.J.)("Thus, as federal courts only adopt state law under the FTCA, 'federal law still supplies the rule of decision under Rule 501 and state privilege law does not apply to Federal Tort Claims Act cases.'")(quoting Menses v. U.S. Postal Serv., 942 F. Supp. 1320, 1323-24 (D. Nev. 1996)(Johnston, M.J.)); Advisory Committee Notes to Fed R. Evid. 501 ("In those situations where a federal court adopts or incorporates state law to fill interstices or gaps in federal statutory phrases, the court generally will apply federal privilege law."). State law does not supply the rule of decision in FTCA cases, because, although courts apply State substantive tort law, they do so based on federal common

_____

28 U.S.C. § 1346(b)(1).

law, and State law acts as a gap-filler rather than providing the rule of decision.  See  Cutting v. United States, 2008 WL 1775278, at *1 (explaining that, because in an FTCA case "jurisdiction is retained in federal courts, no such state policy trumps the federal interest at stake," and, therefore, federal privilege law applies); Beller ex rel. Beller v. United States, 221 F.R.D. 679, 681 (D.N.M. 2003)(Garcia, C.M.J.)(applying federal marital privilege law in an FTCA case, because of "the legislative history of Rule 501, which supports a finding that Congress intended federal privilege law to apply in FTCA cases")(quoting Tucker v. United States, 143 F. Supp. 2d 619, 622 (S.D.W. Va. 2001)(Feinberg, M.J.)).  But see MacDonald v. United States, 767 F. Supp. 1295, 1298 n.3 (M.D. Pa. 1991)(McClure, J.)(concluding that State law applies in FTCA cases, and, therefore, State privilege law applies because rule "501 requires federal courts to determine issues of privilege in accordance with the law of the state that supplies the rule of decision").  Congress explained when it passed rule 501:

> In non-diversity jurisdiction civil cases, federal privilege law will generally apply. In those situations where a federal court adopts or incorporates state law to fill interstices or gaps in federal statutory phrases, the court generally will apply federal privilege law . . . .  When a federal court chooses to absorb state law, it is applying the state law as a matter of federal common law.[16] Thus, state law does not supply the rule of decision (even though the federal court may apply a rule derived from state decisions), and state privilege law would not apply.

Conf. Rep. No. 1597, 93d Cong., 2d Sess. (1974).  The Advisory Committee Notes to rule 501 explain that, where a "federal court chooses to absorb state law, it is applying the state law as a matter of federal common law.  Thus, state law does not supply the rule of decision (even though the federal court may apply a rule derived from state decisions), and state privilege law would not apply."  Fed. R. Evid. 501 Advisory Committee Notes (citing Holmberg v. Ambrecht, 327 U.S.

---

[16]28 U.S.C. § 1346(b)(1), which was enacted in 1992, provides a statutory basis for courts to apply state substantive law in FTCA cases.

391 (1946), and <u>DeSylva v. Ballentine</u>, 351 U.S. 570, 581 (1959)).  Congress intends for State privilege law to apply in federal cases only where the State law is self-operative, such as in a diversity case.  <u>See</u> Conf. Rep. No. 1597, 93d Cong., 2d Sess. (1974); Fed. R. Evid. 501.  The Court, therefore, concludes that the ROIA does not apply here, because federal rules of decision apply in FTCA cases.

      **IT IS ORDERED** that: (i) the Plaintiffs' First Motion to Compel Regarding Defendant's Answers and Responses to the Estate of Rose Sky Tolbert's First Set of Interrogatories and Requests for Production and Memorandum of Law, filed November 20, 2020 (Doc. 84), is granted in part and denied in part; and (ii) the Defendant United States of America must provide the Plaintiffs with a complete privilege log for documents it asserts are privileged under 25 U.S.C. § 1675.

 

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Lisa K. Curtis
Julia Gabrielle Coulloudon
Laura Callanan
Curtis & Co. Law Firm
Albuquerque, New Mexico

--and--

Brandon W. Vigil
Law Office of Brandon W. Vigil
Albuquerque, New Mexico

      *Attorneys for the Plaintiffs*

Fred Federici
   Acting United States Attorney
Elizabeth M. Martinez
Kimberly N. Bell
Christine Hyojin Lyman
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Defendant*